IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYLVIA DARENSBURG, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>METROPOLITAN TRANSPORTATION COMMISSION.,<br><br>    Defendant. | No. C-05-01597 EDL<br><br>**ORDER GRANTING WITH LEAVE TO AMEND DEFENDANT'S MOTION TO DISMISS** |

In this putative class action, Plaintiffs Sylvia Darensburg, Virginia Martinez and Vivian Hain are individuals of color who rely on public transportation provided by the Alameda-Contra Costa Transit District ("AC Transit"), which operates the Bay Area's largest bus-only system. Plaintiffs Amalgamated Transit Union 192 and Communities for a Better Environment are organizations with minority members who also rely on AC Transit. Plaintiffs allege that Defendant Metropolitan Transportation Commission ("MTC"), which allocates transit funding from various sources to each of the Bay Area's transit operators, including AC Transit, has engaged and continues to engage in funding practices that channel resources to projects and programs that disproportionately benefit the largely white ridership of Caltrain and BART at the expense of projects and programs that benefit AC Transit riders, who are overwhelmingly people of color. Plaintiffs allege that MTC discriminated against them in violation of their rights under the Equal Protection Clause, U.S. Const. amend. XIV, § 1, under Title VI of the Civil Rights Act of 1964, 42 U.S.C. section 2000d et seq., and under California Government Code section 11135. Plaintiffs seek injunctive and declaratory relief.

On June 10, 2005, MTC filed a motion to dismiss, arguing that: (1) Plaintiffs lack standing to bring

their claims; (2) Plaintiffs cannot proceed on a disparate impact theory under Title VI or equal protection; and (3) Plaintiffs cannot show that Defendant caused any denial of their rights under the equal protection clause.[1]  The Court held a hearing on MTC's motion on August 23, 2005.

**Background**

The relevant facts as contained in the complaint are as follows:  The individual Plaintiffs are people of color who rely on AC Transit buses to meet their transportation needs.  Compl. ¶¶ 11-13.  As a result of bus service cuts and fare increases, the individual Plaintiffs have suffered adverse consequences such as reduced employment opportunities, risk to personal safety due to walking long distances late at night, lower transit subsidies, longer commutes to necessary destinations, such as the workplace and the grocery store, inability to complete college courses and interference with children's education.  Id.  Plaintiff Communities for a Better Environment seeks to protect and enhance the environment and public health and has members of color who utilize AC Transit.  Compl. ¶¶ 14-16.  Plaintiff Amalgamated Transit Union 192 is a labor organization that engages in legislative, political, educational, cultural, social and welfare activities to further the welfare of its Bay Area membership.  Compl. ¶ 17.  MTC discriminates against the members of these organizations by providing them a lower transit subsidy than the ridership of Caltrain and BART enjoy, and denying them equal transportation benefits.  Id. ¶¶ 16-17.

MTC is the transportation planning, financing and coordinating agency for nine Bay Area counties. Compl. ¶¶ 18-19.  MTC, a local agency, receives millions of federal and state dollars annually and distributes them to Bay Area transit operators, including AC Transit.  Id. ¶ 20.

AC Transit riders are disproportionately people of color, while the passengers of Caltrain and BART are disproportionately white.  Compl. ¶¶ 29-33.  Sixty-one percent of AC Transit riders, as compared to only 14% of Caltrain riders and 22% of BART riders, rely entirely on public transit for their transportation needs.  Id. ¶ 34.

---

[1] MTC requested judicial notice of eighteen exhibits, none of which are referenced in the complaint. See McMillan Decl. Ex. A-O; McLain Decl. Ex. A; Duron Decl. Ex. A; Manoluis Decl. Ex. A.  Plaintiff vigorously opposed the request.  A court may take judicial notice of an adjudicative fact "not subject to reasonable dispute in that it is generally known within the territorial jurisdiction of the trial court or capable of accurate and ready determination by resort to sources whose accuracy can not reasonably be questioned."  Fed. R. Evid. 201.  To the extent that documents offered by MTC, such as annual reports, are judicially noticeable, the Court grants MTC's request, but only to provide context for this matter.

