IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYLVIA DARENSBURG, et al., | No. C-05-01597 EDL |
| Plaintiffs, | **ORDER DENYING DEFENDANT'S MOTION TO DISMISS** |
| v. | |
| METROPOLITAN TRANSPORTATION COMMISSION, | |
| Defendant. | |

In this putative class action, Plaintiffs Sylvia Darensburg, Virginia Martinez and Vivian Hain are individuals of color, and Plaintiffs Amalgamated Transit Union 192 and Communities for a Better Environment are organizations with minority members, all of whom ride buses of the Alameda-Contra Costa Transit District ("AC Transit"), which operates California's largest bus-only transit system. Plaintiffs allege that Defendant Metropolitan Transportation Commission intentionally engages in funding, decisions and advocacy that disproportionately benefit the mostly white ridership of Caltrain and BART rather than the overwhelmingly minority riders of AC Transit.

On September 19, 2005, the Court granted with leave to amend Defendant's first motion to dismiss. On October 11, 2005, Plaintiffs filed an amended complaint again seeking injunctive and declaratory relief for violations of their rights under the Equal Protection Clause, U.S. Const. amend. XIV, § 1, Title VI of the Civil Rights Act of 1964, 42 U.S.C. section 2000d et seq., and California Government Code section 11135. The amended complaint added a number of allegations relevant to causation and redressability designed to remedy the defects identified by the Court in its prior Order.

Nonetheless, Defendant filed a second motion to dismiss (docket number 45), arguing that Plaintiffs' amended complaint still failed to establish standing. The Court held a hearing on Defendant's motion on December 20, 2005.

In the September 19, 2005 Order, the Court concluded that Plaintiffs had not alleged the type of stigmatic injury that by itself was sufficient to confer standing, nor had they sufficiently alleged an economic injury or causation and redressability for their quality of life injury. Because Plaintiffs have augmented the standing allegations in the first amended complaint, rectifying the deficiencies in their original complaint, the Court denies Defendant's second motion to dismiss.

**JUDICIAL NOTICE**

Defendant requests judicial notice of thirteen exhibits and asks the Court to draw complicated inferences from those documents, without the benefit of any testimony to explain the meaning and significance of their contents. Declaration of Alix Bockelman, Ex A-M. Plaintiffs vigorously oppose the request. On a motion to dismiss, a court normally may not look beyond the complaint to matters of public record without converting the motion into one for summary judgment. See Mack v. South Bay Beer Distributors, 798 F.2d 1279, 1282 (9th Cir. 1986), overruled on other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104 (1991). There are two exceptions to this rule: (1) a court may take judicial notice of material which is either submitted as part of the complaint or necessarily relied upon by the complaint; and (2) a court may take judicial notice of matters of public record. See Lee v. City of Los Angeles, 250 F.3d 668, 688-89 (9th Cir. 2001).

The incorporation by reference doctrine permits the court to consider documents central to the allegations in the complaint and whose authenticity no party questions, but which are not attached to the complaint. Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir. 1994); see also Del Puerto Water Dist. v. U.S. Bureau of Reclamation, 271 F. Supp. 2d 1224, 1233, n. 4 (E.D. Cal. 2003) ("However, documents not physically attached to the complaint may nonetheless be considered by the court on a 12(b)(6) motion to dismiss if: (1) the complaint refers to such documents; (2) the document is 'central' to the plaintiff's claims; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion."). If the complaint mentions a document but does not reference it

1 extensively and the document is not integral to the complaint, however, this doctrine does not apply.
2 United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003).

3       Here, Defendant argues that three documents, the Regional Transit Expansion Plan
4 ("RTEP") (Ex. A), the Blueprint (Ex. L) and AC Transit's Strategic Vision Plan (Ex. J) are
5 referenced in the complaint and therefore should be judicially noticed. However, none of these
6 documents are referred to extensively in the complaint, nor are they central to Plaintiff's claims.
7 Therefore, the Court declines to take judicial notice of these documents.

