**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SYLVIA DARENSBURG, et al.,

       Plaintiffs,

 v.

METROPOLITAN TRANSPORTATION
COMMISSION,

       Defendant.

_____/

No. C-05-01597 EDL

**ORDER DENYING PLAINTIFFS'
MOTION FOR SUMMARY
ADJUDICATION; GRANTING IN PART
AND DENYING IN PART
DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT**

      In this class action case, Plaintiffs Sylvia Darensburg and Vivian Hain are individuals of color, and Plaintiffs Amalgamated Transit Union 192 and Communities for a Better Environment are organizations with minority members, who ride buses of the Alameda-Contra Costa Transit District ("AC Transit").  AC Transit operates California's largest bus-only transit system.  Defendant is the Metropolitan Planning Organization ("MPO") for all twenty-six independent transit operators in the nine-county Bay Area.  Plaintiffs contend that Defendant Metropolitan Transportation Commission intentionally engages in funding decisions and advocacy that disadvantage AC Transit's largely minority riders, in comparison to the whiter ridership of the other two "single mode" operators within its jurisdiction, Peninsula Corridor Joint Powers Board ("Caltrain"), which operates trains, and the Bay Area Rapid Transit District ("BART"), which operates heavy rail trains.

      On April 1, 2008, Plaintiffs filed a motion for summary adjudication on the issue of whether Plaintiffs have established a <u>prima facie</u> case of disparate impact discrimination arising out of

1 │ Defendant's practice of funding capital shortfalls, but failing to fund operating shortfalls, in the

2 │ Regional Transportation Plans ("RTP") for the years 1994, 1998, 2001 and 2005.  On April 22 and

3 │ 23, 2008, Defendants filed three summary judgment motions, one challenging the standing of

4 │ individual Plaintiffs, one challenging the standing of the organizational Plaintiffs, and one arguing

5 │ that Plaintiffs have not raised a material issue of fact as to intentional discrimination, nor as to a

6 │ prima facie case of disparate impact sufficient to shift the burden to Defendant to justify its funding

7 │ decisions.  These motions have been fully briefed and the Court heard oral argument on July 24,

8 │ 2008.  On August 1, 2008, the parties submitted post-hearing briefing as requested by the Court at

9 │ the hearing.  For the reasons stated at the hearing and in this Order, Plaintiffs' motion is denied, and

10 │ Defendants' motions are granted in part and denied in part.

11 │ **LEGAL STANDARD**

12 │       Summary judgment shall be granted if "the pleadings, depositions, answers to

13 │ interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

14 │ genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

15 │ law."  Fed. R. Civ. Pro. 56(c).  Material facts are those which may affect the outcome of the case.

16 │ See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is

17 │ genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving

18 │ party.  Id.  "To show the existence of a 'genuine' issue, . . . [a plaintiff] must produce at least some

19 │ significant probative evidence tending to support the complaint."  Smolen v. Deloitte, Haskins &

20 │ Sells, 921 F.2d 959, 963 (9th Cir. 1990) (quotations omitted).  The court must not weigh the

21 │ evidence or determine the truth of the matter, but only determine whether there is a genuine issue for

22 │ trial.  Balint v. Carson City, 180 F.3d 1047, 1054 (9th Cir. 1999).  The court must view the facts in

23 │ the light most favorable to the non-moving party and give it the benefit of all reasonable inferences

24 │ to be drawn from those facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587

25 │ (1986).

26 │       A party seeking summary judgment bears the initial burden of informing the court of the

27 │ basis for its motion, and of identifying those portions of the pleadings and discovery responses that

28 │ demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317,

**United States District Court**
For the Northern District of California

2

323 (1986).  Where the moving party will have the burden of proof at trial, it must affirmatively

demonstrate that no reasonable trier of fact could find other than for the moving party.  On an issue

where the nonmoving party will bear the burden of proof at trial, the moving party can prevail

merely by pointing out to the district court that there is an absence of evidence to support the

nonmoving party's case.  Id.  If the moving party meets its initial burden, the opposing party must

then set forth specific facts showing that there is some genuine issue for trial in order to defeat the

motion.  See Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 250.

**BACKGROUND**

A Regional Transportation Plan ("RTP") is a planning document that is updated every four

years to look ahead at the coming twenty-five-year period to help achieve a balanced transportation

scheme including, inter alia, mass transit, highways, bicycles, and pedestrians.  See Cal. Gov. Code.

§§ 65080, 66513, 29532.  The current RTP, adopted in 2005, is called Transportation 2030, and

Defendant is currently working on the 2009 RTP.  Defendant uses the RTP to allocate federal and

state funding to operating and capital categories.  Funding sources include Transportation

Development Act (TDA) funds, State Transportation Assistance (STA) funds, AB 1107 funds,

federal funds flowing from 49 U.S.C. §§ 5307 and 5309, Congestion Mitigation and Air Quality

("CMAQ") funds, Surface Transportation Program ("STP") funds, and State Transportation

Improvement Program ("STIP/RTIP") funds, as well as local funding sources such as bridge tolls.

Plaintiffs argue that the failure to cover operating shortfalls, while simultaneously covering capital

shortfalls, constitutes discrimination against minorities who use AC Transit.

Of the twenty-six transit operators under Defendant's purview, the seven largest in terms of

operating costs are (in order starting with the largest): (1) San Francisco Municipal Railway

("MUNI"); (2) BART; (3) Santa Clara Valley Transit Authority ("VTA"); (4) AC Transit; (5)

Golden Gate Highway and Transportation District ("GGT"); (6) San Mateo County Transit District

("SamTrans"); and (7) Caltrain.  See Declaration of Therese McMillan Decl. Ex. A at 8.  In 2006,

Defendant commissioned a region-wide survey of transit ridership that revealed that of the twenty-

one operators surveyed, nineteen had a minority ridership of 50% or more.  See McMillan Decl. Ex.

B at 3-95-98.  AC Transit had the highest percentage of minority ridership at 78%.  But five of the

United States District Court
For the Northern District of California

others in the group of seven largest operators had minority riderships of at least 50%: (1) MUNI (58%); (2) VTA (70%); (3) SamTrans (70%); (4) Caltrain (51%); and (5) BART (54%).  See id.  In absolute numbers, AC Transit carries fewer minority passengers than either BART or MUNI.  See McMillan Decl. ¶ 5.  Only one of the top seven, Golden Gate Transit, has mostly white riders, with a minority ridership of 38%.

Plaintiffs initially based their disparate impact analysis on a comparison of AC Transit to BART and Caltrain, on the rationale that these three entities are the only "single mode" transit operators.  In its opposition, Defendant mounted a strong attack on Plaintiffs' comparison of only three operators, all of whom operate a different mode of transit -- bus, heavy rail and train.  In their reply papers, Plaintiffs also compared the seven largest operators within the metropolitan planning area, which together account for 95% of all trips on public transit in the Bay Area.  In that group, the pattern is less clear.  Some of these seven operators with a high percentage of minority riders did not have projected operating shortfalls.  For example, Samtrans, with a minority ridership of 70%, had no operating shortfalls in the three most recent RTPs.  See Declaration of Richard Marcantonio Ex. 22.  At the same time, the only one of these operators with a mostly white ridership, Golden Gate Transit, had a projected  operating shortfall in three RTPs.  See id.

**DISCUSSION**

**1.     Defendant's Motion for Summary Judgment Regarding Standing of Individual Plaintiffs**

The "irreducible minimum" of standing consists of three elements:

First, the plaintiff must have suffered an "injury in fact" -- an invasion of a legally protected interest which is (a) concrete and particularized, [citations omitted] and (b) 'actual or imminent,' not 'conjectural' or 'hypothetical,' [citations omitted].  Second, there must be a causal connection between the injury and the conduct complained of -- the injury has to be 'fairly . . . traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court.' [citations omitted].  Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  In response to a summary judgment motion challenging standing, a plaintiff "can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' Fed. R. Civ. P. 56(e), which for purposes of the summary judgment motion will be taken to be true."  Id. at 561; see also Central Delta Water

4

**United States District Court**
For the Northern District of California

1  Agency v. United States, 306 F.3d 938, 947 (9th Cir. 2002) ("Thus, at the summary judgment stage

2  the plaintiffs need not establish that they in fact have standing, but only that there is a genuine

3  question of material fact as to the standing elements.").

4          "In a class action, standing is satisfied if at least one named plaintiff meets the

5  requirements." Bates v. UPS, 511 F.3d 974, 985 (9th Cir. 2007); see also Armstrong v. Davis, 275

6  F.3d 849, 860 (9th Cir. 2001) ("In order to assert claims on behalf of a class, a named plaintiff must

7  have personally sustained or be in immediate danger of sustaining 'some direct injury as a result of

8  the challenged statute or official conduct.'") (quoting O'Shea v. Littleton, 414 U.S. 488, 494

9  (1974)).  The Ninth Circuit has adopted the Lujan standard for determining standing.  See Bates, 511

10 F.3d at 985.  As stated in Bates:

11          The standing formulation for a plaintiff seeking prospective injunctive relief is simply
            one implementation of Lujan's requirements. The plaintiff must demonstrate that he
12          has suffered or is threatened with a "concrete and particularized" legal harm, Lujan,
            504 U.S. at 560, 112 S.Ct. 2130, coupled with "a sufficient likelihood that he will
13          again be wronged in a similar way." City of Los Angeles v. Lyons, 461 U.S. 95, 111,
            103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). As to the second inquiry, he must establish a
14          "real and immediate threat of repeated injury." O'Shea v. Littleton, 414 U.S. 488,
            496, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). "[P]ast wrongs do not in themselves
15          amount to [a] real and immediate threat of injury necessary to make out a case or
            controversy." Lyons, 461 U.S. at 103, 103 S.Ct. 1660. However, "past wrongs are
16          evidence bearing on whether there is a real and immediate threat of repeated injury."
            O'Shea, 414 U.S. at 496, 94 S.Ct. 669. In addition, the claimed threat of injury must
17          be likely to be redressed by the prospective injunctive relief. Graham v. Fed.
            Emergency Mgmt. Agency, 149 F.3d 997, 1003 (9th Cir.1998) (recognizing that
18          "[p]laintiffs need not demonstrate that there is a 'guarantee' that their injuries will be
            redressed by a favorable decision" but "only that a favorable decision is likely to
19          redress" their injuries) (quotation marks and citation omitted)

20
21 Bates, 511 F.3d at 985-86; see also Armstrong, 275 F.3d at 860 (stating that "[t]he harm suffered by

22 a plaintiff must constitute 'actual injury,' and that where a plaintiff seeks prospective injunctive

23 relief, "he must demonstrate 'that he is realistically threatened by a repetition of [the violation].'")