United States District Court
For the Northern District of California

MTC is responsible for planning, programming and allocating approximately $1 billion annually of federal, state and local funds to transit operators within its jurisdiction, including AC Transit, BART and Caltrain, and also monitors their budgets. Compl. ¶¶ 35, 37. In this role, MTC exercises significant influence over which transportation projects and programs are selected to receive funding from federal and state sources and the level at which the projects and programs are funded. Id. ¶ 39. MTC also acts as an advocate or sponsor for funding for specific transit projects that often cannot receive funding without MTC's support. Id. ¶ 36. MTC determines the amount of money that flows to each of these transit operators for new capital projects and existing programs, including operations and maintenance of these systems, and decides which of several permissible uses of the funds it distributes will be allowable ones. Id. ¶ 38. For example, MTC curtailed AC Transit's ability to use federal preventative maintenance funds to cover operating costs, which was an allowable use of those funds under federal law. Id.

The subsidy per passenger trip, calculated as the actual cost of a passenger's trip less the fare, is the most appropriate way to compare the relative public funding of public transit systems. Compl. ¶ 40. Because MTC controls the funding of the transit operators, it plays a determinative role in the amount of the subsidy per passenger trip. Id. For the years 1998 through 2003, the average subsidy per trip for AC Transit was one-fifth that of Caltrain passengers and less than half that of BART passengers. Id. ¶ 41.

In 2001, MTC failed to fund a project in Richmond, an area with a population that is 69% minority, even though it had designated that project as the most cost-effective in the long range Bay Area Regional Transportation Plan ("RTP"), and instead funded less cost-effective programs for BART and Caltrain. Compl. ¶¶ 42, 46. In 2004, MTC failed to allocate any funds from federal programs known as CMAQ and STP to AC Transit, even though it was eligible to receive some funds. Id. MTC pays little attention to public input regarding transportation planning from communities of color. Id. ¶ 44. MTC departs from transportation planning norms by not providing the greatest transportation benefits for the greatest number of people, instead funding cost-ineffective rail expansion projects that benefit BART and Caltrain riders at the expense of AC Transit passengers. Id. ¶ 45.

**Discussion**

    **1.**     **Legal Standard**

A motion to dismiss under Rule 12(b)(6) cannot be granted unless "it appears beyond doubt that

the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). In analyzing a motion to dismiss, the Court must accept as true all material allegations in the complaint, and construe them in the light most favorable to the nonmoving party. NL Industries, Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986).

**2.    Standing**

The "irreducible minimum" of standing consists of three elements:

> First, the plaintiff must have suffered an "injury in fact" -- an invasion of a legally protected interest which is (a) concrete and particularized, [citations omitted] and (b) 'actual or imminent,' not 'conjectural' or 'hypothetical,' [citations omitted]. Second, there must be a causal connection between the injury and the conduct complained of -- the injury has to be 'fairly . . . traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court.' [citations omitted]. Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). In deciding a motion to dismiss for lack of standing, the court must accept each material allegation in the complaint as true and construe the complaint in favor of the complainant. See Metropolitan Washington Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc., 501 U.S. 252, 264 (1991) (quoting Warth v. Seldin, 422 U.S. 490, 501 (1975)). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presume that general allegations embrace those specific facts that are necessary to support the claim.'" Lujan, 504 U.S. at 561 (quoting Lujan v. National Wildlife Federation, 497 U.S. 871, 889 (1990)).

MTC contends that the individual Plaintiffs lack Article III standing because: (1) they cannot show any injury in fact; (2) they cannot show that MTC caused their injuries; (3) they cannot show that the relief they request is likely to redress their alleged injuries; and (4) they have not alleged a sufficient causal connection to demonstrate a strong likelihood of future injury to support injunctive and declaratory relief. MTC alleges that the organizational Plaintiffs lack standing for these same reasons and also because they cannot show that the relief they request is germane to their organizational purposes. Plaintiffs, however, contend that they have alleged that MTC caused three different injuries that can be redressed by the relief Plaintiffs sought: (1) a stigmatic injury of unequal treatment; (2) an economic injury based on an inequitable subsidy per passenger trip; and (3) an indirect injury to Plaintiffs' quality of life.

**A.    Stigmatic injury**

4

Plaintiffs allege that MTC's funding practices, including its discriminatory funding criteria, inconsistent application of funding criteria and discriminatory lobbying efforts, subjected them to unequal treatment based on their race. See Compl. ¶¶ 32-33, 50. Stigmatic injuries may satisfy the "injury in fact" component of standing. See, e.g., Heckler v. Mathews, 465 U.S. 728, 739-40 (1984) (". . . discrimination itself, by stigmatizing members of the disfavored group as 'innately inferior' and therefore less worthy participants in the political community, [citation omitted], can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group."); Northeastern Florida Chapter of Associated General Contractors of Am. v. City of Jacksonville, FL, 508 U.S. 656, 666 (1993) ("The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit."). Unlike the usual kind of injury in fact, where plaintiffs show injury in fact based on stigma, they also simultaneously satisfy the other two requirements of causation and redressability, because the discrimination directly causes the stigma and its cessation by itself eliminates the stigma.