8       In addition, Defendant asks the Court to take judicial notice of the contents of certain
9 documents attached to the Bockelman declaration as public records. Plaintiffs do not dispute the
10 authenticity of these documents and essentially do not dispute the facts contained in those
11 documents. To the extent that these documents are public records or records of a public entity that
12 contain undisputed facts, they are judicially noticeable. The Court, however, declines Defendant's
13 invitation to take judicial notice of the complex *inferences* that Defendant would have it draw from
14 the facts contained in those documents -- inferences which Plaintiffs vigorously dispute. Where
15 factual findings or the contents of the documents are in dispute, those matters of dispute are not
16 appropriate for judicial notice. Del Puerto, 271 F. Supp. 2d at 1234 (while it is proper to take
17 judicial notice of the existence of public or quasi-public documents, including water permit
18 applications, Senate Reports, State Water Resources Control Board Decisions, "to the extent their
19 contents are in dispute, such matters of controversy are not appropriate subjects for judicial
20 notice."); United States v. Southern California Edison Co., 300 F. Supp. 2d 964, 974 (E.D. Cal.
21 2004) ("While a court may take judicial notice of a judicial or administrative proceeding which has
22 'direct relation to the matters at issue,' a court can only take judicial notice of the *existence* of those
23 matters of public record (the existence of a motion or of the representations having been made
24 therein) but not the veracity of the arguments and disputed facts contained therein. [citation omitted]
25 Similarly, a court may take judicial notice of the existence of certain matters of public record. A
26 court may not take judicial notice of one party's opinion of how a matter of public record should be
27 interpreted.") (emphasis in original).

28       Further, as the Supreme Court explained: "[a]t the pleading stage, general factual allegations

3

of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss, we presume that 'general allegations embrace those specific facts that are necessary to supplement the claims.'" Lujan, 504 U.S. 561 (quoting Lujan v. National Wildlife Fed'n 497 U.S. 871, 889 (1990)). The type of inferences that Defendant seeks to draw from the budget documents do not overcome this presumption. For example, Defendant submitted public records indicating the amount of preventative maintenance funding that AC Transit received over a number of years and asks this Court to infer from those records that Plaintiff's allegation that "MTC is responsible for the decision to curtail AC Transit's ability to make flexible use of federal 'formula' funds to cover preventative maintenance costs" (Am. Compl. ¶ 43) is false. See Mack v. South Bay Beer Distributors, 798 F.2d 1279, 1282 (9th Cir. 1986) (holding that the court need not accept as true allegations in the complaint that contradict facts which may be judicially noticed by the court). The annual funding numbers by themselves are not sufficient at the pleading stage, however, to determine whether Defendant "curtailed" AC Transit's use of the funding, as Plaintiffs allege (Am. Compl. ¶ 43), because "curtailed" is a relative term (as opposed, for example, to "eliminated"). Furthermore, Plaintiffs' claims focus on comparative funding among public transportation operators competing for funds.

Similarly, Defendant asks the Court to conclude from its exhibits that, contrary to Plaintiffs' allegation that Defendant denied AC Transit's request for funding for a Richmond bus program (Am. Compl. ¶ 48), the judicially noticeable documents show that AC Transit did not request that funding and that the project was ultimately funded through another transportation operator. See, e.g., Bockelman Decl. Ex. A021, et seq. (showing projects for which funding was requested); Ex. H022-026 (showing WestCat's application for funding for a Richmond bus project). But the Court cannot conclusively determine from the exhibits alone, without some interpretative testimony from witnesses or experts, that AC Transit never requested funding for this project. Similarly, the Court cannot firmly resolve, from resort to the exhibits alone, Plaintiffs' argument that the Richmond bus project that was allegedly funded may be a different project than the one alleged in the amended complaint.

Accordingly, Defendant's request for judicial notice is granted, but only as to the existence

of the documents and the facts contained therein, not as to the (disputed) inferences that Defendant seeks to draw from them. For the same reasons and with the same restrictions, Plaintiffs' conditional request for judicial notice is also granted. Because the Court declines to draw disputed inferences from the documents, however, they neither support nor negate dismissal.