   (citations omitted).

24
       **A.      Injury in fact**

25
       Plaintiffs rely on three injuries in fact to support standing: (1) stigmatic; (2) quality of life;

26 and (3) economic.  The legal requirements for all three were extensively analyzed in the Court's

27 prior orders resolving Defendant's two motions to dismiss.

28
       **i.      Stigmatic injury**

5

Stigmatic injuries may satisfy the "injury in fact" component of standing.  See, e.g., Heckler v. Mathews, 465 U.S. 728, 739-40 (1984) (". . . discrimination itself, by stigmatizing members of the disfavored group as 'innately inferior' and therefore less worthy participants in the political community, [citation omitted], can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group.").  Where a plaintiff can show injury in fact based on stigma, that showing also simultaneously satisfies the other two standing requirements of causation and redressability, because the discrimination directly causes the stigma and its cessation by itself eliminates the stigma.  Even a facially neutral law may be administered in such a blatantly discriminatory fashion in order to harm disfavored racial minorities that the stigma is readily apparent.  See, e.g., Yick Wo v. Hopkins, 118 U.S. 356, 373 (1886) (the seminal case of "as applied" discrimination against Chinese aliens, reasoning that "the facts shown establish an administration directed so exclusively against a particular class of persons as to warrant and require the conclusion that . . . they are applied by the public authorities . . . with a mind so unequal and oppressive as to amount to a practical denial by the state of the equal protection of the laws"); Keyes v. School Dist. No. 1 Denver, CO, 413 U.S. 189, 201 (1973) (even though school district was not overtly segregated by statute,  school authorities who carried out a systematic program of segregation, e.g., by manipulating school attendance zones, created an illegal dual system).

Plaintiffs argue that Defendant's two-tiered approach to funding, which covers capital rehabilitation shortfalls in the RTPs, but not operating shortfalls, disproportionately harms minorities to such an extent that although the policy is facially neutral, it stigmatizes AC Transit's minority riders.  For example, Plaintiffs point to the Regional Transit Expansion Program ("RTEP") embodied in Resolution No. 3434, which focuses on rail expansion and includes over $13 billion in expansion projects, of which only 2.5% are earmarked for bus projects.  See Marcantanio Decl. Ex. 14 at 584-85; Declaration of Thomas Rubin Ex. 2 at ¶ 46.  By contrast, Plaintiffs point to the Lifeline program, which Defendant has described as "on equal footing" and an "equally important priority" as the RTEP (see Declaration of Richard Marcantanio in Opp'n to Defs.' Mot. for Summ. Adjudication and/or Summ. J. Ex. 71 at 35; Ex. 21 at MTCP 151097; Ex. 75 at MTCP 090646-47),

but which is not fully funded (see Marcantanio Decl. Ex. 8 at 027068 (funding of $216 million out of an estimated need of $2 billion)). Plaintiffs state that because of this alleged two-tiered system, they are made to feel that they are worth less than their white counterparts and that they are unequal participants in the community. See, e.g., Declaration of Vivian Hain ¶ 30 ("However, MTC's repeated under-funding of AC Transit makes me, and other minority riders of AC Transit, feel that we are not entitled to the same quality and quantity of service as BART's more white ridership."); Declaration of Margo Robinson ¶ 14 ("MTC's unequal funding policies and practices also send me a message that I and other riders of color are not as worthy of high-quality transit services as the relatively white ridership of other transit. MTC's unequal funding policies and practices also send me the message that MTC is more interested in serving white riders than minority riders."); Declaration of Jose Casias ¶ 22 ("MTC's funding policies and practices communicate the clear message that I and other minority riders are unequal community participants, that I and other minority riders are worth less than the disproportionately white riders who use other transit operators, and that MTC heeds the needs of white riders, while it ignores the needs of minority riders."); Declaration of Sylvia Darensburg ¶ 33 ("MTC's repeated under-funding of AC Transit makes me, and other minority riders of AC Transit, feel like unequal patrons and make us feel that we are not entitled to the same quality and quantity of service as BART's more white ridership.").

Plaintiffs, however, have not raised a triable issue of fact as to stigmatic injury. First, Defendant's funding decisions do not fall into nearly as stark a pattern, nor impact Plaintiffs nearly as directly, as in the cases finding stigmatic injury. For example, with respect to "committed" funding sources, Defendant has produced evidence that it does not have control over all the funding, and that when it does have control, it has allocated operations funding unequally *in favor of* AC Transit. For example, Transportation Development Act (TDA) funds are generated by an one-quarter-cent sales tax, apportioned by county. See Cal. Pub. Util. Code §§ 99200, et seq. According to Ms. McMillan, Defendant's Deputy Executive Director of Policy, Defendant has given much more TDA funding to AC Transit over the last six years than to BART and Caltrain combined. See McMillan Decl. ¶ 13. In addition, State Transportation Assistance (STA) funds are generated by a sales tax on fuel. See Cal. Pub. Util. Code § 99313.6, et seq. Defendant distributes half of the STA

United States District Court
For the Northern District of California

funds and has allocated AC Transit its share, including much more for operating costs than was allocated to BART and Caltrain combined.  See McMillan Decl. ¶ 11, ¶ 13.  Moreover, AB 1107 funds come from a half-cent sales tax originally imposed to build BART.  See Cal. Pub. Util. Code § 29142.2.  This law dedicates 75% of funds to BART, and then the remaining 25% may go to BART, MUNI or AC Transit.  Defendant allocates the 25% equally to AC Transit and MUNI, and none to BART, even though BART is eligible and MUNI's ridership greatly exceeds AC Transit's.  See McMillan Decl. ¶ 13.  Defendant has no control over the majority of local funding including permanent and temporary half-cent sales taxes by county and voter-approved property taxes.  See McMillan Decl. ¶ 14.  Defendant also has no control over the disposition of funds generated by transit fares.  See id.

Complicating the picture further, BART and Caltrain each have almost 50% minority riders, who benefit from the funding of these two entities; indeed, because BART's ridership is so much higher than AC Transit's, BART carries more minority riders in absolute numbers than AC Transit. (Of course, BART also carries an even larger absolute number of white riders).  Moreover, Golden Gate Transit, which serves a mostly white ridership (63%), has experienced repeated unfunded projected operating shortfalls, and has cut service substantially.  Thus, the funding policies and their implementation are not so blatantly discriminatory as to raise a triable issue of fact as to a stigmatic injury.

**ii.     Quality of life injury**

Actual injury to the quality of life constitutes an injury in fact for purposes of standing.  See Duke Power Co. v. Carolina Environmental Study Group, 438 U.S. 59, 73-74, n. 18 (1978) ("Certainly the environmental and aesthetic consequences of the thermal pollution of the two lakes in the vicinity of the disputed power plants is the type of harmful effect which has been deemed adequate in prior cases to satisfy the injury in fact standard. . . . We do not question that this type of injury may amount to an injury in fact sufficient to lay the basis for standing.  Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society.").  Plaintiffs argue that the evidence shows that their quality of life has suffered as a result of Defendant's practice of refusing to cover operating shortfalls because AC Transit reduces

**United States District Court**
For the Northern District of California

service causing reduced mobility, increased inconvenience and increased safety risks to Plaintiffs.
See, e.g., Darensburg Decl. ¶ 11 (long commute time due to limited buses prevented her from
holding certain jobs); id. ¶¶ 13, 15 (unreliability of service makes it difficult to get to work on
time);id. ¶ 15 (commute takes longer because of delays in service); id. ¶ 17 (cuts in service require
multiple bus transfers); Declaration of Octavio Hernandez ¶ 13 (buses needed by declarant are
normally not running on time causing him to be late to work and to receive warnings regarding
tardiness); id. ¶ 15 (must wait longer for buses); id. ¶ 18 (feels unsafe at night on  the bus); id. ¶ 19
(buses are dirty and not well ventilated); Casias Decl. ¶ 8 (wait for the bus in unsafe neighborhood
has increased); id. ¶ 10 (commute time to work is two or more hours); Robinson Decl. ¶¶ 9, 10
(service cuts made it more difficult for declarant to get to relief points as bus driver in time); Hain
Decl. ¶ 10 (noticed worsened public safety, overcrowding, reduction in service and longer waits); id.
¶ 16 (forced to drop college classes due to lack of reliable transportation); id. ¶ 18 (service cuts
caused her to be late for work); id. ¶ 19 (service cuts made it impossible to get to doctor's
appointments and so only attends when has a functioning car and can afford gas); id. ¶ 21 (difficult
to pick up children at school); id. ¶ 25 (stress caused by transportation issues, including exacerbated
back condition due to walking); Declaration of Virginia Martinez ¶ 13 (decreased frequency of buses
caused her to be late to work); id. ¶ 16 (buses do not run as frequently as she needs); id. ¶ 17 (had to
cut medical appointments short in order to pick up her children from school); id. ¶¶ 21-22 (children
had to walk long distances to and from school); Declaration of Conception Chavez ¶ 9 (services cuts
caused her to be late to church and appointments); id. ¶ 16 (sometimes she feels unsafe waiting so
long for the bus); Declaration of Rebecca Jones-White Decl. ¶ 7 (elimination of night service left her
unable to safely travel home at night).  Although Defendant argues that Plaintiffs should also
provide statistical data, Plaintiffs' own experiences sufficiently demonstrate their quality of life
injury.