Courts have found standing based on stigmatic injuries in suits challenging overt, facially discriminatory classifications, such as the gender-based classification in a pension offset exception to receipt of social security benefits in Heckler and the race-based classification in a city ordinance providing preferential treatment in contracting to minority-owned businesses in Northeastern Florida. MTC's funding practices, by contrast, are facially neutral. Plaintiffs have provided no authority to support their argument that policies and practices like those of MTC can support a claim of stigmatic injury. Instead, they argue that the doctrine should be extended to the less overt but equally harmful disparate treatment that they allege. The rationale holding that the stigma arising from overtly discriminatory schemes is a sufficiently concrete, actual injury to confer standing, however, is that the very classification by itself is inherently degrading, so eliminating the classification will eliminate the stigma, even if the plaintiffs do not otherwise benefit. See Northeastern Florida, 508 U.S. at 667 (holding that to establish standing based on stigmatic injury, a plaintiff need only show the inability to compete on an "equal footing in its quest for a benefit" based on a discriminatory classification). For example, even if the discrimination is remedied by removing the favorable treatment to the other gender or race rather than extending it to the disadvantaged one, the stigma of discrimination is lifted. Here, by contrast, the alleged discrimination is not so immediately

5

apparent as to automatically confer a brand of inferiority upon people of color who use AC Transit; indeed, there are no allegations in the complaint that Plaintiffs were denied equal benefits based on a discriminatory classification. Unlike the stigma cases, disadvantaged AC Transit riders include whites as well as persons of color, and the alleged discrimination results from a facially neutral, complicated funding scheme, not an obviously demeaning classification. Accordingly, the Court is not persuaded that Plaintiffs have alleged the type of stigmatic injury that by itself is sufficient to confer standing.

### B. Economic injury

Plaintiffs allege that MTC's conduct subjected them to a direct economic injury in the form of smaller subsidies per passenger trip than riders of BART or Caltrain. Compl. ¶¶ 40-41. The subsidy closes the gap between the actual cost of a passenger's trip and the amount of the fare paid, and is calculated from data collected in the National Transit Database maintained by the Federal Transit Administration. Compl. ¶ 40.

Concrete economic injury is a sufficient basis for standing. See Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 189 (1970); see also Sierra Club v. Morton, 405 U.S. 727, 733 (1972). Here, however, Plaintiffs only allege that MTC's funding decisions lead to lower subsidies on AC Transit than on BART or Caltrain, which is an indirect economic injury at best, not an injury affecting their pocketbooks or property values. For example, Plaintiffs do not allege that they pay excessive fares on AC Transit because of lower subsidies. Plaintiffs argue that the lower subsidy is as much of a concrete injury as denial of a tax deduction rather than a tax refund, but the analogy is not persuasive. To establish economic injury, Plaintiff must show that the lower subsidy translates into personal economic harm such as excessive fares or reduced property values. See Neighborhood Action Coalition v. City of Canton, Ohio, 882 F.2d 1012, 1016-17 (6th Cir. 1989) (finding that personal injuries of low income individuals such as little or no police response to calls, the existence of a neighborhood business that sells alcohol to minors, deterioration of neighborhood and the presence of unsavory individuals around their homes, affected their property rights and supported standing). The current allegations do not suffice to show economic injury in fact.

### C. Quality of Life injury

The individual Plaintiffs have also alleged ongoing injury to their well being, including lost

employment opportunities, unsafe conditions and lengthy commute times. Compl. ¶¶ 11-13. Plaintiffs further allege that they have been discriminatorily denied improvements in AC Transit's services that would alleviate these harms. Compl. ¶¶ 42, 43, 46, 52. Plaintiffs allege that the bus services that they depend upon are less reliable and dirtier, and that waiting conditions are less safe, than the services afforded Caltrain and BART riders. Compl. ¶ 56.