**DISCUSSION**

### A.   Legal Standard

A motion to dismiss under Rule 12(b)(6) cannot be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). In analyzing a motion to dismiss, review is limited to the complaint and all factual allegations are taken as true and construed in the light most favorable to the plaintiff. Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001) (quoting Cervantes v. City of San Diego, 5 F.3d 1273, 1274 (9th Cir. 1993); Epstein v. Washington Energy Co., 83 F.3d 1136, 1140 (9th Cir. 1996)). "Indeed, factual challenges to a plaintiff's complaint have no bearing on the legal sufficiency of the allegations under Rule 12(b)(6)." Lee 250 F.3d at 688 (holding that the district court erred in assuming the existence of facts that favor defendants based on evidence outside plaintiff's pleadings and in taking judicial notice of disputed factual matters).

### B.   Standing

The "irreducible minimum" of standing consists of three elements:

> First, the plaintiff must have suffered an "injury in fact" -- an invasion of a legally protected interest which is (a) concrete and particularized, [citations omitted] and (b) 'actual or imminent,' not 'conjectural' or 'hypothetical,' [citations omitted]. Second, there must be a causal connection between the injury and the conduct complained of -- the injury has to be 'fairly . . . traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court.' [citations omitted]. Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'

Lujan, 504 U.S. at 560. Here, Plaintiffs allege that Defendant caused three different injuries that can be redressed by the relief Plaintiffs sought: (1) a stigmatic injury; (2) an economic injury; and (3) an indirect injury to Plaintiffs' quality of life.

#### 1.   Stigmatic injury

Although stigmatic injuries may satisfy the "injury in fact" component of standing, the Court

5

determined in its September 19, 2005 Order that based on the allegations in the original complaint, "the alleged discrimination [was] not so immediately apparent as to automatically confer a brand of inferiority upon people of color who use AC Transit; indeed, there are no allegations in the complaint that Plaintiffs were denied equal benefits based on a discriminatory classification. Unlike the stigma cases, disadvantaged AC Transit riders include whites as well as persons of color, and the alleged discrimination results from a facially neutral, complicated funding scheme, not an obviously demeaning classification." Sept. 19, 2005 Order at 5:28-6:5; see also, e.g., Heckler v. Mathews, 465 U.S. 728, 739-40 (1984) (". . . discrimination itself, by perpetuating archaic and stereotypic notions or by stigmatizing members of the disfavored group as 'innately inferior' and therefore less worthy participants in the political community, [citation omitted], can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group."); Northeastern Florida Chapter of Associated General Contractors of Am. v. City of Jacksonville, FL, 508 U.S. 656, 666 (1993) ("The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.").

In so ruling, the Court did not hold that only facially discriminatory classifications can inflict a stigmatic injury sufficient to establish injury-in-fact for standing under Article III. Nor did the Court hold the converse -- that facially neutral government actions (laws, policies or practices) can never inflict such injury. Such a bright line distinction would ignore the more complex reality that invidious discrimination can take many forms. For example, facially neutral laws may be administered in a blatantly discriminatory fashion designed to harm disfavored racial minorities, such that the stigma is readily apparent. See, e.g., Yick Wo v. Hopkins, 118 U.S. 356, 373 (1886) (the seminal case of "as applied" discrimination against Chinese aliens, reasoning that "the facts shown establish an administration directed so exclusively against a particular class of persons as to warrant and require the conclusion that . . . they are applied by the public authorities . . . with a mind so unequal and oppressive as to amount to a practical denial by the state of the equal protection of the laws"); Keyes v. School Dist. No. 1 Denver, CO, 413 U.S. 189, 201 (1973) (even though school district was not overtly segregated by statute, school authorities who carried out a systematic

6

1 program of segregation, e.g., by manipulating school attendance zones, created an illegal dual
2 system). Rather, facially discriminatory classifications by their nature automatically brand the
3 disfavored class as inferior, whereas the impact of ostensibly neutral policies is a more factually
4 intensive inquiry. Facially neutral government policies and practices may -- or may not -- be
5 administered in such a plainly skewed way against a disfavored group as to inflict stigmatic injury
6 sufficient to confer standing. The Court in its prior order held only that Plaintiffs' showing of a
7 stigmatic injury in its original complaint was insufficient to withstand Defendant's motion to
8 dismiss.