       **iii.**    **Economic injury**

       Concrete economic injury can be a sufficient basis for this prong of standing.  See
Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 189 (1970); see
also Sierra Club v. Morton, 405 U.S. 727, 733 (1972).  Plaintiffs argue that they suffer economic

harm by paying higher fares, or being forced to use cars that they can ill afford.  See, e.g., Hain Decl. ¶ 13 (had to miss classes at school because could not afford bus fare and food); id. ¶ 25 (cannot afford to buy second bus fare for each member of family when routes are reconfigured); id. ¶ 27 (if fares are increased, will have to choose between transportation and household expenses and necessities); Darensburg Decl. ¶ 10 (increased fares have caused her to reduce other household costs or restrict her travel); id. ¶ 21 (at times she is unable to grocery shop until she has saved up enough money to buy a monthly pass); Robinson Decl. ¶ 11 (purchased a car because the busline near her home does not run conveniently to the places she commutes); id. ¶ 12 (car payments, insurance and maintenance cause an additional financial burden); Casias Decl. ¶ 12 (bus fares are difficult to avoid, often does not have the money to buy a monthly pass); Hernandez Decl. ¶ 17 (increased fares caused him to miss work because there was no money for the fare); Martinez Decl. ¶ 34 (fares have increased which cuts into grocery budget and causes marital problems); id. ¶ 35 (cost of monthly pass is prohibitive); Chavez Decl. ¶ 14 (cannot afford fare increases); Jones-White Decl. ¶ 8 (elimination of service caused her to take taxis, which are more expensive).  Plaintiffs have met their burden of demonstrating an economic injury for purposes of summary judgment.

**B.     Causation**

The causation prong of the standing analysis is satisfied if the alleged injury is fairly traceable to the purportedly illegal conduct.  See Lujan, 504 U.S. at 560-61 (quoting Simon, 426 U.S. at 41-42).  Defendant argues that Plaintiffs cannot establish causation because AC Transit, which is not a party to this case, makes the final decisions that directly affect Plaintiffs.  See Lujan, 504 U.S. at 562 ("When, however, as in this case, a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more [proof of causation] is needed.") (emphasis added).  The Lujan Court stated:

> In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction -- and perhaps on the response of others as well.  The existence of one or more of the essential elements of standing 'depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict,' [citation omitted]; and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such a manner as to produce causation and permit redressability of injury. [citation omitted].  Thus, *when the plaintiff is not*

10

*himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish.* [citation omitted]

<u>Lujan</u>, 504 U.S. at 562 (emphasis added).

Here, because causation turns on the decisions of a third party in response to Defendant's actions, Plaintiffs must show that Defendant's actions have a determinative or coercive effect on AC Transit's funding decisions to Plaintiffs' disadvantage.  <u>See</u> <u>Bennett v. Spear</u>, 520 U.S. 154, 168 (2000) ("While, as we have said, it does not suffice if the injury complained of is ""the[] result [of] the independent action of some third party not before the court"" [citations omitted], that does not exclude injury produced by determinative or coercive effect upon the action of someone else.").  At a minimum, Defendant's actions must constitute a "substantial factor motivating" AC Transit's decision.  <u>See</u> <u>Tozzi v. U.S. Department of Health and Human Servs</u>, 271 F.3d 301, 308 (D.C. Cir. 2002) ("Where, as here, the alleged injury flows not directly from the challenged agency action, but rather from independent actions of third parties, we have required only a showing that 'the agency action is at least a substantial factor motivating the third parties' actions.'[citation omitted]").

Plaintiffs argue that causation is established because Defendant itself stated in 1994 that the failure to fund operating shortfalls would force AC Transit to cut service and raise fares.  <u>See</u> Marcantonio Opp. Decl. Ex. 54 at 60 (1994 RTP in which Defendant states "service reductions are assumed to account for significant shortfalls."); <u>id.</u> at 63 (the then-current recession caused shortfall in operating funds and has required a projected 5% reduction in service from planned service levels for AC Transit and Golden Gate Transit).  Plaintiffs also rely on their expert's opinion that the standard response to a projected shortfall is an immediate reduction in service, and that the unfunded shortfalls caused a 9.6% decline in service levels.  <u>See</u> Rubin Decl. ¶¶ 11, 23.

By contrast, Defendant presents evidence that the reductions in AC Transit's service in 2002-2003 were due not to long term projections, but to an unexpected short term downturn in the economy; in those years, sales tax revenue was lower than expected, which precipitated the service cuts.  <u>See</u> Skowbo Decl. Ex. D at 1-10.  Moreover, Defendant argues that the projected shortfalls are merely twenty-five year projections, which may never materialize and are for such a lengthy period that they have no immediate impact.  Plaintiffs counter with their experts' opinion that ". . . the

11

**United States District Court**
For the Northern District of California

existence and size of a present or forecasted operating shortfall is both an excellent indicator of whether an operator will be able to continue to provide its existing level of service, and a useful measure of the degree to which it will be forced to cut existing service."  Rubin Decl. Ex. 2 at ¶ 94 ("At the same time, the degree to which MTC covers operating and capital rehabilitation shortfalls in the RTP process measures the amount of assistance MTC provides to operators to enable them to continue to operate and maintain the existing system.").

In addition, Defendant points out that when AC Transit has experienced an actual operating shortfall, Defendant has allocated preventative maintenance funds to AC Transit to help with operating expenses. See, e.g., McMillan Decl. ¶ 21, Ex. I ($49 million in preventative maintenance funds to AC Transit in 200-01); ¶ 22, Ex. J at 5 ($10 million in preventative maintenance funds to AC Transit in 2002-03); ¶ 44, Ex. CC at 4 ($17 million in preventative maintenance funds to AC Transit for 2003-04); ¶ 20, Ex. H at 5 ($13.7 million in preventative maintenance funds to AC Transit for 2005-06).  Accordingly, there is a triable issue of fact as to causation.

## C.     Redressability

Plaintiffs "must show only that a favorable decision is likely to redress [their injuries], not that a favorable decision will inevitably redress [their injuries]."  Graham v. Fed. Emerg. Mgmt. Agency, 149 F.3d 997, 1003 (9th Cir. 1998) (quoting Beno v. Shalala, 30 F.3d 1057, 1065 (9th Cir.1994) (citing Lujan, 504 U.S. at 561, 112 S.Ct. 2130)).  However, a plaintiff's standing fails "where it is purely speculative that a requested change in government policy will alter the behavior of regulated third parties that are the direct cause of plaintiff's injuries."  National Wrestling Coaches Ass'n v. Department of Education, 366 F.3d 930, 938 (D.C. Cir. 2004) ("Because necessary elements of causation and redressability hinge on the independent choices of the regulated third party, 'it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such a manner as to produce causation and permit redressability of injury.'") (quoting Lujan, 504 U.S. at 562).  "[T]he Supreme Court has stated that plaintiffs lack standing primarily when the funding agency is not before the court, Lujan, 504 U.S. at 568-71, 112 S.Ct. 2130 (plurality opinion), or when redressability 'depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the

12

courts cannot presume either to control or predict.' <u>ASARCO, Inc. v. Kadish</u>, 490 U.S. 605, 615, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989) (plurality opinion)."  <u>Graham</u>, 149 F.3d at 1003.  In <u>Lujan</u>, the Court determined that standing was lacking under circumstances that Defendant argues are similar to this case:

> The most obvious problem in the present case is redressability. Since the agencies funding the projects were not parties to the case, the District Court could accord relief only against the Secretary: He could be ordered to revise his regulation to require consultation for foreign projects. But this would not remedy respondents' alleged injury unless the funding agencies were bound by the Secretary's regulation, which is very much an open question.

<u>Lujan</u>, 504 U.S. at 568.

Causation and redressability are essentially two sides of one coin.  <u>See</u> <u>Duke Power Co. v. Carolina Environmental Study Group, Inc.</u>, 438 U.S. 59, 74 ("The more difficult step in the standing inquiry is establishing that these injuries 'fairly can be traced to the challenged action of the defendant,' or put otherwise, that the exercise of the Court's remedial powers would redress the claimed injuries.") (internal citations omitted); <u>see also</u> <u>Gonzales v. Gorsuch</u>, 688 F.2d 1263, 1267 (9th Cir. 1982) ("There is a close relation between the requirement of power to redress a claimed injury and the requirement of a causal link between the injury asserted and the relief claimed."). Plaintiffs argue that their quality of life and economic injuries are redressable through the injunctive relief they seek because the relief would result in additional funding to AC Transit which would lead to increased service and no more fare increases.  <u>See</u> Pls.' Combined Reply and Opp'n Brief  re: Motions for Summ. J. and Summ. Adjudication at 64, n. 99 (citing Am. Compl. at Prayer for Relief ¶¶ 5-6) (Plaintiffs seek an order "to permanently enjoin Defendant MTC from making any funding decision that has an unjustified disproportionately adverse impact on AC Transit riders of color, including decisions that cause (a) AC Transit to experience an unfunded transit operating shortfall while not causing operating shortfalls that affect BART or Caltrain, or while funding capital shortfalls that disproportionately benefit BART or Caltrain, (b) an inequitable subsidy per passenger trip for AC Transit passengers as compared to Caltrain or BART passengers, and/or (c) an inequitable quantity and quality of service for AC Transit passengers as compared to Caltrain or BART passengers; to permanently enjoin Defendant MTC from supporting the funding of or funding any improvement or expansion in service that detracts from the equitable funding of services that

13

benefit AC Transit riders.").

Plaintiffs argue that if Defendant was required to give additional funding to AC Transit, AC Transit would be able to maintain service levels over time rather than cut service, and would implement service improvements such as the Strategic Vision Plan, which is a two-phase implementation of capital and service improvements over a ten-year period to address "local concerns, achieve significant ridership increases and enhance mobility in the service area." See Marcantonio Opp. Decl. Ex. 84 at 50.  Plaintiffs would benefit from improvements described in the Strategic Vision Plan.  See, e.g., Martinez Decl. ¶ 43 (would benefit from benches and covered bus stops, exclusive bus lanes and more frequent service); Darensburg Decl. ¶¶ 29-31 (would benefit from enhanced bus service and increased frequency of service, and newer low-floor vehicles); Hain Decl. ¶¶ 28-29 (same); Casias Decl. ¶¶ 16-20 (same).