Actual injury to the quality of life constitutes an injury in fact for purposes of standing. See Duke Power Co. v. Carolina Environmental Study Group, 438 U.S. 59, 73-74, n. 18 (1978) ("Certainly the environmental and aesthetic consequences of the thermal pollution of the two lakes in the vicinity of the disputed power plants is the type of harmful effect which has been deemed adequate in prior cases to satisfy the injury in fact standard. . . . We do not question that this type of injury may amount to an injury in fact sufficient to lay the basis for standing. Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society."); Harris v. Board of Supervisors, Los Angeles County, 366 F.3d 754, 762 (9th Cir. 2004) (threatened harm to chronically ill indigent patients' health from longer delays in medical treatment and increased pain due to planned cutbacks of county health services for the indigent was sufficient to establish injury in fact for standing purposes).

While Plaintiffs do not allege that their quality of life injuries detrimentally affect their health or property values, unlike in Duke Power, Harris or Neighborhood Action, they do allege other concrete injuries to their well being. Lengthy delays and lack of safety in transit to necessary destinations such as jobs, schools, grocery stores and medical appointments, injure urban residents at least as concretely as aesthetic and environmental harm to lakes injures suburban and rural dwellers. These injuries are sufficient to satisfy the first prong of the standing analysis.

### D. Causation and Redressability

Where, as here, plaintiffs ask for cessation of illegal conduct as relief, the issues of causation and redressability overlap to a significant degree. See Competitive Enterprise Institute v. National Highway Traffic Safety Administration, 901 F.2d 107, 113 (D.C. Cir.1990). MTC argues that Plaintiffs cannot establish causation and redressability because these elements turn on the independent decisions of a third party, AC Transit, that is not before the Court. See Lujan, 504 U.S. at 562 ("When, however, as in this case, a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of

regulation) of *someone else*, much more [proof of causation and redressability] is needed.") (emphasis added). The Lujan Court stated:

> In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction -- and perhaps on the response of others as well. The existence of one or more of the essential elements of standing 'depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict,' [citations omitted]; and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such a manner as to produce causation and permit redressability of injury. [citation omitted]. Thus, *when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish.* [citation omitted].

Lujan, 504 U.S. at 562 (emphasis added) (quoting ASARCO, Inc. v. Kadish, 490 U.S. 605, 615 (1989); Simon v. Eastern Ky. Welfare Rights Organization, 426 U.S. 26, 41-42 (1976); Warth v. Seldin, 422 U.S. 490, 505 (1975); Allen v. Wright, 468 U.S. 737, 758 (1984)).

The causation prong of the standing analysis is satisfied if the alleged injury is fairly traceable to the purportedly illegal conduct. See Lujan, 504 U.S. at 560-61 (quoting Simon, 426 U.S. at 41-42). Here, because causation turns on the decisions of a third party, AC Transit, in response to MTC's actions, Plaintiffs must show that MTC's actions have a determinative or coercive effect on AC Transit's funding decisions to Plaintiffs' disadvantage. See Bennett v. Spear, 520 U.S. 154, 168 (2000) ("This wrongly equates injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation. While, as we have said, it does not suffice if the injury complained of is '"the[] result [of] the independent action of some third party not before the court"' [citations omitted], that does not exclude injury produced by determinative or coercive effect upon the action of someone else."). Thus, MTC's actions must at a minimum constitute a "substantial factor motivating" AC Transit's decision. See Tozzi v. U.S. Department of Health and Human Servs, 271 F.3d 301 (D.C. Cir. 2002) ("Where, as here, the alleged injury flows not directly from the challenged agency action, but rather from independent actions of third parties, we have required only a showing that 'the agency action is at least a substantial factor motivating the third parties' actions.'[citation omitted]").

The causation allegations, while approaching this showing, are not sufficient. The complaint does state generally, for example, that: "Defendant MTC's funding practices deny equal opportunities and benefits to Plaintiffs and Plaintiff Class Members. For example, due to defendant's funding practices,

8

Plaintiffs and Plaintiff Class Members received a quality and quantity of service that is inferior to that received by Caltrain and BART riders." Compl. ¶ 54. Plaintiffs also allege that MTC curtailed AC Transit's ability to make flexible use of preventative maintenance funds. Id. ¶ 38. Finally, the complaint alleges that MTC failed to fund a highly cost-effective bus project in the Richmond area of Contra Costa County and instead funded less cost-effective rail projects for Caltrain and BART. Id. ¶ 42. However, the complaint does not allege, for example, that MTC's revocation of the flexible use of preventative maintenance funds is a substantial factor in inferior AC Transit services, or that AC Transit did not carry out the Richmond project due substantially to MTC's funding decisions.