9 In response to the Court's Order, Plaintiffs made further allegations regarding their stigmatic
10 injury. For example, Plaintiffs now allege that: "Defendant MTC systematically discriminates
11 against low-income people of color in the selection of transit projects, with an *explicit two-tiered*
12 *approach* to transit projects that benefit minority passengers and white passengers, fully funding the
13 latter, but leaving an unfunded shortfall of several billion for the former." Am. Compl. ¶ 45
14 (emphasis added). Plaintiffs further allege:

> Pursuant to Defendant MTC's pattern or practice of discriminatory funding, Defendant MTC has consistently channeled and continues to channel more money and support to projects and programs that benefit the disproportionately white riders of Caltrain and BART than to projects and programs that benefit the disproportionately minority riders of AC Transit. MTC intentionally engages in its policy, pattern, or practice of favoring projects and programs that benefit the disproportionately white riders of Caltrain and BART at the expense of projects and programs that benefit the disproportionately minority riders of AC Transit because of the race and national origin of Plaintiffs and Plaintiff Class members. Defendant MTC for instance fails to provide equal treatment to projects and programs for "transit dependent" riders and AC Transit riders, *treating these classifications of riders as code words for riders of color*.

22 Am. Compl. ¶ 63 (emphasis added). Plaintiffs also allege that: "Defendant's unequal treatment of
23 Plaintiffs and Plaintiff Class members on the basis of their race sends the message that, in the eyes
24 of the government, they are not equal participants in the community and are worth less than their
25 white counterparts on Caltrain and BART." Am. Compl. ¶ 68. In view of these additional
26 allegations, Plaintiffs have sufficiently alleged standing based on a stigmatic injury. Therefore, they
27 have also satisfied the other two requirements of causation and redressability "because the
28 discrimination directly causes the stigma and its cessation by itself eliminates the stigma." Sept. 19,

7

2005 Order at 5:12-13.

### 2. Economic injury

In its September 19, 2005 Order, the Court determined that Plaintiffs' allegations of an economic injury, which were based on allegations that Defendant's funding practices subjected them to smaller subsidies per passenger trip than riders of BART or Caltrain, were insufficient. The Court stated: "To establish economic injury, Plaintiff must show that the lower subsidy translates into personal economic harm such as excessive fares or reduced property values." Sept. 19, 2005 Order at 6:20-21 (citing Neighborhood Action Coalition v. City of Canton, Ohio, 882 F.2d 1012, 1016-17 (6th Cir. 1989) (finding that personal injuries of low income individuals such as little or no police response to calls, the existence of a neighborhood business that sells alcohol to minors, deterioration of neighborhood and the presence of unsavory individuals around their homes, affected their property rights and supported standing)).

In their amended complaint, Plaintiffs still contend that the lower subsidy per passenger trip is a cognizable economic injury caused by Defendant. Am. Compl. ¶ 46, 47, 64. Plaintiffs further allege, however, that: "The discriminatory funding, advocacy, and other decisionmaking practices of Defendant MTC have repeatedly forced AC Transit to increase the fares Plaintiffs and Plaintiff Class members pay for bus service," and that: "Plaintiffs and many members of the Plaintiff Class are non-discretionary transit riders with low incomes who have no alternative but to rely on AC Transit bus service" with the higher fares. Am. Compl. ¶ 49. Further, the complaint alleges that Defendant failed to fund a free student bus pass program, which would have benefitted Plaintiffs who have children. Am. Compl. ¶¶ 50, 57. Plaintiffs have now sufficiently alleged an economic injury for purposes of standing.

### 3. Causation

The Court determined in its September 19, 2005 Order that Plaintiffs' allegations regarding causation were insufficient to survive Defendant's motion to dismiss:

> The causation prong of the standing analysis is satisfied if the alleged injury is fairly traceable to the purportedly illegal conduct. See Lujan, 504 U.S. at 560-61 (quoting Simon, 426 U.S. at 41-42). Here, because causation turns on the decisions of a third party, AC Transit, in response to MTC's actions, Plaintiffs must show that MTC's actions have a determinative or coercive effect on AC Transit's funding decisions to Plaintiffs' disadvantage. See Bennett v. Spear, 520

> U.S. 154, 168 (2000) ("This wrongly equates injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation. While, as we have said, it does not suffice if the injury complained of is '"'the[] result [of] the independent action of some third party not before the court'"' [citations omitted], that does not exclude injury produced by determinative or coercive effect upon the action of someone else."). Thus, MTC's actions must at a minimum constitute a "substantial factor motivating" AC Transit's decision. See Tozzi v. U.S. Department of Health and Human Servs, 271 F.3d 301 (D.C. Cir. 2002) ("Where, as here, the alleged injury flows not directly from the challenged agency action, but rather from independent actions of third parties, we have required only a showing that 'the agency action is at least a substantial factor motivating the third parties' actions.'[citation omitted]").