Defendants respond that Plaintiffs' injuries are not redressable for a number of reasons, some of which were addressed above in the discussion of causation.  In particular, Defendant strongly disputes that it can shift a significant amount of funds away from capital expenses of other operators to AC Transit's operating expenses, thereby redressing its operating shortfalls, based on Defendant's contention, discussed below, that most of the funding sources under its control are dedicated by law to other uses.  Further, Defendant argues that even if it covered AC Transit's operating shortfalls in the RTPs, Plaintiffs have not shown a likelihood that AC Transit would implement the Strategic Vision Plan, would increase service frequency or would avoid fare increases.  Defendant also points to AC Transit's board policy 550, which guides the service plan for AC Transit, as mitigating the impact of cuts in service on Plaintiffs: "AC Transit will allocate service primarily on the basis of demand, provided that certain minimum service levels are provided.  Geographic equity is a consideration, but is not as important as providing more frequency when such service is warranted." Skowbo Decl. Ex. B at 2.  In line with this policy, AC Transit preserved the trunk lines that Plaintiffs mostly ride, while it cut less traveled routes in the hills where the ridership tends to be whiter.  On the other hand, Plaintiffs have undisputedly suffered from service cuts and far hikes, which seem likely to be alleviated by additional funds.  While Defendant points to recent evidence that AC Transit was primarily concerned about the rising costs of fuel and health insurance (see

Marcantonio Opp. Decl. Ex. 83), spending additional funds to meet these rising costs would help avoid further cuts in service or fare hikes.

**D. Conclusion**

Defendant's motion for summary judgment as to Plaintiffs' standing is granted as to the stigmatic injury, but is denied as to the quality of life and economic injury.  There is a triable issue of fact as to causation of these two injuries.

**2.     Defendant's Motion for Summary Judgment regarding Organizational Plaintiffs**

**A.     Standing**

Defendant also challenges the standing of the two organizational Plaintiffs in this case: Amalgamated Transit Union, Local 192 ("ATU 192") and Communities for a Better Environment ("CBE").  An organization has standing when: (1) its members would otherwise have standing to sue in their own right; (2) the interests that it seeks to protect are germane to the organization's purpose and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.  See Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 343 (1977); see also United Food and Commercial Workers Union v. Brown Group, 517 U.S. 544, 557 (1996) (finding that only the third prong of the Hunt test is prudential, not constitutional, in nature: ("[T]he third prong of the associational standing test is best seen as focusing on these matters of administrative convenience and efficiency, not on elements of a case or controversy within the meaning of the Constitution.").  For the same reasons as the individual Plaintiffs, there is a triable issue of fact as to the organizational Plaintiffs on the first prong of this test.  The third prong is satisfied because the Plaintiffs seek declaratory and prospective relief, rather than monetary damages, so the organizations' members need not participate in the litigation.  See Alaska Fish & Wildlife Fed'n & Outdoor Council v. Dunkle, 829, F.2d 933, 938 (9th Cir. 1987).

Defendant contends that the interests at stake in this lawsuit are not germane to the organizations' purpose.  ATU 192 represents transit employees, including bus, rail and ferry operators.  See Hoffman Decl. Ex. B.  ATU 192 advocates for its members primarily in the areas of wages, benefits and working conditions.  See Hoffman Decl. Ex. C at 38.  The Objects in ATU 192's Constitution include not only furthering the direct interests of members, but also seeking the

United States District Court
For the Northern District of California

improvement of social and economic conditions.  See Hoffman Decl. Ex. D at 5.  The by-laws include the objectives of promoting charitable activities and public relations consistent with interests of members.  See Hoffman Decl. Ex. A at 4.  Political action is a priority for ATU 192.  See Hoffman Decl. Ex. E.  ATU's legislative agendas reveal that they are interested in, inter alia, increasing funding for public transit, including to "allow certain federal transit funds to be used for operating assistance."  See Hoffman Decl. Ex. F, G.

CBE is a "social justice organization with a focus on environmental health and justice."  See Hoffman Decl. Ex. H.  It organizes in "working class communities of color because those communities suffer the most from environmental pollution and toxics."  See id.  "CBE works in urban communities in Northern and Southern California among low-income African Americans, Latinos and other nationalities who are bombarded by pollution from freeways, power plants, oil refineries, seaports, airports and chemical manufacturers."  See id.  The vision of CBE is to "protect the earth and human life for future generations."  See Hoffman Decl. Ex. I.  In addition to this case, CBE's current litigation includes protecting children from dirty diesel fumes, reducing emissions from steel plants, prohibiting cremetoria from operating in Richmond, stopping construction of new power plants, pursuing enforcement of the Clean Water Act, and reducing pollution from oil refineries.  See Hoffman Decl. Ex. L.

Defendant argues that seeking to promote racial equality in access to public transportation by forcing Defendant to allocate more funding to AC Transit and less to other transit operators is not germane to the organizational purposes of either organizational Plaintiff.  The germaneness test, however, is "undemanding."  Presidio Golf Club v. National Park Serv., 155 F.3d 1153, 1159 (9th Cir. 1998); see also Humane Soc'y of the United States v. Hodel, 840 F.2d 45, 58 (D.C.Cir.1988) (as amended) ("It remains only to note that in thus characterizing the germaneness requirement as mandating mere pertinence between litigation subject and organizational purpose, we join a number of other courts which ... have declared it undemanding.") (collecting cases).  The Hodel court concluded that germaneness "would seem to require only that an organization's litigation goals be pertinent to its special expertise and the grounds that bring its membership together."  Hodel, 840 F.2d at 56; accord Nat'l Lime Ass'n v. Envtl. Prot. Agency, 233 F.3d 625, 636-37 (D.C.Cir.2000).

United States District Court
For the Northern District of California

Both organizational Plaintiffs satisfy this requirement.  ATU 192 is a union representing individuals in the transportation industry in the Bay Area, and has among its goals, improving general social and economic conditions.  See Williams Decl. ¶ 5.  Ms. Williams, the president of ATU 192, states that currently most of the ATU 192 members are racial minorities.  See id. ¶ 3.  ATU 192 has advocated in furtherance of the interests of AC Transit riders as well as its own members in opposition to fare hikes and service cuts.  See id. ¶ 5.  Even if not all of ATU 192's members may benefit from this lawsuit, the organization still has standing:

> Although some Society members, preferring that refuges be closed to the public altogether, may not share this aesthetic goal, our decision in National Maritime Union of America v. Commander, Military Sealift Command, 824 F.2d 1228 (D.C.Cir.1987) forecloses this internal conflict as a basis for defeating associational standing. See id. at 1234 ("we think that the mere fact of conflicting interests among members of an association does not of itself defeat the association's standing to urge the interests of some members in litigation, even though success may harm the legal interests of some members").

Hodel, 840 F.2d at 60, n. 25.[1]

Similarly, the mission of CBE is to "achieve environmental health and justice by building grassroots power in and with communities of color and working-class communities."  See www.cbecal.org/about/mission.html.  The issues in this lawsuit, equality in transportation funding and quality of public transportation in low-income areas, are at least pertinent to that mission. Defendant's arguments to the contrary contemplate a showing well beyond the established low threshold for germaneness.

**B.    Prior settlement with CBE**

Defendant argues that it is entitled to summary judgment as to CBE on the ground that CBE has waived all claims related to the 2005 RTP, the only RTP within the statute of limitations, and therefore cannot challenge prior RTPs either.  In 2002, CBE sued Defendant and others over the adoption of the 2001 San Francisco Bay Area Ozone Attainment Plan for the 1-Hour National Ozone

---

[1]    Defendant's reliance on Local 186, International Brotherhood of Teamsters v. Brock, 812 F.2d 1235 (9th Cir.1987) is misplaced.  That case held that challenging a racketeering act disqualifying persons convicted of certain crimes from seeking employment in a labor organization in order to reinstate a convicted arsonist as a union official was not germane to the purposes of a labor union.  See id. at 1239. The court found that although the arsonist had suffered a cognizable injury, no other union members had.  Id. at 1238 (allegations that members were deprived of Fry's services and that other members could someday be similarly disqualified were "abstract hypotheticals").

17

1  Standard in San Francisco Superior Court, alleging that Defendant failed to implement a

2  Transportation Control Measure Plan ("TCM") that would achieve the required reduced emissions

3  from transportation sources to meet air quality standards.  See Declaration of Adam Hoffman Ex. V.

4  In March 2004, CBE entered into a settlement agreement resolving that lawsuit.  The agreement

5  required Defendant to, inter alia, prepare annual reports for five years detailing projects and

6  programs that are recipients of Defendant's discretionary funding decisions from certain funding

7  sources, including some funds at issue in this case.  See McMillan Decl. Ex. AA at 9.  In

8  consideration, CBE released related claims:

9       CBE and TRANSDEF, on behalf of themselves and their respective directors,
        officers, employees, agents, representatives, successors in interest or assigns, waive,
10      relinquish, and release any and all claims, rights, liabilities, demands, obligations,
        duties, promises, damages, actions and causes of action of any kind whatsoever,
11      whether known or unknown, arising under any provision of law to challenge
        judicially MTC's development, preparation and/or adoption of the 2005 RTP or its
12      EIR.

13  McMillan Decl. Ex. AA at 10-11.  The agreement also had a general release of all claims "with

14  respect to, pertaining to or arising from the facts of the lawsuit," and a waiver of California Civil

15  Code § 1542.  See id. at 11.  CBE, however, points to the paragraph after the release in the

16  settlement agreement in which CBE does not waive "any rights to contest in a court of law any

17  matters outside the scope of the Agreement."  McMillan Decl. Ex. AA at 11.

18       In this case, CBE alleges in the complaint that it was harmed through the use of the RTP by

19  failing to cover the operating shortfall of AC Transit in the 2005 RTP.  See Second Am. Compl. at 2,

20  12, 14, 16.  Defendant construes the settlement releases broadly, while CBE attempts to construe

21  them narrowly.  It appears that most, if not all, of CBE's claims are barred by this settlement

22  agreement.  However, the parties did not address all the permutations of this defense against CBE,

23  so the Court cannot definitively rule out any possibility that this plaintiff has the ability to pursue

24  some aspect of Plaintiffs' case.  At the summary judgment hearing, the Court ordered the parties to

25  meet and confer to determine whether they could reach agreement on this issue.  The Court awaits

26  the results.