Similarly, Plaintiffs' allegations of redressability are insufficient. To survive a motion to dismiss on the issue of redressability, a plaintiff "must allege facts from which it reasonably could be inferred that, absent the [challenged policy], there is a substantial probability that . . . if the court affords the relief requested, the asserted [injury] will be removed." Warth v. Seldin, 422 U.S. 490, 504 (1975); see also Duke Power Co. v. Carolina Environmental Study Group, 438 U.S. 59, 74, n. 20 (1978) ("'substantial likelihood' that the relief requested will redress the injury claimed"). A plaintiff lacks standing "where it is purely speculative that a requested change in government policy will alter the behavior of regulated third parties that are the direct cause of plaintiff's injuries." National Wrestling Coaches Ass'n v. Department of Education, 366 F.3d 930, 938 (D.C. Cir. 2004) ("Because necessary elements of causation and redressability hinge on the independent choices of the regulated third party, 'it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such a manner as to produce causation and permit redressability of injury.'") (quoting Lujan, 504 U.S. at 562).

Here, the relief that Plaintiffs seek is an order enjoining Defendant from "making any funding decision that has an unjustified disproportionately adverse impact on AC Transit riders of color, including decisions that cause an inequitable subsidy per passenger trip and/or inequitable quantity and quality of service for AC Transit passengers as compared to Caltrain or BART passengers," and "supporting the funding of or funding any improvement or expansion in service that detracts from the equitable funding of services that benefit AC Transit riders." Compl. Prayer ¶¶ 5-6. Yet even if MTC were ordered to do so, MTC argues that Plaintiffs could remain subject to discriminatory treatment because MTC only controls a portion of AC Transit's budget and AC Transit has the final say on how it spends funds received from

9

MTC as well as other sources. It is insufficiently clear whether a court order aimed at MTC would have remedied Plaintiffs' quality of life injury because there are insufficient allegations that MTC determines in significant part the extent to which AC Transit funds the services that Plaintiffs seek, rather than bus services primarily benefitting other residents of Alameda and Contra Costa counties. Significantly, AC Transit also operates a transbay commuter service to San Francisco, which the complaint does not allege is of particular utility to Plaintiffs, as opposed to largely white, affluent commuters. The Court is not persuaded by Plaintiffs' argument that any improvement in AC Transit's transit network, even an improvement in commuter service to San Francisco's financial district, would redress Plaintiffs' injuries. This argument is fundamentally inconsistent with Plaintiffs' claims; under this logic, Plaintiffs would just as readily benefit from increased funds to BART.

Plaintiffs' complaint alleges generally that if MTC refrained from its discriminatory funding practices, "it *could* instead, but has repeatedly declined to, support and fund projects and programs that improve transit for the transit dependent and inner city/urban dwellers . . . . MTC *could* also support and fund projects and programs that would provide transit riders in low-income communities of color with bus shelters, greater security, night routes, seating during peak and non-peak hours and greater access to doctors and hospitals." Compl. ¶ 43 (emphasis added). Significantly, the complaint does not allege that MTC would likely do so.

Plaintiffs also allege that MTC failed to fund AC Transit's bus project in the Richmond area, even though MTC ranked it the most cost-effective project in the 2001 Regional Transportation Plan, instead funding two cost-ineffective projects for Caltrain and BART. Compl. ¶ 42. However, the complaint does not allege that the project would likely be realized if Plaintiffs obtain the ruling that they seek.

Similarly, Plaintiffs allege that MTC "monitors the budgets of the transit operators within its jurisdiction" and "determines the amount of money that flows to each of these transit operators for new capital projects and existing programs," (Compl. ¶¶ 37-39), but do not allege that MTC's funding practices have a determinative effect on how AC Transit actually allocates its funds among competing uses. As noted, Plaintiffs also allege that "[MTC] is responsible for the decision to curtail AC Transit's ability to make flexible use of [certain] federal 'formula' funds," (Compl. ¶ 38), but do not allege that AC Transit previously used those federal funds flexibly to benefit Plaintiffs, that the curtailment harmed services to

10

Plaintiffs, and that the restoration of flexibility would improve the services on which they depend.