Sept. 19, 2005 Order at 8:12-25. The Court noted that the original complaint did not allege, for example, that MTC's revocation of the flexible use of preventative maintenance funds was a substantial factor in inferior AC Transit services or that MTC's funding decisions precluded AC Transit from carrying out the Richmond project. Id. at 9:5-8.

In response to the Court's Order, Plaintiffs have supplemented their complaint with sufficient allegations of causation for purposes of standing. Plaintiffs now allege that Defendant's practices cause their economic injury in the form of increased fares. Am. Compl. ¶ 52 ("If Defendant MTC ceased its discriminatory funding, advocacy, and other decisionmaking practices, AC Transit would provide improved services and/or reduced fares that would directly benefit Plaintiffs and other minority riders of AC Transit's core, non-Transbay, service."); Am. Compl. ¶ 49 ("Because Defendant MTC has engaged, and continues to engage, in its discriminatory funding, advocacy, and other decisionmaking practices, AC Transit has repeatedly been unable to implement projects and programs that would have improved transit opportunities for Plaintiffs and Plaintiff Class members, and AC Transit has repeatedly been forced to reduce services that had previously been available to Plaintiffs and Plaintiff Class members, or to implement fare increases that injure Plaintiffs and Plaintiff Class members, or a combination of the two. The discriminatory funding, advocacy, and other decisionmaking practices of Defendant MTC have repeatedly forced AC Transit to increase the fares Plaintiffs and Plaintiff Class members pay for bus service.").

Further, Plaintiffs have augmented their allegations that Defendant's practices caused their quality of life injuries, such as reduction of service, which were adequately pled in both the original and the amended complaints. For example, with respect to preventative maintenance funds, Plaintiff

9

now alleges that:

> Defendant MTC is responsible for the decision to curtail AC Transit's ability to make flexible use of federal "formula" funds to cover preventive maintenance costs, an allowable use of those funds under federal law. Despite Defendant MTC's knowledge of the importance of having preventive maintenance funding available to sustain AC Transit service, Defendant MTC has recently adopted a policy which restricts the availability of such funding to two years out of the next twelve. This decision has the effect of injuring Plaintiffs Darensburg, Martinez, and Hain, and the members of Plaintiffs ATU 192 and CBE, and members of the Plaintiff Class by, *inter alia*, forcing AC Transit to divert scarce operating funds to use for preventive maintenance, thereby necessarily reducing the amount of operating funds available to AC Transit to provide service for Plaintiffs and members of the Plaintiff Class.

Am. Compl. ¶ 43. With respect to the Richmond bus project, the amended complaint states:

> Because MTC rejected the proposal for the AC Transit Richmond bus project, AC Transit was unable to obtain the funding that it needed in order to provide this service, thus depriving Plaintiffs and the members of the Plaintiff Class of the benefits of greater mobility that the project would have afforded them.

Am. Compl. ¶ 48. Plaintiffs also allege that by channeling disproportionate sums of available capital funds to rail projects, Defendant "limits the pool of funds available to improve bus service through new projects, . . . [and] also starves the existing bus system by draining the limited pool of funds available for allocation to bus programs for operations, maintenance, capital, and related purposes," which has the effect of "(1) reducing AC Transit's ability to implement planned service improvements that would benefit Plaintiffs and the members of the Plaintiff Class, and/or (2) forcing AC Transit to reduce services that had previously been available to Plaintiffs and members of the Plaintiff Class, or to implement fare increases that injure them, or a combination of the two." Am. Compl. ¶ 58. In addition, Plaintiffs allege that: ". . . to the extent that [AC Transit] does not receive the additional funds through Defendant MTC that are needed to implement its [Strategic Vision] plan, AC Transit will be unable to do so, and Plaintiffs and members of the Plaintiff Class will not receive these benefits. Indeed, AC Transit's financial projections indicate that, if it does not receive additional funds from Defendant MTC, the service that AC Transit is able to provide to Plaintiffs and members of the Plaintiff Class will decline further." Am. Compl. ¶ 53. Finally, Plaintiffs allege that Defendant's advocacy on behalf of legislation regarding the Jobs Access and Reverse Commute ("JARC") funding program "would, and in fact does, reduce funding available to AC Transit by