27  **3.      Plaintiffs' Motion for Summary Adjudication and Defendant's Motion for Summary
            Judgment**

28

18

**United States District Court**
For the Northern District of California

Plaintiffs move for summary adjudication on a discrete issue: that they have established a prima facie case of disparate impact discrimination arising out of Defendant's consistent practice of failing to fund the operating shortfalls it identifies in the RTPs, while funding capital shortfalls, thereby shifting the burden to Defendant to justify its funding decisions.  In its cross-motion for summary judgment on the merits of all of Plaintiffs' claims, Defendant argues that summary judgment should be granted on the grounds that Plaintiffs have not raised a triable issue of fact either as to a prima facie case of disparate impact or as to intentional discrimination.

### A.        Private Right of Action to Enforce Government Code § 11135

Defendant raises the threshold issue of whether Plaintiffs can bring a private action under California Government Code section 11135, the statute on which they base their disparate impact claim.  Government Code section 11135 is a state analogue to Title VI, 42 U.S.C. § 2000d, et seq., which prohibits discrimination in federally-funded programs.  Section 11135(a) states:

> (a) No person in the State of California shall, on the basis of race, national origin, ethnic group identification, religion, age, sex, sexual orientation, color, or disability, be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state. Notwithstanding Section 11000, this section applies to the California State University.

See also 22 Cal. Code Regs. § 98101(i)(1) ( prohibition against "in carrying out any program or activity directly, or through contractual, licensing or other arrangements, on the basis of ethnic group identification, religion, age, sex, color, or a physical or mental disability: . . . (i) to utilize criteria or methods of administration that: (1) have the purpose or effect of subjecting a person to discrimination on the basis of ethnic group identification, religion, age, sex, color, or a physical or mental disability. . . ."). Without citing any specific authority on point, Defendant argues that because there is no private right of action to enforce disparate impact regulations under Title VI, there is similarly no private right of action under section 11135.  See Alexander v. Sandoval, 532 U.S. 275, 280-81 (2001) (holding that there is no private right of action to enforce disparate impact regulations promulgated under Title VI).

However, the California statute and the regulations which implement it differ in an essential way from Title VI.  Although violation of the state implementing regulation, California Code of

**United States District Court**
For the Northern District of California

Regulations section 98101(i)(1), may be addressed by mandatory remedial action by a state agency under section 98110, the statutory scheme itself expressly provides a private right of action: "This article and regulations adopted pursuant to this article may be enforced by a civil action for equitable relief." Cal. Gov't Code § 11139; see also Blumhorst v. Jewish Family Servs. of Los Angeles, 126 Cal.App.4th 993, 1002 (2005) (stating that: "the Legislature did create a private cause of action for civil rights discrimination by the amendments to section 11139. . . ."). Defendant has pointed to no federal analogue to section 11139, so the reasoning of Sandoval is not applicable to private enforcement of California's disparate impact regulations.

Moreover, Plaintiffs have established that Defendant is a recipient of state funds for purposes of Government Code section 11135. "[I]t is a discriminatory practice for a recipient, in carrying out any program or activity directly, or through . . . other arrangements . . . to utilize criteria or methods of administration that . . . have the purpose or effect of subjecting a person to discrimination on the basis of ethnic group identification." 22 Cal. Code. Regs. § 98101. "Program or activity" includes "any project, action or procedure undertaken directly by recipients of state support. . . ." 22 Cal. Code Regs. § 98010. Therefore, a recipient of state support may not discriminate in any of its activities. This conclusion is reinforced by the legislative history of § 11139, in which the Legislature stated its understanding that § 11135 extends to "entities undertaking programs or activities that are funded directly by the state, and entities that receive financial assistance from the state." See Marcantonio Opp. Decl. Ex. 82 at 6.

Further, Plaintiffs have shown that Defendant's funding and planning process constitutes a program or activity for purposes of section 11135. California regulations provide that a program or activity is state-supported if it receives state support either in whole or in part. See 22 Cal. Code Regs. § 98010. Defendant has not pointed to any requirement that the program or activity must be completely state funded, or that section 11135 reaches only the discriminatory allocation of *state* transportation funds. Although Defendant's activities do not fall squarely within the list of exemplary programs or activities in section 98010, those examples are expressly not exclusive. To the extent that Defendant's conduct comes within the definition of program or activity, it is acting with the "aid of state support" because the planning budget includes state funding.

**B.       Disparate impact**

Plaintiffs argue that they are entitled to summary adjudication that they have established a prima facie case of disparate impact discrimination.  A prima facie case of disparate impact discrimination requires proof of:

> '(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices.'

Gamble v. City of Escondido, 104 F.3d 300, 306 (9th Cir. 1997) (quoting Pfaff v. U.S. Dep't of Housing and Urban Development, 88 F.3d 739, 745 (9th Cir. 1996)) (construing the Fair Housing Act).

**i.       Facially neutral policy**

One of Defendant's most significant responsibilities is to prepare the region's RTP.  34 U.S.C. § 134(c)(1) ("To accomplish the objectives in subsection (a), metropolitan planning organizations designated under subsection (d), in cooperation with the State and public transportation operators, shall develop long-range transportation plans and transportation improvement programs for metropolitan planning areas of the State.").  The RTP must contain "[a] financial plan that demonstrates how the adopted transportation plan can be implemented, indicates resources from public and private sources that are reasonably expected to be made available to carry out the plan, and recommends any additional financing strategies for needed projects and programs. 23 U.S.C. § 134(i)(2)(C).  Congress requires RTPs to be fiscally constrained, in the sense that Defendant may not include in an RTP any project or program that costs more than can be funded out of reasonably anticipated revenues.  See Marcantonio Decl. Ex. 7 at MTCP062960-61; Ex. 43 at 46-47.  Further, the RTP must emphasize preservation of the existing transportation system.  See 23 U.S.C. § 134(h)(1)(H).

It is undisputed that Defendant follows a four-step funding procedure in the RTP.  At step one, Defendant "estimate[s] available revenues from all sources: Federal, state, regional, local."  See Marcantonio Decl. Ex. 4 at 143:24-25.  At step two, Defendant "assess[es] existing system needs of the system that is on the ground both in terms of . . . operating, maintaining and sustaining."  See id. at 144:9-13.  At step three, Defendant determines what funding sources are eligible for meeting the

operation and maintenance needs, "taking into account eligibility restrictions on those funds. . . ." See id. at 139:1-5. At step four, after applying all eligible funds to operations and maintenance of the existing system, Defendant applies any excess Track 1, or uncommitted, funding to prior committed projects or new projects in the long-range plan. See id. at 139:15-141:1.

Plaintiffs argue that pursuant to this facially neutral policy, Defendant discriminatorily failed to cover AC Transit's operating shortfalls in recent RTPs: $136.151 million in the 1998 RTP; $36.7 million in the 2001 RTP and $64.355 million in the 2005 RTP. See Marcantonio Decl. Ex. 22; see also Rubin Decl. Ex. 2 at ¶ 95-98 (opining that the shortfall in 2005 is actually more than $500 million). This funding protocol is neutral on its face, thereby satisfying the first prong of Plaintiffs' prima facie case.

### ii.   Adverse impact on AC Transit

Plaintiffs' original analysis of disparate impact based on comparing only three operators -- AC Transit, BART and Caltrain -- is fundamentally flawed. Plaintiffs argued that the comparison is apt because these three entities are all single mode operators that have operations in multiple counties and together they account for 35% of all Bay Area transit riders. See Marcantonio Decl. Ex. 20. The rationale is not persuasive, both because the three differ in important respects from each other, and because Plaintiffs would ignore Defendant's practice with respect to the other four transit operators who serve the majority of riders. While the three operators Plaintiffs selected for comparison are all single mode, each operate a quite different mode of transit, with quite distinct capital and operating needs. While BART's geographic area encompasses AC Transit's, it extends well beyond Alameda and Contra Costa County and relies on highly capital-intensive, partially underground, heavy rail. Caltrain also operates a completely different type of transportation, capital-intensive above ground trains, mostly in a different geographic area than AC Transit. See New York Urban League v. State of New York, 71 F.3d 1031, 1038 (2d Cir. 1991) (questioning whether two "fundamentally different" transportation systems, the subway and the commuter rail lines in New York City, could be adequately compared for purposes of disparate impact based on fare box recovery ratios because the ratios do not take into account differing costs in operating the systems, maintenance requirements, labor contracts, how they carry passengers, etc.). Also, as noted by

United States District Court
For the Northern District of California

Defendant, Caltrain only opened in 1992 and BART has added several lines to its service, including lines into minority areas, while AC Transit's service area has long remained the two counties of Alameda and Contra Costa, and transbay service to San Francisco.

At the same time, other operators that Plaintiffs excluded from their original comparison are more comparable to AC Transit in certain respects. For example, Golden Gate Transit operates a bus system, the same mode as AC Transit, as well as a ferry system that, similar to AC Transit's transbay buses, carries passengers across the bay into San Francisco.

In their reply brief, Plaintiffs set forth a more appropriate analysis of disparate impact based on a comparison of the top seven regional operators, which together account for approximately 95% of all public transit trips in the Bay Area. Defendant has not raised any persuasive argument that this comparison is invalid, as it includes the operators who account for almost all the transit trips in the Bay Area, while excluding only the very small operators who collectively account for just 5% of trips.

A statistical measurement of impact may be, but is not necessarily, sufficient to show adverse impact. See Gamble, 104 F.3d at 306 (holding that the plaintiff failed to establish a prima facie case for disparate impact because "he has presented no statistics *or other proof* demonstrating that the City's permit practices have a significantly adverse or disproportionate impact on the physically disabled or elderly.") (emphasis added); Larry P., 793 F.2d at 983 (without requiring statistical proof, "the district court found that improper placement in E.M.R. [educable mentally retarded] classes has a definite adverse effect, in that E.M.R. classes are dead-end classes which de-emphasize academic skills and stigmatize children improperly placed in them."); cf. South Bronx Coalition for Clean Air v. Conroy, 20 F. Supp. 2d 565, 572-73 (S.D. N.Y. 1998) ("disparate impact under Title VI requires 'a reliable indicator of disparate impact' and 'an appropriate statistical measure' that takes into account all relevant bases of comparison) (quoting New York Urban League, Inc. v. State of New York, 71 F.3d 1031, 1038 (2d Cir.1995)); New York City Envir. Justice Alliance v. Giulliani, 214 F.3d 65 (2d Cir. 2000) (plaintiffs required to employ facts and statistics that "adequately captured" the impact of the City's plans on the protected group); Ram v. New Mexico Dep't of the Environment, 2006 U.S. Dist. LEXIS 95369, *38-39 (D. N.M. 2006) ("The Supreme Court has held

that statistical evidence alone is sufficient to establish a prima facie case of disparate impact discrimination. [citation omitted]. Statistics are not irrefutable, however, and any proffered statistical analysis 'must involve the appropriate comparables, and must "cross a threshold of reliability before it can establish even a prima facie case of disparate impact."' [citation omitted].").  Plaintiffs argue that they have provided three meaningful measurements of adverse impact: (1) operating shortfalls; (2) percentage of total shortfall that Defendant funds in the RTPs; and (3) service level reductions. See Pls.' Reply at 31.