MTC points to a series of cases in which the Supreme Court held that the plaintiffs lacked standing because redressability was too speculative. See <u>Allen</u>, 468 U.S. at 758 (holding that the plaintiffs, parents of black children who challenged IRS tax policies toward racially discriminatory schools, lacked standing because it was "entirely speculative . . . whether withdrawal of a tax exemption from any particular school would lead the school to change its policies."); <u>Simon</u>, 426 U.S. at 43 (holding that the plaintiffs, organizations that challenged an IRS policy allowing favorable tax treatment to nonprofit hospitals that offered indigents only emergency room services, lacked standing, reasoning that the plaintiffs' allegations only amounted to speculation that abrogation of the policy would result in the availability of free medical services to the plaintiffs); <u>Warth</u>, 422 U.S. at 490 (holding that the plaintiffs, low income individuals and organizations representing them who challenged a zoning ordinance as exclusionary and discriminatory, lacked standing because the "remote possibility, unsubstantiated by allegations of fact that their situation . . . might improve were the court to afford relief," did not establish redressability for purposes of a motion to dismiss, rather, their inability to buy or rent in the community more likely stemmed from the economics of the housing market and their financial situation rather than illegal conduct). The issue of redressability here, however, does not appear to be as fundamentally speculative as in these cases, where fundamental market economic forces or deeply entrenched opposition to integrated schools appeared as or more likely to motivate the challenged conduct as the government policies that the plaintiffs sought to enjoin. Here, by contrast, Plaintiffs' argument that more money flowing to AC Transit is likely to benefit its inner city patrons is plausible.

Even so, Plaintiffs need to amend their complaint to allege that MTC's discriminatory funding is a substantial motivating factor in the inferior quality of AC Transit's services to transit-dependent inner-city residents and to show a substantial probability that the relief they seek will remedy the injury. In addition, if Plaintiffs are able to amend to show cognizable economic injury, similar allegations of causation and redressability are necessary.

**E.     Organizational Plaintiffs**

An organization has standing when: (1) its members would otherwise have standing to sue in their own right; (2) the interests that it seeks to protect are germane to the organization's purpose and (3) neither

the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. See Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 343 (1977); see also United Food and Commercial Workers Union v. Brown Group, 517 U.S. 544, 557 (1996) (finding that only the third prong of the Hunt test is prudential, not constitutional, in nature: ("[T]he third prong of the associational standing test is best seen as focusing on these matters of administrative convenience and efficiency, not on elements of a case or controversy within the meaning of the Constitution.")).

With respect to the first prong, the same issues identified above with respect to the individual Plaintiffs regarding causation and redressability affect the standing of the organizational Plaintiffs' members. The third prong is satisfied because the complaint seeks declaratory and prospective relief, rather than monetary damages, so the organizations' members need not participate in the litigation. See Alaska Fish & Wildlife Fed'n & Outdoor Council v. Dunkle, 829, F.2d 933, 938 (9th Cir. 1987).

However, MTC challenges the organizations' standing under the second prong, the germaneness of the interests to the organizations' purposes. Plaintiff Communities for a Better Environment is an "environmental health and justice non-profit organization that seeks to protect and enhance the environment and public health." Compl. ¶ 14. Plaintiff CBE alleges that it has fought for cleaner air in the Bay Area for twenty years and brought a successful suit in 1989 against MTC to enforce national standards for ozone and carbon monoxide in order to improve air quality. Id. Plaintiff CBE also alleges that it later brought another lawsuit against MTC to compel it to implement a transportation control measure that sought to ease air pollution by increasing public transportation ridership. Compl. ¶ 15. Plaintiff CBE alleges that it has members who are people of color who "utilize AC Transit to serve their transportation needs," and that "Defendant discriminates against CBE's people of color members by providing them with lower transit subsidies than white Caltrain and BART riders and by denying them equal transportation benefits." Compl. ¶ 16. CBE alleges that "non-discriminatory funding would necessarily include actions to improve public AC Transit service, which would have the effect of reducing vehicle emissions." Compl. ¶ 16. The connection between the interests CBE seeks to protect in this case and its purpose may perhaps prove to be too tenuous when put to the test of evidence, such as proof that the members deprived of adequate bus service drive polluting cars rather than walk, thereby increasing the harm to the environment. But the allegations, which must be presumed true, are sufficient to survive a motion to dismiss.