several million dollars a year." Am. Compl. ¶ 39.

### 4. Redressability

The Court determined in its September 19, 2005 Order that Plaintiffs had not sufficiently alleged redressability for purposes of alleging standing. Sept. 19, 2005 Order at 11:21-25 (". . . Plaintiffs need to amend their complaint to allege that MTC's discriminatory funding is a substantial motivating factor in the inferior quality of AC Transit's services to transit-dependent inner-city residents and to show a substantial probability that the relief they seek will remedy the injury. In addition, if Plaintiffs are able to amend to show cognizable economic injury, similar allegations of . . . redressability are necessary."); see also Warth v. Seldin, 422 U.S. 490, 504 (1975) (holding that to survive a motion to dismiss on the issue of redressability, a plaintiff "must allege facts from which it reasonably could be inferred that, absent the [challenged policy], there is a substantial probability that . . . if the court affords the relief requested, the asserted [injury] will be removed.").

In response to the Court's Order, Plaintiffs augmented the redressability allegations, which are now sufficient. For example, Plaintiffs allege that the amount of service that AC Transit provides to Plaintiffs "would grow if Defendant MTC provided AC Transit with additional operating funds and flexibility," and that "[i]f Defendant MTC ceased its discriminatory funding, advocacy, and other decisionmaking practices, AC Transit would provide improved services and/or reduced fares that would directly benefit Plaintiffs and other minority riders of AC Transit's core, non-Transbay, service." Am. Compl. ¶¶ 43, 52. In addition, Plaintiffs' allegations about AC Transit's Strategic Vision Plan link the cessation of Defendant's discriminatory practices with actions by AC Transit that would benefit Plaintiffs by implementing provisions in the Plan to provide "overall service improvements, including providing fast, frequent, reliable service on a wide variety of routes with attractive vehicles and an easy-to-use fare structure at affordable levels," such as enhancing service on bus routes serving the cities in which Plaintiffs live and starting a free bus pass program. Am. Compl. ¶ 50. Specifically, Plaintiffs allege that AC Transit "will implement its plan to the extent that it receives the additional funds through Defendant MTC that are needed to implement and operate the plan," but that "[c]onversely, to the extent that it does not receive the additional

11

funds through Defendant MTC that are needed to implement its plan, AC Transit will be unable to do so." Am. Compl. ¶ 53.

### C. Statute of Limitations

Defendant argues that Plaintiffs' claims, which were filed in April 2003, are barred by California's two-year statute of limitations (Cal. Civ. Proc. Code § 335.1) because "the only allegations occurring within the limitations period are those that are contradicted by judicially noticeable facts." Am. Mot. to Dismiss at 24. Plaintiffs, however, are alleging present and ongoing discrimination; the background and historical information alleged in the complaint can be relevant to the ongoing discrimination. See Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 266-67 (1977); see also Cholla Ready Mix, Inc. v. Civish, 382 F.3d 969, 975 (9th Cir. 2004) (acts occurring beyond the statute of limitations period may be relevant background material in support of a timely claim). Further, as stated above, the Court cannot conclude at the pleading stage that the properly noticed documents outside the pleadings contradict Plaintiffs' allegations.

**CONCLUSION**

Defendant's Motion to Dismiss is denied. A further case management conference is scheduled for January 24, 2006 at 10:00 a.m. The parties shall submit a joint case management conference statement no later than January 17, 2006.

**IT IS SO ORDERED.**

Dated: January 20, 2006

*Elizabeth D. Laporte*
ELIZABETH D. LAPORTE
United States Magistrate Judge

12