With respect to operating shortfalls, Plaintiffs' expert opines that "the existence and size of a present or forecasted operating shortfall is both an excellent indicator of whether an operator will be able to continue to provide its existing level of service, and a useful measure of the degree to which it will be forced to cut existing service."  See Rubin Decl. Ex. 2 at ¶ 94; see also id. at ¶¶ 90-93. "Unrelieved capital rehabilitation shortfalls are unlikely to have an immediate significant impact on the existing system, whereas unrelieved operating shortfalls pose serious and immediate threats to the existing system in the form of service cuts, fare increases, and other impacts on the quantity and quality of transit services provided."  Id. at ¶ 24.  Plaintiffs also note that of the seven major operators, the high-minority operators (defined by Plaintiffs as over 70% minority ridership) suffer greater operating shortfalls than the lower-minority operators (defined by Plaintiffs as 60% or less minority ridership), both as a percentage of total operating budget and on a per rider basis. Specifically, as a percentage of budget, AC Transit had a higher operating shortfall (7.91%) than any of the lower-minority operators, which had operating shortfalls as follows:  Golden Gate Transit (4.57%), MUNI (3.78%), Caltrain (1.05%) and BART (0%).  See Rubin Decl. Ex. 2 at ¶ 101(a); Ex. F.  On a per rider basis, AC Transit had a higher operating shortfall per rider ($0.60) than any of the lower-minority operators ($0.13 for Caltrain and MUNI, $0.09 for Golden Gate Transit, $0.00 for BART).  See id. at ¶ 101(b); Ex. G.

With respect to percentage of total shortfall funded by Defendant in the RTP, Plaintiffs' expert opines that because both operating and capital funds are needed to maintain existing service, "the degree to which MTC covers operating and capital rehabilitation shortfalls in the RTP process measures the amount of assistance MTC provides to operators to enable them to continue to operate

United States District Court
For the Northern District of California

and maintain the existing system." Rubin Decl. Ex. 2 at ¶ 94. Mr. Rubin concluded that Defendant covered a lower percentage of AC Transit's total shortfall (operating and capital rehabilitation) than that of any of the low-minority operators whose shortfalls AC Transit helped to cover. See Rubin Decl. Ex. 2 at ¶ 102. Specifically, Mr. Rubin determined that while Defendant covered 14.02 % of total shortfall for AC Transit, it covered 43.61% of BART's total shortfall and 16.37% of Golden Gate Transit's total shortfall. See id. Ex. 2 at Ex. H. Mr. Rubin's report also shows that Defendant did not cover any of the total shortfall for high-minority operators Samtrans and VTA. Id.

Plaintiffs argue that Defendant could allocate additional funding to AC Transit at the final step of the funding process to cover the operating shortfalls, but chooses not to. However, the extent to which Defendant has the ability to apply additional Track 1 uncommitted funding to AC Transit's operating shortfalls is sharply disputed. The parties agree that the major sources of Track 1 uncommitted funding at Step 4 are Congestion Mitigation and Air Quality ("CMAQ") funds, Surface Transportation Program ("STP") funds and State Transportation Improvement Program ("STIP/RTIP") funds.

For example, the purpose of the CMAQ program "is to fund transportation projects or programs that will contribute to attainment or maintenance of the national ambient air quality standards (NAAQS) for ozone, carbon monoxide (CO) and particulate matter (PM)." Publication of Interim Guidance on the Congestion Mitigation and Air Quality Improvement (CMAQ) Program, 71 Fed. Reg. 76038, 76039 (Dec. 19. 2006). Guidelines for project eligibility for CMAQ funds include:

1. Capital Investment

CMAQ funds may be used to establish new or expanded transportation projects or programs that reduce emissions, including capital investments in transportation infrastructure, congestion relief efforts, diesel engine retrofits, or other capital projects.

2. Operating Assistance

There are several general conditions that must be met for operating assistance to be eligible under the CMAQ program.
a. Operating assistance is limited to new transit services, intermodal facilities, and travel demand management strategies (including traffic operation centers); and the incremental cost of expanding existing transit services.
b. In using CMAQ funds for operating assistance, the intent is to help start up viable new transportation services that can demonstrate air quality benefits and eventually cover their costs as much as possible. Other funding sources should supplement and ultimately replace CMAQ funds for operating assistance, as these projects no longer

United States District Court
For the Northern District of California

represent additional, net air quality benefits but have become part of the baseline transportation network.
c. Operating assistance includes all costs of providing new transportation services, including, but not limited to, labor, fuel, administrative costs, and maintenance.
d. When CMAQ funds are used for operating assistance, non-Federal share requirements still apply.
e. With the focus on start-up costs only, operating assistance under the CMAQ program is limited to three years. The provisions in 23 U.S.C. § 116 place responsibilities for maintenance on States. Since facility maintenance is akin to operations, three years of CMAQ assistance provides adequate incentive and flexibility while not creating a pattern of excessive or even perpetual support. Exceptions are listed below under VII.D.7 Travel Demand Management, VII.D.8 Public Education, and VII.D.10 Carpooling and Vanpooling.

71 Fed. Reg. at 76042. Although CMAQ funds are generally earmarked for capital purposes, the funds can be used for operating expenses under certain circumstances, but only for a three-year period. The parties do not dispute the purposes of CMAQ funds and Defendant's ability to use CMAQ funds for the operation of new service for the first three years. The remaining evidence about these funds, however, establishes a triable issue of fact as to whether these funds can be allocated by Defendant to operating shortfalls in the RTP.

Ms. McMillan testified that CMAQ funds "are oriented mainly toward capital projects that either enhance air quality in some fashion, i.e., serve to reduce emissions of some sort or fashion, pollutant emissions, or go toward mitigating congestion." Declaration of Kimon Manolius in Support of Defs.' Opp'n to Pls.' Mot. for Summ. Adjudication Ex. A at 338:4-7. As stated in the regulations, Ms. McMillan testified that CMAQ funds can only be used for operations for the start-up of new service and only for three years; specifically, the funds cannot be used "to sustain an existing level of service," but must be used for a "net increase in service provided." See id. at 338:8-19. Plaintiffs' expert, Thomas Rubin, testified similarly: "CMAQ can [be used for operations] but only in a very specific instance and that of new service." Declaration of Julia Veit Ex. B at 86:14-15; id. at 130:8-12 ("And with that one exception for new transit service for CMAQ only, CMAQ . . . cannot be used for operations, but they can be used for virtually any type of transit capital."). Mr. Rubin also stated that his "best recollection is that if you want to use CMAQ funds for operations, you do have to jump through extra hoops to do it. And as I mentioned, there are some very specific requirements: Has to be new service, and you have to show that there is an air quality impact in particular. Those are not the only ones, but those are the two in particular that they want to see that

26

**United States District Court**
For the Northern District of California

there's some justification for using these funds for those purposes." Veit Decl. Ex. B at 139:5-13.

At the same time, however, Mr. Rubin stated in his report that CMAQ funds can be used for transit operations in other ways, by transferring them pursuant to 23 U.S.C. § 104(k) or ". . . by using CMAQ for the Federal share of the replacement cost of vehicles, rather than using § 5307 funds, thus freeing up § 5307 funds for preventative maintenance uses." Rubin Decl. Ex. 1 at ¶ 137. According to Mr. Rubin, preventative maintenance is an operating expense, and there is no ceiling on the amount of § 5307 funds which may be used for preventative maintenance. See Rubin Decl. Ex. 1 at ¶¶ 87, 120. There is evidence, however, that such a transfer of funds may no longer be permitted. Ms. McMillan testified that: ". . . [I]n the early '90s when [the Intermodal Surface Transportation Efficiency Act of 1991] was established, the enabling legislation on CMAQ was vague enough that we were able, and a few other entities were able, to make the case that maintenance and rehab contributed to air quality reduction. With TEA-21 [Transportation Equity Act for the 21st Century], the subsequent authorization, they cleaned up the language to clearly prohibit the use for those purposes, and that was carried over with SAFETEA [Safe, Accountable, Flexible, and Efficient Transportation Equity Act of 2003]." Manolius Decl. in Support of Defs.' Opp'n to Pls.' Mot. for Summ. Adjudication Ex. A at 339:23-340:5. Accordingly, there is a triable issue of fact as to whether CMAQ funds can be allocated to operating shortfalls in the RTP.