12

Plaintiff Amalgamated Transit Union is a labor organization that represents employees who live and work in the Bay Area. Compl. ¶ 17. The purposes of the Union include: "To engage in such legislative, political, educational, cultural, social and welfare activities as will further the interests and welfare of the membership of the organization." Id. The Union alleges that it has members who are people of color who "use AC Transit to serve their transportation needs." Id. The Union also alleges that "Defendant discriminates against ATU 192's people of color members by providing them with lower transit subsidies than white Caltrain and BART riders and by denying them equal transportation benefits." Compl. ¶ 17. As noted above, the complaint has sufficiently alleged harm to well being from unsafe, infrequent overcrowded busses and bus shelters. The Union, however, does not make any specific allegation tying its interest in furthering the welfare and interests of its membership to the injuries sought to be redressed in this case. With such a broad statement of interest, arguably almost anything could be germane to the Union's interest. However, at this early stage of litigation, the Union has made sufficient allegations to show that the interests sought to be protected are germane to its purpose.

### F.   Entitlement to injunctive or declaratory relief

MTC alleges that Plaintiffs do not have standing to seek injunctive relief. To be entitled to injunctive relief, Plaintiffs must allege that they are realistically threatened by a repetition of the alleged violation. See Armstrong v. Davis, 275 F.3d 849, 860-61 (9th Cir. 2001); Fortyune v. American Multi-Cinema, 364 F.3d 1075, 1081 (9th Cir. 2004) (In the context of injunctive relief, [the plaintiff] must additionally demonstrate 'a sufficient likelihood that he will again be wronged in a similar way.'") (quoting City of Los Angeles v. Lyons, 461 U.S. 95, 111 (1983)). Past exposure to illegal conduct alone is insufficient to establish standing for purposes of obtaining injunctive relief. See Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 109 (1998). But past wrongs are probative of whether there is a real and immediate threat of repeated injury. See Fortyune v. American Multi-Cinema, 364 F.3d 1075, 1081 (9th Cir. 2004).

MTC also argues that Plaintiffs' declaratory relief claim is not ripe. See Texas v. United States, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated or indeed may not occur at all."). Generally, courts should consider declaratory relief only: "'(1) when the judgment will serve a useful purpose in clarifying and settling the legal

relations in issue; and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" McGraw-Edison Co. v. Preformed Line Prods. Co., 362 F.2d 339, 342 (9th Cir. 1966) (quoting Borchard, Declaratory Judgments 229 (2d ed. 1941)).

Plaintiffs have met their burden of alleging a threat of repetition of the alleged violation for purposes of obtaining injunctive relief by alleging that they have been injured in the past by MTC's conduct and that their injuries arising from MTC's discriminatory policies are ongoing. Compl. ¶¶ 11-13, 16-17, 53-56, 60, 63, 66. Similarly, Plaintiffs' allegations of ongoing injuries are sufficient at least at this early stage to show the ripeness of Plaintiffs' claim for declaratory relief. Id. Therefore, Plaintiffs' allegations supporting injunctive and declaratory relief are sufficient to survive this motion.

### 3. Title VI/Equal Protection

MTC argues that Plaintiffs cannot sustain their claims brought under Title VI and the Equal Protection clause. Only intentional discrimination is actionable under Title VI. See 42 U.S.C. § 2000d; Save Our Valley v. Sound Transit, 335 F.3d 932, 943-44 (9th Cir. 2003) (citing Alexander v. Sandoval, 532 U.S. 275, 293 (2001)). Similarly, claims based solely on discriminatory impact are not actionable under the Equal Protection clause. See Washington v. Davis, 426 U.S. 229, 239 (1976) ("But our cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional *solely* because it has a racially disproportionate impact.") (emphasis in original); see also Larry P. v. Riles, 793 F.2d 969, 984 (9th Cir. 1984) ("We cannot, however, sustain the finding of a violation by [Defendant] of the equal protection clause . . . on the theory that the pervasiveness of discriminatory effect can, without more, be equated with the discriminatory intent required by *Washington v. Davis*.").

Plaintiffs do not dispute that only intentional discrimination is actionable under their federal claims. See Opp'n at 24:6-8. The complaint contains allegations of purposeful discrimination sufficient to survive a motion to dismiss. See, e.g., Compl. ¶ 60.

//
//
//
//

**Conclusion**

Accordingly, MTC's motion to dismiss is granted with leave to amend. An amended complaint must be filed no later than October 11, 2005.

**IT IS SO ORDERED.**

Dated: September 19, 2005

*Elizabeth D. Laporte*
ELIZABETH D. LAPORTE
United States Magistrate Judge