Similarly, there is a triable issue of fact as to whether STP funds can be used for operating expenses. Mr. Rubin testified in his deposition that STP funds cannot be used for operations. See Veit Decl. Ex. B at 86:13-14 ("Basically, STP cannot directly be used for operations, transit operations."); id. at 130:9-11 (". . . STP cannot be used for operations, but they can be used for virtually any type of transit capital."). However, Plaintiffs argue that under Mr. Rubin's transfer or exchange theory, like that described above with respect to CMAQ funds, STP funds can be used for operating expenses. See id. at 130:13-17 ("By taking 10 million of your 25 million in 5307 and using that for operations and then backfilling that 10 million from CMAQ or STP, you now have 10 million for operations which is what you need, and you have 25 million for capital, which is what you need."). The funding statute permits use of STP funds for numerous projects, but only one related to transit projects: "[c]apital costs for transit projects eligible for assistance under chapter 53

United States District Court
For the Northern District of California

1   of title 49, including vehicles and facilities, whether publicly or privately owned, that are used to

2   provide intercity passenger service by bus."  23 U.S.C. § 133(b)(2); <u>see also</u> Def.'s Post-Hearing

3   Submission Ex. D (<u>FHWA and FTA Funds That May Be Used For Either Highway or Transit</u>

4   <u>Purposes</u>, <u>www.fhwa.dot.gov/hep/flexfdtable.htm)</u> (stating that the primary purpose of STP funds is

5   "[C]onstruction, reconstruction, rehabilitation, resurfacing, restoration, and operational

6   improvements for highways and bridges including construction or reconstruction  necessary to

7   accommodate other transportation modes," and that eligible projects include "[c]apital costs of

8   transit projects . . . including vehicles and facilities, publicly or privately owned, that are used to

9   provide intercity bus service.").  It is undisputed that STP funds can be used for capital purposes, but

10  Mr. Rubin opines that Defendant can transfer STP funds for use as preventative maintenance

11  operating funds and can exchange STP funds for operating funds under its STP Reimbursement

12  Exchange program.  <u>See</u> Rubin Decl. Ex. 1 ¶¶ 134-39 (stating that "STP funds are limited to capital

13  projects, but may be used for almost any capital need, including rehabilitation or expansion, for any

14  mode of surface transportation.").  Mr. Rubin also states that use of STP funds for preventative

15  maintenance, an operating expense, is permissible, but that Defendant has not exercised this option

16  with respect to AC Transit, while it has done so in connection with BART.  Specifically, Mr. Rubin

17  states that in connection with future BART car replacement capital expenses, Defendant adopted

18  Resolution 3738, in which Defendant agreed to provide BART with current STP funds for

19  preventative maintenance, and in exchange, BART would deposit an equal amount of local funds to

20  account for future car replacement needs.  <u>See</u> Rubin Decl. Ex. 1 at ¶ 139.  This exchange enabled

21  Defendant to allocate current STP funds that could not have otherwise been used for future car

22  replacement because there is a time limit on their use (Cal. Streets & Highways Code § 182.6(b)),

23  and allowed BART to use local funds, which do not expire, for future capital expenses.  <u>See</u> <u>id.</u>

24          Ms. McMillan, however, testified that while STP funds "are the most flexible of the federal

25  flexible funds in some respect" in that the funds can be used "for almost any conceivable capital

26  need . . . ," the funds cannot be used for operations and are "capital limited."  Manolius Decl. in

27  Support of Defs.' Opp'n to Pls.' Mot. for Summ. Adjudication Ex. A at 359:14-25.  Therefore, there

28  is a triable issue of fact as to whether Defendant can use STP funds through transfer or exchange to

cover operating shortfalls in the RTPs.

There is also a triable issue of fact as to whether STIP/RTIP funds could be allocated to cover operating shortfalls in the RTP. The STIP is the Transportation Capital Program developed at the state level, which extends authority to regions to establish their programming priorities. See Manolius Decl. in Support of Defs.' Opp'n to Pls.' Mot. for Summ. Adjudication Ex. A at 64:11-16. The RTIP is Defendant's submission to the state for the STIP. See id. at 67:11-13; see also Cal. Gov't Code § 14527(a) ("After consulting with the department, the regional transportation planning agencies and county transportation commissions shall adopt and submit to the commission and the department, not later than December 15, 2001 and December 15 of each odd-numbered year thereafter, a five-year regional transportation improvement program. . . ," which shall include all projects to be funded with regional improvement funds for capital expenses under California Streets & Highways Code § 164(a).). It is not clear that these funds could be applied to operating shortfalls. Alix Bockelman, Defendant's Director of Programming and Allocations, testified that "[w]hile MTC approves the RTIP in its entirety as well as the final approval rests with the California Transportation Commission, which is a statewide commission. However, over the last many cycles, the CMAs [Congestion Management Agencies] have had the primary responsibility for selecting projects within their county share." Manolius Decl. in Support of Defs.' Opp'n to Pls.' Mot. for Summ. Adjudication Ex. B at 55:21-56:1. Further, Ms. Bockelman also testified that "transit operating isn't an eligible use of RTIP funds." Def.'s Post-Hearing Submission Ex. L at 504:4-5. In addition, Ms. McMillan testified that "RTIP is capital only." Id. at Ex. M at 683:25. Plaintiffs' expert, Mr. Rubin, also states that RTIP funds are "primarily capital. There are some ways that you can get a little bit of operations in there. But they are primarily capital." Veit Decl. Ex. B at 270:21-23.

Mr. Rubin opines, however, that Defendant could use STIP/RTIP funds in a manner that indirectly defrays transit operating shortfalls. Specifically, Mr. Rubin opines that: "These provisions [regarding STIP/RTIP] allows MTC, should it so desire, to use such funds for AC Transit capital purposes, thereby replacing other funds that can be shifted to operating subsidies, and to capitalize certain operating expenses." Rubin Decl. Ex. 1 at Ex. C at 19.

29

Also, the extent to which Defendant may redirect to AC Transit additional federal funds flowing primarily from 49 U.S.C. §§ 5307 and 5309 is unclear, but appears limited at best.  See McMillan Decl. ¶ 15 (Federal Transportation Agency administers these funds and distributes them based on urbanized areas defined by census data).  For example, of the three types of § 5309 funds -- Fixed Gateway Modernization (designated for rail and ferry or for bus systems to operate in dedicated HOV lanes), New Starts (dedicated to new starts of rail or bus rapid transit projects as determined by Congress), and Bus Discretionary (for bus and bus facilities) -- AC Transit did not submit eligible projects for the first two types of funding for the period from 1998 through 2006. See id. at ¶¶ 16, 18.  During that period, AC Transit requested Bus Discretionary funds, and Defendant awarded AC Transit $5.4 million, nearly as much as the allocation to BART for its congressional earmarked project.  See id.  Mr. Rubin, however, opines these federal funds can be used in combination with other funds as described above, to cover operating shortfalls.

With respect to service cuts as a measure of adverse impact, Plaintiffs' expert opines that the "most meaningful measure of the amount of service that a transit agency provides to transit riders is 'Vehicle Revenue Miles' (VRMi)," which measure  the "miles that vehicles actually travel while in revenue [i.e., passenger] service."  Rubin Decl. Ex. 1 at ¶ 102 (opining that VRMi is a more meaningful measure than Vehicle Revenue Hours because "people ride public transportation to get from one place to another, not to find ways to spend time, and so the metric that captures the distance traveled more closely reflects the purpose for which public transit exists (transit users board buses and trains to ride X miles, not to ride for Y minutes)."  According to Plaintiffs' expert, over the period from 1995 to 2006, the actual Vehicle Revenue Miles for AC Transit only increased 12.6%, while the actual Vehicle Revenue Miles for all other operators increased 26.8%, a growth rate of 113% higher than that of AC Transit.   In looking at only the years 2002 to the present, Plaintiffs' expert states that AC Transit has experienced real declines of 10%, while BART and Caltrain riders had increases of 4% and 27%, respectively.  Rubin Decl. Ex. 2 at ¶ 152.  Responding to Defendant's expert's analysis of the 1995-2005 time period, Plaintiffs' expert states that during that longer time frame, motor bus vehicle revenue miles declined by 3%, while BART's heavy rail vehicle revenue miles increased by 36.9% and Caltrain's commuter rail vehicle revenue miles

**United States District Court**
For the Northern District of California

increased by 61.8%.  Rubin Decl. Ex. 2 at ¶ 155.

Even assuming that Plaintiffs' expert is correct, there is a triable issue of fact as to causation for purposes of Plaintiffs' disparate impact analysis for the same reasons set forth above in the discussion of standing.  For example, as described above, Defendant introduced evidence that when AC Transit experienced actual, as opposed to projected, operating shortfalls, Defendant approved every request since 1999 from AC Transit for operating assistance in the form of preventative maintenance funds.  Thus, projected operating shortfalls do not necessarily result in the same amount of actual shortfalls.   Further, Defendant's expert opined that: "If local transit operators need more funding and refuse to cut services, the onus lies on them and the residents they serve to provide supplemental funds, as has been the case in the past with voter-approved permanent sales tax referenda in Santa Clara and San Mateo Counties."  <u>See</u> Declaration of Robert Cervero Ex. 1 at 5. In addition, Defendant has provided evidence that past service difficulties were due to the recession, not necessarily to projected operating shortfalls.  <u>See</u> Declaration of Nancy Skowbo at ¶ 7, Ex. D (AC Transit short range plan stating that the economic downturn has had a negative effect on funding); McMillan Decl. Ex. Z (Resolution 3525 stating that the economic slump has battered transit operating revenues causing  transit operators to confront cost-cutting measures).

### iii.        Disproportionate impact on minorities

To show a potentially illegal disproportionate effect, Plaintiffs must also establish that the adverse effects of Defendant's conduct will be suffered disproportionately by the minority group. <u>See</u> <u>Keith v. Volpe</u>, 858 F.2d 467, 484 (9th Cir. 1988) (stating that of the persons who would benefit from the housing project because they are low-income, two-thirds were minorities, so the failure to build the housing had twice the adverse impact on minorities as on whites); <u>Garcia v. Spun Steak Co.</u>, 998 F.2d 1480, 1486 (9th Cir. 1993) (to show disparate impact, the plaintiffs must show, <u>inter alia</u>, that the employee population in general was not affected by the English-only policy to the same degree as the protected group; there, the vast majority of employees who speak another language are Hispanic and so Hispanics would be disproportionately affected by the English-only policy). Relying on <u>Keith</u> and <u>Garcia</u>, Plaintiffs argue that disproportionality is established by comparing the percentage of minorities in the population of the adversely affected entity to that of the other entities.

31

United States District Court
For the Northern District of California

Specifically, Plaintiffs argue that minorities are disproportionately impacted by Defendant's practice of failing to fund operating shortfalls in the RTPs because 78% of the ridership of AC Transit is minority, compared to only 53% of BART and 50% of Caltrain.  Defendant points to the undisputed fact that, as an absolute number, more minorities ride BART and Caltrain than AC Transit.  See Declaration of Stefan Boedecker Ex. B at ¶ 17-18 (BART's share of weekly minority riders is 56.5%, Caltrain's is 4.8% and AC Transit's is 38.7%, therefore, BART, not AC Transit, carries the most minority riders).  Expanding the analysis to the top seven operators reveals two operators which each have a minority ridership of 70%, VTA and Samtrans, as well as two others with a lower percentage of minorities.

Comparing percentages can be an adequate method to show disparate impact.  See, e.g., Powell v. Ridge, 189 F.3d 387, 394 (3d Cir. 1999) (overruled on other grounds by Alexander v. Sandoval, 532 U.S. 275 (2001) (finding that plaintiffs stated a claim for disparate impact by alleging that school districts with higher proportions of minority students received less revenue than those with higher proportions of white students).  However, when the comparison is not confined to the unduly narrow subset of only three operators but extended to the top seven, it is not clear that the disparity in percentages is sufficient to establish this element of disparate impact beyond a triable issue of fact, particularly in light of the relatively large percentages, and even larger absolute numbers, of minorities who benefit from the allegedly favorable treatment of operators like BART.  And even if disparate impact were clear, the issue of causation presents a triable issue of fact.

**C.     Discriminatory intent**

Plaintiffs also sue for intentional discrimination under Title VII.  See Alexander v. Sandoval, 532 U.S. 275 (2001).  "To prevail on a Title VI claim . . . a plaintiff must prove (1) that he is an "intended beneficiary of the federally-funded program the defendants ... participated in," [citations omitted], and (2) that the defendant intentionally discriminated against him in violation of the statute."  The Epileptic Foundation v. City and County of Maui, 300 F. Supp. 2d 1033, 1011 (D. Haw. 2003).

Defendant moves for summary judgment on the ground that Plaintiffs have not presented sufficient evidence of intentional discrimination to raise a triable issue of fact.  As described above,

**United States District Court**
For the Northern District of California

1    Defendant has produced evidence that it has no authority to redirect earmarked federal funds, and

2    that it has provided preventative maintenance funding to AC Transit to use for operating expenses

3    whenever AC Transit sought such funding.

4         Plaintiffs concede that they have no evidence of direct discriminatory intent, but argue that

5    the totality of the circumstances shown by Plaintiffs' indirect evidence (see Arlington Heights v.

6    Metro. Housing Dev. Corp., 429 U.S. 252, 266 (1977)), shows a triable issue of fact.  In Arlington

7    Heights, the Court included a non-exhaustive list of illustrative subjects for courts to consider in

8    determining whether discriminatory intent existed:

9         The impact of the official action whether it 'bears more heavily on one race than
          another,' [citation omitted] may provide an important starting point. Sometimes a
10        clear pattern, unexplainable on grounds other than race, emerges from the effect of
          the state action even when the governing legislation appears neutral on its face.  The
11        evidentiary inquiry is then relatively easy.  But such cases are rare.  Absent a pattern
          as stark as that in Gomillion or Yick Wo, impact alone is not determinative and the
12        Court must look to other evidence.  The historical background of the decision is one
          evidentiary source, particularly if it reveals a series of official actions taken for
13        invidious purposes. . . .  The specific sequence of events leading up the challenged
          decision also may shed some light on the decisionmaker's purposes. . . .  Substantive
14        departures too may be relevant, particularly if the factors usually considered
          important by the decisionmaker strongly favor a decision contrary to the one reached.
15        . . . The legislative or administrative history may be highly relevant, especially where
          there are contemporary statements by members of the decisionmaking body, minutes
16        of its meetings, or reports.

17   Arlington Heights, 429 U.S. at 266 (footnotes and citations omitted); see also Reeves v. Sanderson

18   Plumbing Prods., 530 U.S. 133, 147 (2000) (stating in an age discrimination case that: "Proof that

19   the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence

20   that is probative of intentional discrimination, and it may be quite persuasive.") (citation omitted);

21   Diaz v. San Jose Unified Sch. Dist., 733 F.2d 660, 665, 674 (9th Cir. 1984).

22        Plaintiffs argue that they have introduced evidence of the factors potentially indicative of

23   intentional discrimination set forth in Arlington Heights, raising a triable issue of fact as to

24   discriminatory intent.  Specifically, Plaintiffs argue that they have provided expert testimony and

25   evidence regarding the "important starting point" from Arlington Heights, that is, the discriminatory

26   effect of Defendant's actions.  See, e.g., Sanchez Decl. Ex. 1 at 96-97 (Defendant was aware at least

27   as early as mid-1990s that AC Transit carried significantly greater percentage of minorities);

28   Marcantonio Opp. Decl. Ex. 2 at 104-06 (MTC current director aware since 1993 that AC Transit

33

carried more minority passengers), Ex. 66 (in 1993, AC Transit's percentage of white passengers

was 32%); Ex. 65 (in 1998, AC Transit's percentage of white passengers was 24%).  Plaintiffs also

argue that they have shown the historical background of inadequate funding.  See, e.g., Marcantonio

Opp. Decl. Ex. 38 at 2 ("BART has not required MTC-allocated operating funds because legislation

sponsored by MTS in 1977 in cooperation with BART, AC Transit and San Francisco directly

allocated three fourths of a ½ cent sales tax in Alameda, Contra Costa, and San Francisco counties to

BART.  As shown on page 9 of the BART packet - this produced $108.5 million for BART in 1994.

Follow up legislation sponsored by MTC in 1979 secured the remaining one-fourth of the sales tax

revenue for AC Transit and SF Muni based on MTC's allocation.  The calculations jointly developed

then assumed AC Transit and SF Muni would have access to TDA and FTA section 9 - the other

significant regional revenues.  Since then, these revenues have declined compared to AC  Transit

and SF Muni budgets causing them to curtail services and raise fares."); Rubin Decl. Ex. 2 at ¶¶ 95-

98 (Defendant failed to take into account service cuts at AC Transit in the 2005 RTP baseline,

thereby understating the shortfall by $500 million).

Plaintiffs contend further that they have provided evidence that Defendant departed from

substantive norms and mandatory policy by failing to preserve the existing bus service and

prioritizing rail expansion over expansion of Lifeline bus services.  See Marcantonio Opp. Decl. Ex.

14, 15, 16.  Finally, Plaintiffs argue that there are several incidents showing that Defendant has

covered up its discrimination and departed from acknowledged procedural norms by, for example,

not providing minority participants with the information and analysis necessary to meaningfully

participate in the decision-making process.  See Sanchez Decl. Ex. 1 at 5; Marcantonio Opp. Decl.

Ex. 53 at MTCP 257574.  See, e.g., Marcantonio Opp. Decl. Ex. 73 at  PL 005380 (letter from

pastors and associate ministers calling for equity in funding for bus services); Ex. 73 at MTCP

153451 (response from MTC saying that it intends to ensure that rail expansion does not come at

expense of minority bus service); Ex. 14 at 744-45 (stating that Resolution 3434 would apply to

MUNI and VTA, and possibly AC Transit).

Looking at the totality of the circumstances, however, the Court concludes that Plaintiffs

have not raised a triable issue of fact under Arlington Heights and its progeny.  The circumstances

United States District Court
For the Northern District of California

include too many strong contraindications of discriminatory motive, that preclude drawing any reasonable inference of discriminatory intent.  Many have already been discussed above in the context of the causation prong of standing and the analysis of disparate impact.  Examples include Defendant's allocation of preventative maintenance funds to AC Transit to help with operating expenses.  See, e.g., McMillan Decl. ¶ 21, Ex. I ($49 million in preventative maintenance funds to AC Transit in 200-01); ¶ 22, Ex. J at 5 ($10 million in preventative maintenance funds to AC Transit in 2002-03); ¶ 44, Ex. CC at 4 ($17 million in preventative maintenance funds to AC Transit for 2003-04); ¶ 20, Ex. H at 5 ($13.7 million in preventative maintenance funds to AC Transit for 2005-06).

Particularly inconsistent with any intent to discriminate on the basis of race and ethnicity is Defendant's treatment of the whitest of the seven major carriers, Golden Gate Transit, almost two-thirds of whose passengers are white in a transit area that is majority minority.[2]  Facing steep operating shortfalls in three RTPs in 1994, 1998 and 2005 (see Marcantonio Decl. Ex. 22), which MTC did *not* cover, Golden Gate Transit cut its service by 35% and lost 21% of its ridership.  See Dehart Decl. ¶¶ 3-8.  While Plaintiffs downplay the significance of Defendant's treatment of Golden Gate Transit as an "outlier," that argument is more appropriately directed to the disparate impact analysis, which looks at overall effect, not at motive. While the Court is cognizant that intentional discrimination can be subtle and has not been eradicated from society, it would strain credulity to infer that Defendant is motivated by racial discrimination to harm AC Transit's minority riders by not covering operating shortfalls, yet allows Golden Gate Transit's largely white riders to suffer steep cuts in service instead of covering its operating shortfalls.[3]  The totality of the circumstances here thus differ very significantly from those in Diaz, where the governing agency consistently chose discriminatory alternatives over non-discriminatory ones.  See Diaz, 733 F.2d at 665, 674 (defendant school board "consistently selected the most segregative alternatives" whenever it had a

---

[2]      Indeed, Golden Gate Transit is the second most white of the twenty-one operators analyzed in Defendant's 2006 Demographic Survey.  See Boedecker Decl. Ex. A at 10.  Alameda Ferry is the only entity with a higher percentage of white passengers.  Id.

[3]      As calculated by Defendant's expert, the percentage of total shortfalls (operating plus capital rehabilitation) that Defendant covered is very similar: 14.37% of AC Transit's and 16.37% of Golden Gate Transit's.  See Rubin Decl. Ex. B at Ex. H.

**United States District Court**
For the Northern District of California

1  choice, completely disregarded state law requirements to take affirmative steps to desegregate its

2  schools, intentionally assigned faculty and staff to schools on the basis of race, and deviated from its

3  otherwise paramount neighborhood schools policy only to allow white students, but not minority

4  students, to transfer from overcrowded schools.).  Accordingly, Plaintiffs have not raised a triable

5  issue of fact as to discriminatory intent.

6  **CONCLUSION**

7       Accordingly, Plaintiffs' Motion for Summary Adjudication is denied.  Defendants' Motions

8  for Summary Judgment as to standing are denied.  Defendant's Motion for Summary Judgment on

9  the discrimination claims is granted as to intentional discrimination and denied as to disparate

10  impact.

11  **IT IS SO ORDERED.**

12  Dated: August 21, 2008

_Elizabeth D. Laporte_
_____
ELIZABETH D. LAPORTE
United States Magistrate Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28