United States District Court
For the Northern District of California

1
2
3
4
5
6                    IN THE UNITED STATES DISTRICT COURT
7
                FOR THE NORTHERN DISTRICT OF CALIFORNIA
8
9
SYLVIA DARENSBURG, et al.,                    No. C-05-01597 EDL
10
              Plaintiffs,           **FINDINGS OF FACT AND**
11                                  **CONCLUSIONS OF LAW FOLLOWING**
       v.                           **COURT TRIAL**
12
METROPOLITAN TRANSPORTATION
13  COMMISSION,
14              Defendant.
    _____/
15

16        Plaintiffs Sylvia Darensburg and Vivian Hain are individuals of color, and Plaintiffs

17  Amalgamated Transit Union 192 and Communities for a Better Environment are organizations with

18  minority members, who use the bus system of the Alameda-Contra Costa Transit District ("AC

19  Transit").  Defendant Metropolitan Transportation Commission ("MTC"), is the Metropolitan

20  Planning Organization ("MPO") for all twenty-six independent transit operators in the nine-county

21  Bay Area.  In this class action, Plaintiffs contend that MTC makes funding decisions that adversely

22  affect AC Transit's largely minority riders, in comparison to the riderships of the other largest

23  operators in the Bay Area.  The seven largest operators, which collectively account for 95% of

24  transit riders in the Bay Area, are: (1) AC Transit; (2) Bay Area Rapid Transit District ("BART");

25  (3) Peninsula Corridor Joint Powers Board ("Caltrain"); (4) Golden Gate Highway and

26  Transportation District ("GGT"); (5) San Francisco Municipal Railway ("Muni"); (6) San Mateo

27  County Transit District ("SamTrans"); and (7) Santa Clara Valley Transit Authority ("VTA").

28        More specifically, Plaintiffs contend that three of MTC's apparently neutral transportation

    funding practices in fact divert funding from preserving and improving existing bus operations to

United States District Court
For the Northern District of California

costly expansion and capital rehabilitation of rail services, disproportionately harming AC Transit's

predominantly minority bus riders, in violation of California Government Code section 11135.

Specifically, Plaintiffs challenge MTC's: (1) selection and funding of rail expansion projects over

bus projects through its Regional Transit Expansion Program embodied in Resolution 3434; (2)

allocation of "committed" funds to capital rehabilitation instead of transit operations, and to capital

expansion instead of capital rehabilitation of the existing transit system; and (3) assignment of

"uncommitted" funds to offset projected capital rehabilitation shortfalls, but not operating shortfalls.

 Plaintiffs argue that they have made a prima facie showing of disparate impact as to each of these

three practices, that MTC cannot meet its burden of proving necessity in response, and that even if

MTC has, Plaintiffs have shown equally effective but less discriminatory alternatives.

MTC disputes that Plaintiffs have established a prima facie case of disparate impact, and

argues that even if they have, MTC has met its burden of showing a legitimate justification.  First,

MTC denies that it prioritizes rail expansion over maintenance and operations of the existing system.

MTC also argues that it does not have control over the allocation of most "committed" funds, and

that when it does have control over those funds, it has allocated funds for operations in the form of

preventive maintenance to AC Transit.  Second, MTC argues that it has little control over the

allocation of "uncommitted" funds, and that it allocates the funds that it does control to cover

operating shortfalls.  Third, MTC further argues that its practices are justified by its reliance on the

advice of the Partnership Board, which consists of representatives of federal and regional transit

agencies, including AC Transit, and environmental entities, by its scoring system for allocation of

committed funds that reflects the consensus of the Partnership Board, and by its "Fix it First" policy

focusing on maintenance of existing capital systems, among other reasons.  Finally, MTC argues

that in response to its justification, Plaintiffs have not met their burden of showing an equally

effective alternative with a less racially disproportionate impact.

On August 21, 2008, the Court issued an order resolving the parties' motions for summary

adjudication and for summary judgment.  The Court denied Plaintiffs' Motion for Summary

Adjudication on the issue of whether Plaintiffs had established as a matter of law a prima facie case

for disparate impact discrimination arising out of MTC's failure to fund the operating shortfalls it

**United States District Court**
For the Northern District of California

1  identifies in the quadrennial Regional Transportation Plans, while funding capital shortfalls.  The

2  Court granted in part and denied in part MTC's Motions for Summary Judgment, holding that there

3  were triable issues of fact as to standing and disparate impact discrimination, but that there was no

4  triable issue of fact as to intentional discrimination.

5       This case was tried to the Court in October 2008.   Because this case involved an array of

6  funding source and other acronyms familiar to the transit cognoscenti but not necessarily to the rest

7  of the public, the Court notes that a Joint Glossary of Terms prepared by the parties is available at

8  docket number 340.  The parties also submitted joint findings of fact (Nos. 1-369) on August 29,

9  2008 (docket no. 291), October 3, 2008 (docket no. 346), October 8, 2008 (docket no. 353) and

10 October 21, 2008 (docket no. 364).[1]  After considering and weighing all the evidence and the

11 parties' arguments, and having assessed the credibility of the witnesses, the Court enters the

12 following findings of fact and conclusions of law as required by Federal Rule of Civil Procedure

13 52(a).

14      The Court begins with a few preliminary observations.  First, throughout the litigation of this

15 case, the Court has been impressed by the high level of advocacy on both sides of this dispute.

16 Counsel have conducted themselves professionally and respectfully in their interactions with the

17 Court and with each other during numerous court appearances and the three-week trial.  The Court

18 also appreciates the parties' responsiveness to the Court's suggestions to stipulate to facts not

19 reasonably in dispute and to streamline presentation of this case at trial.  The parties were well-

20 served by their counsel in this case.  Second, the Court was also impressed by the sincere dedication

21 to meeting the needs of disproportionately minority riders of AC Transit on the part of Plaintiffs and

22 their witnesses.  The Court was left with no doubt that AC Transit's bus riders would benefit from

23 additional service and that many of them are burdened by fare hikes and service cuts, hampering

24 their efforts to get to work, medical appointments, and grocery shopping and to meet other important

25 needs.  At the same time, the Court also came to appreciate the difficult challenge faced by MTC's

26 public servants of meeting a wide array of complex transportation needs and competing priorities of

27 

28
_____

[1]      To the extent that joint findings are not explicitly set forth in the findings below, they are incorporated by reference as if set out in full.  The Court further notes that its conclusions of law may also contain findings of fact.

United States District Court
For the Northern District of California

multiple operators throughout the Bay Area with limited and often highly restricted funds.  The Court found the fact witnesses on both sides to be sincere and generally credible, although occasionally, as noted below, somewhat biased in their perceptions due to their particular roles.

Further, the Court found the expert witnesses to be highly qualified.  The Court was impressed by the extensive knowledge of Plaintiffs' expert, Thomas Rubin, of transportation planning and his concern with meeting the transit needs of underserved minority populations.  As set forth in more detail below, however, the Court found that a few of his comparisons of relative funding and other matrices which he contended show unjustified disproportionate impact on AC Transit riders were not persuasive because they did not treat all transit operators alike or focused only on one type of comparison to the exclusion of other equally valid alternatives.  Nor was the Court persuaded that the transportation statute and planning documents that he pointed to required the very strong, indeed paramount, priority on preserving existing urban bus operations that he advocated, at the cost of meeting other important transportation needs that MTC is also mandated by statute to consider.  These other needs include, for example, a modern, integrated transit network that aids smart growth, and lures commuters out of their single occupancy vehicles to improve air quality.  By the same token, the Court was not entirely persuaded by the testimony of MTC's planning expert, Dr. Robert Cervero, to the extent that he downplayed the importance of preserving urban bus services.  Similarly, although MTC's statistician, Stefan Boedeker, provided a number of illuminating comparisons, two of his graphs used inconsistent scales that made AC Transit's funding pattern look more similar to that of other operators than it really was.

Ultimately, as explained in detail below, the Court concludes that Plaintiffs have not proven disparate impact discrimination in violation of the California statute.  It is worth pointing out that the Court's conclusion is supported in part by MTC's recent practice, commenced the same year that this lawsuit was filed, of allowing more operating funds in the form of preventive maintenance to flow to AC Transit than MTC allowed under its previous practice of reserving such funds for capital rehabilitation only.  Indeed, this lawsuit may have had some salutary impact on causing MTC to refine such policies.

//

**FINDINGS OF FACT**

**Background**

1. Created by the California Legislature in 1970, MTC is the transportation planning, coordinating and financing agency for the nine-county San Francisco Bay Area. <u>See</u> Cal. Gov't Code §§ 66500 <u>et seq.</u>; Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 8.

2. MTC is not a transit operator. <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 9.

3. MTC sets policy and makes funding decisions through its Board of Commissioners. <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 11.

4. MTC's work is guided by a nineteen-member policy board. Fourteen commissioners are appointed directly by local elected officials. In addition, two members represent regional agencies, the Association of Bay Area Governments and the Bay Conservation and Development Commission. Finally, three nonvoting members have been appointed to represent federal and state transportation agencies and the federal housing department. <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 19.

5. MTC convenes three advisory committees: (1) the MTC Advisory Council; (2) the Elderly and Disabled Advisory Committee; and (3) the Minority Citizens Advisory Committee. <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 27.

6. The Minority Citizens' Advisory Committee ("MCAC") advises MTC on issues of concern to African-American, Hispanic, and Asian-American constituencies. MTC recently added low-income interests to the MCAC's portfolio. <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 28.

7. MTC functions as both the regional transportation planning agency, a state designation, and as the region's MPO for federal purposes. It is responsible for regularly updating the Regional Transportation Plan ("RTP"), a comprehensive blueprint for the development of mass transit, highway, airport, seaport, railroad, bicycle and pedestrian facilities. <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 12.

**United States District Court**
For the Northern District of California

8. MTC is the designated recipient of a variety of federal and state funding sources, and is responsible for setting policies and making decisions about the allocation and use of those funding sources that are within its control. <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 30.

9. With the authority over the Bay Area's transportation purse strings has come responsibility for overseeing the efficiency and effectiveness of the region's transportation system. MTC monitors transit operators' budgets, conducts performance audits and adopts a yearly productivity/transit coordination improvement program to ensure that the region's numerous bus, rail and ferry systems are in sync in terms of their routes, fares, transfer policies, schedules, passenger information and facilities. <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 16.

10. In January of 1992, MTC convened the Bay Area Partnership Board. <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 26.

11. The Bay Area Partnership Board is a confederation of the top staff of various transportation agencies in the region (e.g., MTC, public transit operators, county congestion management agencies, city and county public works departments, ports, Caltrans, U.S. Department of Transportation) as well as environmental protection agencies. <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 25.

**Plaintiffs**

12. The Class consists of Black, Hispanic, Asian or Pacific Islander, and American Indian or Alaskan native individuals who are patrons of Alameda Contra Costa Transit District (AC Transit). <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 1.

13. The named class representatives are Sylvia Darensburg and Vivian Hain. <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶¶ 2, 4.

14. The Organizational Plaintiffs are Communities for a Better Environment ("CBE") and Amalgamated Transit Union Local 192 ("ATU"). ATU represents transit employees, including bus, rail and ferry operators and advocates for its members primarily in the areas of wages, benefits and working conditions. <u>See</u> Aug. 21, 2008 Order Denying Plaintiffs' Mot.

United States District Court
For the Northern District of California

for Summ. Adjudication; Granting in Part and Denying in Part Def.'s Mot. for Summ. J. ("Aug. 21, 2008 Order on Summ. Adjudication/Judgment") at 15:23-25.  ATU's legislative agendas reveal that they are interested in, <u>inter alia</u>, increasing funding for public transit, including to "allow certain federal transit funds to be used for operating assistance."  <u>See</u> <u>id.</u> at 16:2-4.  CBE is a "social justice organization with a focus on environmental health and justice," focusing on "working class communities of color because those communities suffer the most from environmental pollution and toxics."  <u>See</u> <u>id.</u> at 16:5-7.  The vision of CBE is to "protect the earth and human life for future generations."  <u>See</u> <u>id.</u> at 16:10-11.

15.  On February 1, 2005, MTC received a letter from Public Advocates, Inc., Communities for a Better Environment (CBE) and Amalgamated Transit Union (ATU) 192, alleging that MTC has historically engaged, and continues to engage in policies and practices "that benefit the disproportionately white riders of BART and Caltrain . . . at the expense of disproportionately minority riders of AC Transit."  <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 7.

16.  AC Transit's change in transfer policy in 2001 limiting transfers to use within 90 minutes increased Plaintiff Sylvia Darensburg's transit expenses by causing her to have to pay full fare more often. She also has been injured by increases in fares that stretch her limited budget. She has been unable to accept or keep certain attractive jobs as a result of inadequate AC Transit service. She has been docked pay at jobs due to being late because of unreliable AC Transit service.  Increases in transit fares have also stretched her budget such that she has been unable to pay other bills on time. <u>See</u> Supplemental Joint Findings of Fact (docket # 346) at ¶ 262(a).

17.  Ms. Darensburg would benefit from improvements to the International Boulevard/East Oakland and Hesperian routes. She would also benefit from improvements to routes such as San Pablo Avenue, Foothill/MacArthur, MacArthur/Oakland Airport, College Avenue/University, and Mission/Outer 14th Avenue routes. Signal improvements along these lines would also benefit her if they led to shorter travel times.  <u>See</u> Supplemental Joint Findings of Fact (docket # 364) at ¶ 263(a).

18.  Newer, low-floor vehicles would also benefit Ms. Darensburg because it would make it easier for her to grocery shop, as the buses would more easily accommodate a grocery cart, allowing her to reduce the number of trips she takes to the grocery store. This improvement would save her time, energy, and transportation costs. It would also make it easier for her to travel with her granddaughter because low-floor vehicles would more easily accommodate a stroller. <u>See</u> Supplemental Joint Findings of Fact (docket # 346) at ¶ 263(b).

19.  Ms. Darensburg would also benefit from increased night and weekend service, in particular on Line 98, which would allow her to go to Wal-Mart to shop. <u>See</u> Supplemental Joint Findings of Fact (docket # 346) ¶ 263(c).

20.  Increases in AC Transit fares and recent limitations in use of transfers makes transit more expensive and more difficult for Plaintiff Vivian Hain to afford.  Unreliable transit has also forced her to rely on unreliable cars that break down frequently and require frequent expensive repairs. Increases in AC Transit fares negatively impact her ability to buy food for herself and her family. Inadequate service has caused Ms. Hain to be subject to discipline at work for tardiness and put her at risk for failing to meet Welfare-to-Work requirements.  Ms. Hain cannot afford to use BART regularly. <u>See</u> Supplemental Joint Findings of Fact (docket # 346) at ¶ 262(b).

21.  Ms. Hain would benefit from enhanced AC Transit bus service and increased frequency of service in certain high traffic areas.  In particular, she and her family would directly benefit from improvements to the Telegraph/International Boulevard/and College Avenue/University routes. Signal improvements along these lines would also benefit her and her children if they led to shorter travel times. <u>See</u> Supplemental Joint Findings of Fact (docket # 346) at ¶ 263(d).

22.  In addition, newer low-floor vehicles would make it easier for Ms. Hain to grocery shop since the buses would more easily accommodate a grocery cart.  This would allow her to make fewer trips to the grocery store overall which would reduce her transportation expenses, as well as saving her time and physical energy. <u>See</u> Supplemental Joint Findings of Fact (docket # 34) at ¶ 263(e).

23.   Class member Jose Casias has been forced to own a car, on which he must spend money for gas, maintenance, and insurance, due to inadequate bus service for getting to and from work. He has lost money due to having to leave work early to catch a bus before AC Transit service stops running at night. He and his mother find the fares difficult to afford, especially as they have increased over the last ten years. Further increases would force his family to spend less on food.  See Supplemental Joint Findings of Fact (docket # 346) at ¶ 262(c).

24.   Mr. Casias would benefit from enhanced routes/increased frequency of buses along the following routes: San Pablo Avenue, Telegraph/International Boulevard, Foothill/MacArthur, MacArthur/Oakland Airport, Shattuck/Alameda, College Avenue/University, Hesperian, 6th Street/Hollis, Sacramento/Market, and Mission/Outer E. 14th Avenue.  Mr. Casias would also benefit from additional night and weekend service, because he would be able to take AC Transit to work instead of driving his car, and would be able to save considerably on gas money and mileage. Expanded night and weekend service would also make AC Transit a safer choice for his family and him, because it would mean less time waiting at bus stops. See Supplemental Joint Findings of Fact (docket # 346) at ¶ 263(k).

25.   Class member Concepcion Chavez sometimes has to take a taxi to medical appointments because AC Transit buses are unreliable. The taxi costs much more than the bus. AC Transit's fare increases since 1996 are not affordable for Ms. Chavez on her Social Security income. Because she can not afford the fares she needs, she has to ask her kids for money. See Supplemental Joint Findings of Fact (docket # 346) at ¶ 262(d).

26.   Ms. Chavez would benefit from additional benches and shelters at AC Transit stops because it is difficult for her to walk and stand for long periods of time, and because it would provide shelter from rain and cold.  Ms. Chavez would also benefit from low-floor buses because she believes it would be easier for her to get in and out of the bus with her arthritic knee.  Ms. Chavez would also benefit from increased frequency of service so she could avoid planning her day around transit and could get to church on time.  See Supplemental Joint Findings of Fact (docket # 346) at ¶ 263(h).

9

**United States District Court**
For the Northern District of California

27. Class member Octavio Hernandez has little flexibility in his budget.  Mr. Hernandez has missed work because he could not afford AC Transit's fares. <u>See</u> Supplemental Joint Findings of Fact (docket # 346) at ¶ 262(e).

28. Mr. Hernandez would benefit from greater frequency of service, especially on the 82/1, 40, and 43 lines. He believes increased priority for buses at traffic signals might reduce delays and make his travels more efficient. <u>See</u> Supplemental Joint Findings of Fact (docket # 346) at ¶ 263(i).

29. Class member Virginia Martinez has to pay two AC Transit fares to get to and from the grocery store since AC Transit limited transfer use to ninety minutes. She has received warnings at work due to tardiness because of too-infrequent bus service. She has pursued fewer job opportunities, including jobs that would provide more hours than her existing job, because it was too difficult and expensive to reach certain jobs on AC Transit. Ms. Martinez's husband could not take a better-paying job further from home because it required AC Transit and BART to reach it, and the extra fares would have exceeded the increased wages.  AC Transit fare increases cut into her family's food budget, and her family's wages do not keep up with AC Transit's fare increases.  She must spend money on gas and other vehicle expenses because AC Transit's buses are too infrequent to be reliable transportation for her children to get to school.  <u>See</u> Supplemental Joint Findings of Fact (docket # 346) at ¶ 262(f).

30. Ms. Martinez would benefit from covered bus stops and benches because they would provide shelter from the rain.  She would also benefit from exclusive bus lanes and more frequent service because they would speed up her travel.  <u>See</u> Supplemental Joint Findings of Fact (docket # 346) at ¶ 263(j).

31. Class member Rebecca Jones-White has had to pay for taxi trips to get home from work due to lack of AC Transit service late at night.  She had to buy a car because AC Transit had insufficient service for her to get to and from work and to get where she needed to go on weekends.  Ms. Jones-White has to incur significant expenses for gas, repairs, and insurance for her car because she can not get where she needs to on AC Transit. <u>See</u> Supplemental

**United States District Court**
For the Northern District of California

Joint Findings of Fact (docket # 346) at ¶ 262(g).

32. Ms. Jones-White would benefit from AC Transit buses running more often near her Union Hall at night, so she could use AC Transit to get to and from work without waiting outside in unsafe areas for long periods of time.  Being more able to use AC Transit to get to and from work would also save her money on gas.  <u>See</u> Supplemental Joint Findings of Fact (docket # 346) at ¶ 263(f).

33. Class member Margo Robinson has been written up at work for tardiness due to reduced frequency of the AC Transit bus she takes to get to work.  She purchased a car because she could not get to work early enough on the only AC Transit line near her home and because the line does not go to the other places she needs to reach.  Ms. Robinson's car is expensive; she spends money on maintenance, insurance, gas, and repairs that she would not have to spend if she could reach the destinations she needs to reach on AC Transit's bus.  <u>See</u> Supplemental Joint Findings of Fact (docket # 346) at ¶ 262(h).

34. Ms. Robinson would benefit from earlier service on the AC Transit lines that she could use to get to work, including the 45 and the 82.  She would also benefit from reinstatement of the 58 line, because it would allow her to connect more conveniently to many locations.  Ms. Robinson would also benefit from increased AC Transit service because it would allow her to save money on gas and other expenses of owning and driving a car.  <u>See</u> Supplemental Joint Findings of Fact (docket # 346) at ¶ 263(g).

**Regional Transportation Plan ("RTP")**

35. The RTP is the region's long-range transportation plan over a twenty-five year time horizon.  The RTP is a prerequisite for the Bay Area's transportation projects to qualify for federal funds.  <u>See</u> 23 U.S.C. § 134(g); Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 34.

36. MTC uses the terms "Regional Transportation Plan" and "long-range transportation plan" interchangeably.  <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 35.

37. MTC adopted its 1994 RTP in or about June, 1994, by Resolution 2687.  <u>See</u> Joint Proposed

11

Findings of Fact and Conclusions of Law (docket # 291) at ¶ 36.

38.  MTC adopted its 1998 RTP in or about October, 1998, by Resolution 3116.  <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 37.

39.  MTC adopted its 2001 RTP in or about December, 2001, by Resolution 3427.  <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 38.

40.  MTC adopted its current RTP, known as the "Transportation 2030 Plan," in or about February, 2005, by Resolution 3681.  <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 39.

41.  Among other mandates for the planning process, MTC is required to "emphasize the preservation of the existing transportation system."  23 U.S.C. § 134(h)(1)(H).

42.  Other mandates for the planning process set forth in the same statute require MTC to also: "support the economic vitality of the metropolitan area, especially by enabling global competitiveness, productivity, and efficiency," "increase the safety of the transportation system for motorized and nonmotorized users," "increase the security of the transportation system for motorized and nonmotorized users," "increase the accessibility and mobility of people and for freight," "protect and enhance the environment, promote energy conservation, improve the quality of life, and promote consistency between transportation improvements and State and local planned growth and economic development patterns," "enhance the integration and connectivity of the transportation system, across and between modes, for people and freight," and "promote efficient system management and operation."  23 U.S.C. § 134(h)(1)(A)-(G).

43.  Since 1991, Congress has required long-range transportation plans to be fiscally constrained.  <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 42.

44.  In MTC's 2005 RTP, Financially Constrained Element refers to programmed local, regional, state, and federal funds, as well as discretionary state and federal funds anticipated to be available over the long term of the Transportation 2030 Plan.  <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 46.

45.  The financially-constrained element of MTC's 2005 RTP included approximately $118

billion.  Of that sum, approximately $76 billion in funding is designated for transit, with the remainder for highways and local streets and roads.  Of the transit portion, approximately $61 billion is designated for maintaining and operating the existing system, approximately $2 billion for system efficiency, and approximately $13 billion for transit expansion.  See Joint Proposed Findings of Fact and Conclusions of Law (docket #291) at ¶ 48.

46.  MTC's 2001 RTP included six goals, one of which was "equity," which the RTP described as the goal of "achiev[ing] fairness in the planning, funding and operation of the region's transportation system."  See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 50.

47.  MTC broadly follows a four-step process in preparing the financial plan of its RTP.  See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 86.

48.  In step one of the RTP process, for the revenue side, MTC staff prepares financial estimates for all transportation-related funding sources, including fund sources for transit, and assigns these dollars to transit projects based on current laws, policy, or historic funding levels, as applicable.  See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 87.

49.  In step two of the RTP process, for the expense side, MTC generally relies on data from the Short Range Transit Plans ("SRTP") for the first ten years and uses standard escalating assumptions for operating or life cycles for capital for the remaining years of the long-range plan.  See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 88.

50.  MTC's 2003 SRTP Guidelines provide in part that: "The [ten year] operations budget must be sustainable and generally balanced each year over the period of the SRTP, using currently available or reasonably projected revenues. . . .  Where reductions in service levels are required in order to achieve a balanced operating budget, [the operator must] describe the reductions and assess their impact on the affected service areas and communities."  See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 85.

51.  At step three, MTC determines what funding sources are eligible for meeting the operation and maintenance needs, "taking into account eligibility restrictions on those funds. . . ."  See

13

Aug. 21, 2008 Order on Summ. Adjudication/Judgment at 21:27.

52. At step four, after applying all eligible funds to operations and maintenance of the existing system, MTC applies any excess Track 1, or uncommitted, funding to prior committed projects or new projects in the long-range plan. <u>See</u> Aug. 21, 2008 Order on Summ. Adjudication/Judgment at 21:28-22:2.

53. For the 1998 RTP, the 2001 RTP, and the Transportation 2030 plan, assignment of regional transportation plan revenues was consistent with MTC policies current at the respective time those plans were prepared, and provided the basis for projecting those revenue assignments forward into the future. MTC policies were assumed to be consistent throughout the respective twenty-five-year period encompassing each plan. <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 89.

54. As part of its process of preparing the financial plan of its RTP, MTC issues "calls for data" to the transit operators, requesting year-by-year projections over twenty-five years of operating costs and local operating revenues (in year of expenditure dollars), and an explanation of the assumptions on which these projections were based. MTC requests data on an existing "baseline" of service. The "baseline" includes only those services in operation, under construction, or that have full funding commitments, but not potential Regional Transit Expansion Program projects under MTC Resolution No. 3434. MTC instructs operators to use their most recent SRTP operating costs as a "baseline," and to "trend off" of that baseline for the outer fifteen years. <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 99.

55. A "transit operating shortfall" in the RTP is the difference between an operator's projected operating revenues and its projected operating costs. <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 107.

56. In or about 2004, MTC stated to the California Legislature that its draft 2005 RTP "projects a transit operating shortfall totaling $1.6 billion over 25 years that will need to be addressed with similar fare and service changes absent a new source of operating funds." <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 108.

14

**United States District Court**
For the Northern District of California

57.   MTC identified a projected operating shortfall for AC Transit of $360.5 million in the 1994 RTP.  See Second Supplemental Joint Proposed Findings of Fact (docket # 353) at ¶ 306.

58.   MTC identified a projected operating shortfall for AC Transit of $136.2 million in the 1998 RTP.  See Second Supplemental Joint Proposed Findings of Fact (docket # 353) at ¶ 307.

59.   MTC identified a projected operating shortfall for AC Transit of $36.7 million in the 2001 RTP.  See Second Supplemental Joint Proposed Findings of Fact (docket # 353) at ¶ 308.

60.   MTC identified a projected operating shortfall for AC Transit of $64.4 million in the 2005 RTP.  See Second Supplemental Joint Proposed Findings of Fact (docket # 353) at ¶ 309.

**Transit Operators**

61.    Alameda Contra Costa Transit District ("AC Transit"), Bay Area Rapid Transit District ("BART"), Peninsula Corridor Joint Powers Board ("Caltrain"), Golden Gate Bridge Highway and Transportation District ("GGT"), San Francisco Municipal Railway ("Muni"), San Mateo County Transit District ("SamTrans") and Santa Clara Valley Transit Authority ("VTA") are the seven largest operators in the region.  See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 53.

62.    In the aggregate, these seven operators account for more than 95% of the Bay Area's total annual transit trips.  See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 54.

63.   The annual ridership of these seven largest transit operators for Fiscal Year 2005-2006 was approximately as follows:  AC Transit (65.383 million); BART (101.578 million); Caltrain (10.149 million); GGT (9.403 million); Muni (220.880 million); SamTrans (14.506 million); VTA (40.187 million).  See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 55.

64.   Minorities account for approximately 61% of the Bay Area's aggregate transit ridership.  The proportion of minority riders on the seven largest transit operators is as follows: 78% of AC Transit riders; 53% of  BART riders; 50% of Caltrain riders; 38% of GGT riders; 58% of Muni riders; 70% of SamTrans riders; and 70% of VTA riders.  See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 56.

15

65. AC Transit connects with nine other bus systems, twenty-one BART stations, six Amtrak stations, and three ferry terminals. <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 63.

66. AC Transit was created by statute. <u>See</u> Cal. Public Utilities Code §§ 24561 <u>et seq.</u>; Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 64.

67. AC Transit's patrons in Contra Costa County include a higher percentage of white riders than AC Transit's patrons in Alameda County. <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 65.

68. In or about 2001, the AC Transit Board of Directors adopted a policy document entitled, "Strategic Vision:  A World Class System for the East Bay" ("Strategic Vision").  <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 66.

69. AC Transit has published an SRTP that contains the Strategic Vision. <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 67, 69.

70. AC Transit's Strategic Vision describes a tiered approach to "accomplish the goal of increasing ridership to about 85 million by 2005-06, then rising to 100 million by 2010." <u>See </u>Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 72.

71. The first tier is known as the Financially Constrained Operating Plan ("FCOP"), "which is based on anticipated revenue from existing sources." <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 73.

72. Bay Area Rapid Transit ("BART") operates rail service consisting of five routes to forty-three stations in four counties. <u>See</u> Third Supplemental Joint Findings of Fact (docket # 364) at ¶ 312.

73. According to BART's STRP for FY 2003-2012, "[t]he Bay Area economy began to slow in late 2000, mid-way through FY01, and BART ridership declined as a result." <u>See</u> Trial Exhibit ("Tr. Ex.") 1172, Chap. 3, p. 3; Third Supplemental Joint Findings of Fact (docket # 364) at ¶ 315.

74. According to BART's SRTP for FY 2005-2014, BART ridership, after growing at record rates for several years, decreased with the Bay Area economic downturn from FY02 through

FY03.  BART reported that much of the ridership decrease was attributable to the Bay Area economy, hard hit by the loss of technology jobs and by the terrorist attacks of September 11, 2001.  <u>See</u> Third Supplemental Joint Findings of Fact (docket # 364) at ¶ 325.

75.     According to BART's SRTP for FY 2005-2014, "BART's ridership is often directly impacted by the health of the economy."  <u>See</u> Tr. Ex. 1898, p. 3-6; Third Supplemental Joint Findings of Fact (docket # 364) at ¶ 328.

76.     Caltrain is a train system operating in San Francisco, San Mateo and Santa Clara counties.  <u>See</u> Tr. Ex. 667 at 32-34.  The Joint Powers Board, consisting of Muni, SamTrans and VTA, took over ownership of Caltrain in July 1992.  <u>See</u> <u>id.</u>

77.     Caltrain lost 4.25% of its ridership in FY 2001-2002 and 11.85% in FY 2002-2003.  <u>See</u> Tr. Ex. 1166 at 4-1.

78.     Caltrain cut service after the 2002-2003 recession.  <u>See</u> Reporter's Transcript ("RT") 549:12-18.

79.     In or about June 2004, Caltrain began to run eighty-six trains each weekday, including ten express trains known as "Baby Bullet" trains between San Francisco and San Jose.  <u>See</u> Tr. Ex. 219.  Weekend service was also restored at that time, with thirty-two Saturday trains and thirty Sunday trains.  <u>See</u> <u>id.</u>  Service increased in July 2005, when Caltrain began running ninety-six trains each weekday, including twenty-two Baby Bullet trains.  <u>See</u> <u>id.</u>

80.     Since the Baby Bullet opened, ridership has increased on Caltrain by more than 50%.  <u>See</u> RT 884:25-885:4.

81.     GGT is the smallest of the seven largest operators in terms of number of passengers carried per year.  <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 57.

82.     GGT owns the Golden Gate Bridge, which provides GGT with toll revenues as a source of operating funding.  Demand for GGT bus services has fallen by 25% since 2000-2001.  <u>See</u> RT 510:16-22.

83.     In late 2001 and early 2002, the economy contributed to GGT's projection of a revenue shortfall of one billion dollars over ten years.  <u>See</u> RT 972:18-973:19.  GGT developed a

strategic plan to address the projected shortfall, which was updated in 2002, and included service cuts.  See RT 973:20-974:15.

84.  GGT had service cuts after the 2002-2003 recession.  See RT 549:4-5.

85.  Since fiscal year 2004, GGT has increased service because ridership increased.  See RT 979:17-20.

86.  The San Francisco Municipal Transportation Agency is composed of San Francisco Municipal Railway ("Muni") and the Department of Parking and Traffic.  See http://www.sfmta.com/cms/ahome/indxabmu.html.

87.  Muni served approximately 217 million riders in FY 2006-2007.  See Stipulation Regarding Ridership, Revenue Vehicle Miles, and Revenue Vehicle Hours of Seven Largest Operators (docket # 371) at Ex. C.

88.  Muni had service cuts after the 2002-2003 recession.  See RT 549:8-9.

89.  Muni receives parking-related revenues.  See RT 927:9-11.

90.  In 2004, Muni had a $13 million shortfall that was covered with a fare increase, parking fee and fine increases, as well as staff reductions.  See Tr. Ex. 1178 at 66.

91.  SamTrans provided bus service to approximately 14.5 million riders in San Mateo County in FY 2006-2007.  See Stipulation Regarding Ridership, Revenue Vehicle Miles, and Revenue Vehicle Hours of Seven Largest Operators (docket # 371) at Ex. C.

92.  SamTrans cut service after the 2002-2003 recession.  See RT 549:6-7.

93.  In 2003, SamTrans restructured their local service to provide feeder service to the new BART extension.  See RT 417:4-22.

94.  SamTrans's ridership stabilized in FY 2007 due to some rebound in the economy.  See Tr. Ex. 1902 at 1.

95.  On June 12, 2002, the Board of Directors for SamTrans adopted certain bus service changes comprising the elimination of some routes, the combination of other routes and adjusted frequencies.  The Board of Directors adopted the changes with the understanding that staff would be authorized to implement the changes as of August 25, 2002.  See Tr. Ex. 1920; Third Supplemental Joint Findings of Fact (docket # 364) at ¶ 369.

96. VTA operates bus and light rail service.  See Tr. Ex. 1913; Third Supplemental Joint Findings of Fact (docket # 364) at ¶ 342.

97. VTA is the Congestion Management Authority ("CMA") for Santa Clara County.  See Third Supplemental Joint Findings of Fact (docket # 364) at ¶ 343.

98. VTA has statutory authority to enact sales and use taxes if so authorized by the voters.  See Third Supplemental Joint Findings of Fact (docket # 364) at ¶ 345.

99. The VTA Board of Directors on August 9, 2000 voted to place a half-cent transit sales tax, Santa Clara County 2000 Measure A, on the November 7, 2000 General Election ballot.  The voters passed the tax, which is dedicated to specified public transit capital improvement projects and operations in Santa Clara County, including the BART extension to Silicon Valley.  See Tr. Ex. 1914; Third Supplemental Joint Findings of Fact (docket # 364) at ¶ 346.

100. On June 15, 2006, the VTA Board approved the 2000 Measure A Revenue and Expenditure Plan, a $21.6 billion capital and operations program.  See Tr. Ex. 1180 at 4; Third Supplemental Joint Findings of Fact (docket # 364) at ¶ 348.

101. Approximately 18.5% of 2000 Santa Clara County Measure A sales-tax revenues are designated annually for operating purposes, which VTA projected to be $6.869 million in FY 2006 and $28.815 million in FY 2007.  See Tr. Ex. 1180 at 6-7; Third Supplemental Joint Findings of Fact (docket # 364) at ¶ 349.

102. VTA reported to MTC in its Mini-SRTP for FY 2007-2016 that "the addition of Measure A Operating Assistance" allows VTA "to project a reduction of Federal Preventive Maintenance in FY 2008 to levels consistent with pre-recession numbers, so that it may reinstate its local capital program."  See Tr. Ex. 1180 at 6, § 1.3; Tr. Ex. 1181 at 54; Third Supplemental Joint Findings of Fact (docket # 364) at ¶ 350.

103. On May 2, 2002, the VTA Board of Directors made a finding that a fare increase was necessary to meet operating expenses and to fund capital projects necessary to maintain service within the existing service area, while maintaining minimum required financial reserves, and adopted Resolution No. 02.05.15 establishing new rates and fares for VTA bus, light rail, and paratransit services effective July 1, 2002.  See Tr. Ex. 1915; Third

1

Supplemental Joint Findings of Fact (docket # 364) at ¶ 354.

2   104.   VTA implemented a 5% service reduction in July 2002.  <u>See</u> Tr. Ex. 1183, p. 2-8; Third

3          Supplemental Joint Findings of Fact (docket # 364) at ¶ 355.

4   105.   VTA implemented a 9% service reduction in April 2003.  <u>See</u> Tr. Ex. 1183, p. 2-8; Third

5          Supplemental Joint Findings of Fact (docket # 364) at ¶ 357.

6   106.   VTA reported in its SRTP for FY 2004-2013 that the high rate of unemployment in Santa

7          Clara County had a dramatic impact on transit ridership.  VTA reported in its SRTP for FY

8          2004-2013 that ridership trends closely mirror unemployment trends -- as unemployment

9          increases, ridership declines.  <u>See</u> Tr. Ex. 1183, p. 2-8; Third Supplemental Joint Findings of

10         Fact (docket # 364) at ¶ 359.

11  107.   VTA bus ridership declined 13% between FY 2001-02 and 2002-03.  VTA reported in its

12         SRTP for FY 2004-2013 that the decline was attributed to the "weak local economy."  <u>See</u>

13         Tr. Ex. 1183, p. 2-5; Third Supplemental Joint Findings of Fact (docket # 364) at ¶ 360.

14  108.   VTA light rail ridership declined 22% between FY 2001-02 and 2002-03.  VTA reported in

15         its SRTP for FY 2004-2013 that the decline was attributed to the "weak local economy."  <u>See</u>

16         Tr. Ex. 1183, p. 2-5, 2-7; Third Supplemental Joint Findings of Fact (docket # 364) at ¶ 361.

17  109.   VTA reported in its SRTP for FY 2004-2013 that after 2001, declines in bus and light rail

18         productivity were primarily due to the poor performance of the local economy.  <u>See</u> Tr. Ex.

19         1183, p. 2-8; Third Supplemental Joint Findings of Fact (docket # 364) at ¶ 362.

20  110.   VTA reported in its SRTP for FY 2004-2013 that "[i]n excess of 200,000 jobs have been lost

21         in our community."  <u>See</u> Tr. Ex. 1183, p. 2-8; Third Supplemental Joint Findings of Fact

22         (docket # 364) at ¶ 363.

23  111.   VTA reported in its SRTP for FY 2004-2013 that "[b]etween FY 1997 and FY 2001, VTA

24         bus and light rail passengers per scheduled revenue hour steadily declined for several

25         reasons.  These were years of system expansion, and it is very difficult for new services to be

26         as productive as the core services that were already in place. Added to that, the most highly

27         productive markets were already being served."  <u>See</u> Tr. Ex. 1183 at 2-7; Third Supplemental

28         Joint Findings of Fact (docket # 364) at ¶ 364.

**United States District Court**
For the Northern District of California

112.   On September 12, 2008, VTA reported a rise in both bus and rail ridership with average weekday ridership being at the highest levels since August 2002.  See Tr. Ex. 1917; Third Supplemental Joint Findings of Fact (docket # 364) at ¶ 365.

113.   In November 2001, the VTA and BART Boards of Directors approved "a cooperative agreement regarding institutional, project implementation and financial issues related to the BART extension."  See Tr. Ex. 1181, p. 78; Tr. Ex. 1182, p. 74; Tr. Ex. 1183, p. 4-23; Third Supplemental Joint Findings of Fact (docket # 364) at ¶ 366.  VTA reported in its SRTP for FY 2004-2013 that it is "seeking to close the gap in the regional transportation network by providing an extension of the Bay Area Rapid Transit (BART) system to Silicon Valley."  See Tr. Ex. 1183, p. 4-23; Third Supplemental Joint Findings of Fact (docket # 364) at ¶ 366.

114.   BART reported in its SRTP for FY 2008 through FY 2017 that: "VTA is providing the funding support for all BART costs related to support work for the Silicon Valley Rapid Transit project.  BART and VTA will continue to work towards the completion of the proposed BART to Santa Clara County Extension, with VTA taking the lead in financing and completing the project planning, design and construction."  See Tr. Ex. 1898, p. 5-22; Third Supplemental Joint Findings of Fact (docket # 364) at ¶ 367.

115.   The revenue from the one-eighth cent sales and use tax that was proposed by the VTA Board of Directors and approved by the voters on November 4, 2008 can be used only to fund the operation, maintenance and future capital reserve for the BART Extension to Santa Clara County.  See VTA Board Resolution No. 08.08.23, http://www.vta.org/bart/documents/other/adopted_resolution_08_08_23.pdf); see also http://www.vta.org/bart; Third Supplemental Joint Findings of Fact (docket # 364) at ¶ 368.

**MTC Demographic Survey**

116.   In 2006, MTC commissioned a region-wide demographic survey of Bay Area transit ridership ("Demographic Survey").  See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 58.

117.   In or about June 2007, MTC issued a final report entitled "MTC Demographic Survey, Phase One" ("the 2007 Report").  See Joint Proposed Findings of Fact and Conclusions of Law

21

(docket # 291) at ¶ 59.

118.   The 2007 Report reports the findings of Phase One of a survey of the ridership of riders of fixed-route transit service provided by approximately twenty Bay Area transit operators.  <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 61.

119.   The MTC Demographic Survey was the first demographic survey of the riderships of Bay Area transit operators that MTC had prepared, commissioned or conducted.  <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 62.

120.   Since at least as early as September 2000, MTC has annually published a report entitled "Statistical Summary of Bay Area Transit Operators."  <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 77.

121.   MTC's "Statistical Summary" publication provides, for each Bay Area transit operator, a variety of data on operating budgets and service levels.  Among other things, it reports annual ridership, annual revenue vehicle miles and hours, and operating budget.  <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 78.

**Lifeline Transportation Network**

122.   In or about December 2001, MTC adopted the Lifeline Transportation Network Report as a part of the "Blueprint element" of the 2001 RTP.  <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 235.

123.   The "Blueprint" element of the 2001 Regional Transportation Plan was "MTC's advocacy document for new transportation revenues" to fund key transportation projects. <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 248.

124.   The purpose of the Lifeline Transportation Network Report was to assess the current ability of the fixed route transit system to serve low-income communities in the region.  <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 236.

125.   The Lifeline Transportation Network Report, which was included in the 2001 RTP, defined a network of lifeline transit routes identified by MTC as critical to meeting the transportation needs of low income people in the San Francisco Bay Area.  <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 237.

**United States District Court**
For the Northern District of California

126. The Lifeline Transportation Network Report estimated that, assuming a fixed route solution, a total of 1.55 million service hours per year of additional service would be needed to fill the gaps identified in the Lifeline Transportation Network.  See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 241.

127. The Lifeline Transportation Network Report identified as a "first priority" supporting "the current network of transit routes that effectively serve low-income communities."  See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 242.

**Equity Analysis**

128. In the Equity Analysis of its 2001 RTP and its 2005 RTP, MTC analyzed "Communities of Concern" that were defined on the basis of proportional geographic concentrations of minority populations and low-income populations in "Regional Travel Analysis Zones" ("RTAZs").  See Supplemental Joint Findings of Fact (docket # 346) at ¶ 257.

129. RTAZs are small area neighborhoods or communities that serve as the smallest geographic basis for travel demand modeling.  See Supplemental Joint Findings of Fact (docket # 346) at ¶ 253.

130. Communities of Concern, as defined in the 2001 and 2004-05 Equity Analyses, are found in each of the nine Bay Area Counties.  See Supplemental Joint Findings of Fact (docket # 346) at ¶ 257.

131. The 2005 RTP Equity Analysis included an RTAZ as part of a community of concern if 30% or more of the households within that zone are below 200% of the poverty level because using this threshold places an emphasis on evaluating areas with significant concentrations of low-income households.  Also, as 50% of the Bay Area is non-white (according to the 2000 U.S. Census data used in the 2004-05 Equity Analysis), an RTAZ was also included as a community of concern if 70% or more of the persons in the households were of the following descent: African American, Asian American, Hispanic or Latino, American Indian or Alaska Native, Native Hawaiian or Other Pacific Islander, or Multi- Racial (two or more races). These two thresholds of 30% and 70% were also used to define a community of concern in the 2001 equity analysis. The 30%/70% thresholds together represent 33% of the Bay Area

1   population.  See Supplemental Joint Findings of Fact (docket # 346) at ¶ 252.

**Funding Types**

### Resolution 3434

132.   Resolution 3434 is also known as the Regional Transit Expansion Program ("RTEP").
Resolution 3434 consists of a list of high-priority rail and express/rapid bus improvements to
serve the Bay Area's most congested corridors.  MTC adopted Resolution 3434 in December
2001 to establish clear priorities for the investment of transit expansion funds.  See Joint
Glossary at 13.

133.   MTC's 2001 RTP states that: "The cornerstone of this RTP is the Regional Transit
Expansion Program – adopted by the Commission as Resolution 3434 – which calls for a
nearly $11 billion investment in new rail and bus projects . . . .  Resolution 3434 is the
successor to MTC's Resolution 1876, which was adopted in 1988 and delivered . . .
improvements [such] as the BART extensions to Pittsburg/Bay Point and Dublin/Pleasanton,
the Tasman light-rail extension in Silicon Valley, and the . . . BART extension to [SFO]."
See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 208.

134.   Resolution No. 3434 is a strategic long-range master plan.  The plan contemplates that MTC
would find additional sources of funds to fully fund the projects in the plan.  In order to be
included in the RTP, however, the project would have to have full capital funding and its
transit agency must demonstrate an ability to operate the increase in service.  If a project had
a capital shortfall, it could not be included in the RTP.  See RT 1028:3-19.

135.   For Resolution No. 3434, the funding projections are long range projections which are
expected to take twenty-five to thirty years to fulfill.  See RT 961:1-12.

136.   Resolution 3357 sets forth the criteria MTC adopted to govern the selection of projects for
Resolution 3434.  See RT 423:4-10; Tr. Ex. 104.  In Resolution 3357, MTC formulated
different selection criteria for bus projects than for rail projects.  See RT 1255:8-10; Tr. Ex.
104, Attachment A.  When Resolution No. 3434 was originally adopted in 2001, MTC issued
a call for projects.  Projects were to be judged by criteria adopted in Resolution No. 3357,
which fell into two main categories.  First, there were financial-based criteria which assessed

United States District Court
For the Northern District of California

whether a sponsor already had funds, whether federal, state and/or local, committed to the project.  Second, there were performance-related criteria, which assessed the relationship of the project to land-use goals, connectivity with other systems, and ability to fill gaps in the transit network. See RT 1012:2-1013:25; Tr. Ex. 1456.

137.   For a bus project to be included in Resolution 3434, Resolution 3357 required a demonstration that the bus project could effectively address congestion relief by providing a clearly attractive (i.e., faster and/or more convenient) alternative to single occupancy vehicles.  The same criteria was not listed in the requirements for rail projects, although MTC assumed that rail projects would satisfy this requirement. See RT 1256:17-1258:3; Tr. Ex. 104, Attachment A.

138.   MTC issued a call for project candidates specifically instructing operators to submit projects based on these criteria. See RT 423:14-17.  One of the evaluation criteria in Resolution 3357 was cost-effectiveness, as rated on a scale of high, medium, or low. See RT 424:4-9, 1256:3-5; Tr. Ex. 104, Attachment A, Section A.  MTC assigned a high cost-effectiveness score to projects with a capital cost of $0 to $15 per new rider. See RT 424:10-12. However, a high rating on the cost-effectiveness scale was not a prerequisite to a project's inclusion in Resolution 3434 and several Resolution 3434 projects had low efficiency ratings. See RT 424:13-21.

139.   When formulating Resolution 3434, MTC intended to include bus projects to "provide transitional express bus services more quickly in corridors where rail service is planned but not deliverable for many years." See RT 1258:4-1259:7; Tr. Ex. 104 at MTCP151108.

140.   MTC recognizes that express bus projects can be completed more quickly than new rail extensions, and generally require a much smaller capital investment. See RT 1259:8-1260:22.

141.   AC Transit requested funds from MTC for the 2001 RTEP for the Berkeley-Oakland-San Leandro Bus Rapid Transit, Phase 1 Project. See RT 425:23-426:6; Tr. Ex. 103 at MTCP000982; see also RT 116:18-117:9; 117:24-118:2. The total capital cost of that project was approximately $104 million in 2001 dollars. See RT 426:7-10; Tr. Ex. 103 at

25

United States District Court
For the Northern District of California

MTCP000982.  That service area is largely minority and predominantly low-income.  <u>See</u> Spencer Dep. of 09-10-07 at 65:21-66:4.  AC Transit sought funding for that project to contribute to improved mobility for area residents and greater access to jobs.  <u>See id.</u> at 66:12-21.  AC Transit received some money for that project, but MTC did not allocate the full amount requested by AC Transit.  <u>See id.</u> at 66:22-67:2.  The project is currently not fully funded.  <u>See id.</u> at 67:3-6.  AC Transit has plans to go forward with the improvements if it receives full funding.  <u>See id.</u> at 67:7-10.

142.  AC Transit also requested funds from MTC in the 2001 RTEP for the AC Transit/ Oakland/San Leandro Bus Rapid Transit, Phase Two (International Boulevard - East 14th Street) Project.  <u>See</u> RT 426:13-17; Tr. Ex. 103 at MTCP000985; <u>see also</u> RT 116:18-117:9; 118:5-8.  The total capital cost of that project was approximately $270 million in 2001 dollars.  <u>See</u> RT 426:18-20; Tr. Ex. 103 at MTCP000985.

143.  AC Transit also requested funds from MTC in the 2001 RTEP for the AC Transit Enhanced Bus/Rapid Transit, Miscellaneous Corridors project.  <u>See</u> RT 426:21-25; Tr. Ex. 103 at MTCP000988.  AC Transit submitted a proposal for eight miscellaneous corridors set forth in the Strategic Vision Plan chart, including San Pablo Avenue, Telegraph/International Boulevard/East 14th, MacArthur Boulevard and Hesperian/Mission/East 14th.  <u>See</u> RT 116:18-117:4, 118:14-17, 162:18-24; Tr. Ex. 582 at Table ES-1.  The total capital cost of that project was approximately $906 million in 2001 dollars.  <u>See</u> RT 427:1-6; Tr. Ex. 103 at MTCP000988.

144.  AC Transit's funding requests under Resolution 3434 were close to a billion dollars.  <u>See</u> RT 119:8.  In 2001, Resolution 3434 ultimately provided just above $200 million for AC Transit's projects.  <u>See</u> RT 119:5-12.

145.  As adopted in 2001, Resolution No. 3434 included nineteen projects with a total projected capital cost of $10.519 billion in 2001 dollars.  <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 213.

146.  As adopted in 2001, Resolution No. 3434 included five BART projects: BART to Warm Springs; Warms Springs to San Jose; Oakland Airport Connector; East Contra Costa Rail

**United States District Court**
For the Northern District of California

1  Extension; and Tri-Valley Rail Extension.  <u>See</u> Joint Proposed Findings of Fact and

2  Conclusions of Law (docket # 291) at ¶ 214.

3  147.    As adopted in 2001, Resolution No. 3434 included three Caltrain projects: Caltrain Rapid

4  Rail/Electrification; Caltrain Express, Phase 1; and Caltrain Express, Phase 2.  <u>See</u> Joint

5  Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 215.

6  148.    As adopted in 2001, Resolution No. 3434 included two AC Transit projects: AC Transit

7  Oakland/San Leandro Bus Rapid Transit, Phase 1 (Enhanced Bus); and AC Transit Enhanced

8  Bus, Hesperian/Foothill/MacArthur corridors.  <u>See</u> Joint Proposed Findings of Fact and

9  Conclusions of Law (docket # 291) at ¶ 216.

10  149.    As adopted in 2001, Resolution No. 3434 projected the total project cost of the following

11  projects, in 2001 dollars, as follows: (1) BART to Warm Springs: $634 million; (2) BART,

12  Warms Springs to San Jose: $3.710 billion; (3) BART Oakland Airport Connector: $232

13  million; (4) BART East Contra Costa Rail Extension: $345 million; (5) BART Tri-Valley

14  Rail Extension: $345 million; (6) Caltrain Rapid Rail/Electrification: $602 million; (7)

15  Caltrain Express, Phase 1: $127 million; (8) Caltrain Express, Phase 2: $330 million; (9)AC

16  Transit Oakland/San Leandro Bus Rapid Transit, Phase 1 (Enhanced Bus): $151 million; and

17  (10) AC Transit Enhanced Bus, Hesperian/Foothill/MacArthur corridors: $90 million.  <u>See</u>

18  Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 217.

19  150.    As adopted in 2001, Resolution No. 3434 projected the capital shortfall for the following

20  projects, in 2001 dollars, as follows: (1) BART to Warm Springs: none; (2) BART, Warms

21  Springs to San Jose: none; (3) BART Oakland Airport Connector: none; (4) BART East

22  Contra Costa Rail Extension: $99 million; (5) BART Tri-Valley Rail Extension: $145

23  million; (6) Caltrain Rapid Rail/Electrification: none; (7) Caltrain Express, Phase 1: none;

24  (8) Caltrain Express, Phase 2: $190 million; (9) AC Transit Oakland/San Leandro Bus Rapid

25  Transit, Phase 1 (Enhanced Bus): none; (10) AC Transit Enhanced Bus,

26  Hesperian/Foothill/MacArthur corridors: $63 million.  <u>See</u> Joint Proposed Findings of Fact

27  and Conclusions of Law (docket # 291) at ¶ 218.

28  151.    As amended in 2006, Resolution No. 3434 included 20 projects (18 pending completion and

United States District Court
For the Northern District of California

two open for service), with a total projected capital cost of $13.503 billion in 2006 dollars. <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 220.

152.   As amended in 2006, Resolution No. 3434 included five BART improvement projects: BART to Warm Springs; BART, Warms Springs to San Jose/Santa Clara; BART/Oakland Airport Connector; East Contra Costa BART Extension (eBART); Tri-Valley Transit Access Improvements to/from BART.  <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 221.

153.   As amended in 2006, Resolution No. 3434 included two projects that were open for service: Caltrain Express: Baby Bullet and Regional Express Bus.   As amended in 2006, Resolution No. 3434 included two Caltrain projects that were not yet open for service: Caltrain Electrification; and Caltrain Express: Phase 2.  <u>See</u> Tr. Ex. 98 at MTCP239004.

154.   As amended in 2006, Resolution No. 3434 included two AC Transit projects: AC Transit Berkeley/Oakland/San Leandro Bus Rapid Transit; and AC Transit Enhanced Bus, Grand-MacArthur corridor.  <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 223.

155.   As amended in 2006, Resolution No. 3434 projected the total capital cost of the following projects, in 2006 dollars, as follows: (1) BART to Warm Springs: $686 million; (2) BART, Warms Springs to San Jose/Santa Clara: $4.792 billion; (3) BART/Oakland Airport Connector: $350 million; (4) East Contra Costa BART Extension (eBART): $407 million; (5) Tri-Valley Transit Access Improvements to/from BART: $464 million; (6) Caltrain Electrification: $471 million; (7) Caltrain Express, Phase 2: $250 million; (8) AC Transit Berkeley/Oakland/San Leandro Bus Rapid Transit: $175 million; and (9) AC Transit Enhanced Bus, Grand-MacArthur corridor: $68 million.  <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 224.

156.   As amended in 2006, Resolution No. 3434 projected the capital shortfall for the following projects, in 2006 dollars, as follows: (1) BART to Warm Springs: none; (2) BART, Warms Springs to San Jose/Santa Clara: none; (3) BART/Oakland Airport Connector: none; (4) East Contra Costa BART Extension (eBART): none; (5) Tri-Valley Transit Access Improvements

28

to/from BART: none; (6) Caltrain Electrification: $94 million; (7) Caltrain Express, Phase 2: $66 million; (8) AC Transit Berkeley/Oakland/San Leandro Bus Rapid Transit: none; and (9) AC Transit Enhanced Bus, Grand-MacArthur corridor: $52 million.  See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 225.

157.   The 2008 update to Resolution No. 3434 included the assignment of funds from Proposition 1B, which authorizes the state to issue a $20 billion general obligation bond for a variety of transportation improvements, and the unanticipated additional Congestion Mitigation and Air Quality ("CMAQ") funds.  See 23 U.S.C. § 149.  Proposition 1B has a program called "SLPP" which refers to state and local partnerships.  If a sponsor has local funds dedicated to the project, the state will do a one to one match with Proposition 1B money.  These funds are allocated to the region through a formula that is based on the relative amounts of local self-help revenues that the transit operators have available.  The formulas are specified geographically.  See RT 1059:8-16.

158.   VTA is the project sponsor for the BART Warm Springs to San Jose extension, which means that it promised to deliver the project.  See RT 1018:13-15.

159.   VTA worked with MTC for years to address the growing congestion on the I-880 corridor, which goes from Oakland to San Jose.  Because San Jose is a major employment center and a many workers commute to San Jose from Alameda County via I-880, congestion has increased.  Because there is no transit service in that corridor, VTA wanted to fill that gap.  VTA demonstrated that commitment by taking a half cent sales tax measure to the voters.  That measure, which dedicates funds to the BART system, passed in 2000.  See RT 1018:21-1020:2.

160.   The BART Warm Springs to San Jose project had $649 million earmarked by the California Legislature to form the Traffic Congestion Relief Program ("TCRP").  The project also estimated over $3 billion in local sales tax money.  MTC had no discretion to move these funds to another use.  VTA, as Santa Clara's Congestion Management Agency, also dedicated $49 million in Santa Clara County Regional Transportation Improvement Program ("RTIP") funds to the project.  VTA also targeted $636 million in federal New Starts funds

29

United States District Court
For the Northern District of California

that it hoped to receive.  See RT 1020:2-1022:12; Tr. Ex. 1036 at 8.

161.    The BART Warm Springs to San Jose project was included in the 2001 RTP but removed
        from the 2005 RTP because when the economic crisis hit, and the estimated revenue from
        sales tax revenue for operations failed to meet the test of sufficiency to operate the extension.
        See RT 1064:4-1065:11.

162.    MTC has committed funds to AC Transit's Bus Rapid Transit corridors under Resolution No.
        3434.  See RT 106:12-15.

163.    AC Transit received the full amount of Regional Measure 2 ("RM2") funds that it requested
        for the Telegraph Bus Rapid Transit service.  See Martin DT 91:5-7.  RM2 was a ballot
        measure instituting a $1 bridge toll increase passed by Bay Area voters in March 2004.  The
        expenditure plan funds thirty-seven capital projects, with an emphasis on transit
        improvements in the bridge corridors, as well as a dozen transit operating projects to enhance
        service along the bridge corridors.  See Joint Glossary at 13.

164.    AC Transit's Bus Rapid Transit project increased by $100 million dollars between 2001 and
        2008.  MTC fully filled this gap because this project was identified as a top project to target
        for receipt of Small Starts funding.  Between 2001 and 2008, the scope of the
        MacArthur/Hesperian project was reduced.  See RT 1054:4-1055:17.

165.    MTC had some unanticipated CMAQ funds that came to the region.  MTC made a strategic
        decision to allocate these funds to a number of programs including Resolution No. 3434.
        MTC provided $35 million of the funds to cover the shortfall in AC Transit's Bus Rapid
        Transit program so that the project could be included in the 2009 RTP.  See RT
        1049:23-1050:14.

166.    The Transbay Transit Center is part of Resolution No. 3434, with a projected cost of $2.6
        billion as of 2006.  Of that cost, $301 million is projected to come from county sales tax
        revenue; $25 million is projected from San Francisco RTIP funds, $67 million is projected
        from a federal earmark that the project sponsor obtained, and $444 million is projected to be
        obtained from a combination of land sales and planned tax increment from a planned new
        redevelopment area related to the terminal.  MTC cannot transfer any of these funds to

another use.  See RT 1023:21-1026:12, Tr. Ex. 1036 at 8.

167.   The project sponsor of the Transbay Project is the Transbay Joint Powers Board, made up of representatives of AC Transit, Muni, GGT, and SamTrans.  See RT 565:25-566:18.

168.   The Caltrain Baby Bullet project had $127 million in TCRP funds before it was selected for inclusion in Resolution No. 3434, leaving $1 million to be funded from another source.  The second phase of the Baby Bullet project was funded in part by county sales tax measures adopted by the three county Caltrain partners, Santa Clara, San Francisco and San Mateo.  The sales tax measures were included in expenditure plans which were adopted outside of MTC's jurisdiction.  See RT 1026:13-1027:17, Tr. Ex. 1036 at 8.

169.   The Baby Bullet project was included in MTC's Resolution No. 3434 after Caltrain obtained money from the Traffic Congestion Relief Program initiative committed to the project.  See RT 883:25-884:6.

**Committed Funds versus Discretionary Funds**

170.   Committed funds are "revenues that are dedicated by law, ballot measure or prior MTC programming actions to specific transportation investments." See Joint Glossary at 6.

171.   MTC operates on a July 1 to June 30 fiscal year.  "Fiscal year 2006" means the fiscal year beginning on July 1, 2005 and ending on June 30, 2006.  See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 115.

172.   By statute, MTC can impose conditions on the use of funds from certain funding sources.  See RT 227:2-6.

173.   MTC prepares an annual report for MTC Discretionary Funding.  See, e.g., Tr. Ex. 454.  The list of funds included in this report were agreed to in the context of a legal settlement agreement.  See RT 821:12-822:2; 360:6-15.

174.   MTC prepared a "master scan" of funds considered as part of the 2005 RTP.  See RT 360:16-25; Tr. Ex. 455.  This "master scan" of funds is a more complete survey of funding sources over which MTC has discretion than the Report of Discretionary Funding.  See RT 360:22-25, 361:4-9.

**Federal Committed Funds**

175. The Federal Transit Administration ("FTA") administers formula Sections 5307 and 5309 funds and distributes them based on urbanized areas defined by census data. <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 124.

176. Section 5307 funds are granted by the United States Secretary of Transportation to finance mass transit capital projects as well as to finance the planning and improvement costs of equipment, facilities, and associated capital maintenance for use in mass transit (also known as "preventive maintenance"), including the renovation and improvement of historic transportation facilities with related private investment. Section 5307 funds are authorized on a formula basis and programmed by MTC under its Transit Capital Priorities process. <u>See</u> Joint Glossary at 1.

177. There are three categories of Section 5309 funds: Fixed Guideway Modernization; Discretionary Capital - Bus and Bus Facilities; and Discretionary Capital - New Starts. <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 140.

178. Section 5309 Fixed Guideway Modernization formula funds may be utilized for both capital renewal, replacement and expansion projects, and for preventive maintenance operating expenses. A "fixed guideway" includes heavy rail, commuter rail, light rail, monorail, trolleybus, aerial tramway, inclined plane, cable car, automated guideway transit, ferryboats, motor bus service on controlled rights-of-way, and HOV lanes. Section 5309 Fixed Guideway Modernization funds are authorized on a formula basis and programmed by MTC under its Transit Capital Priorities process. <u>See</u> Joint Glossary at 1. "Eligible purposes are capital projects to modernize or improve existing fixed guideway systems, including purchase and rehabilitation of rolling stock, track, line equipment, structures, signals and communications, power equipment and substations, passenger stations and terminals, security equipment and systems, maintenance facilities and equipment, operational support equipment including computer hardware and software, system extensions, and preventive maintenance." <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 141.

179. Section 5309 Discretionary Capital – Bus and Bus Facilities funds may be utilized for system

expansion, capital renewal and replacement, and bus preventive maintenance operating expenses:  "Eligible capital projects include the purchasing of buses for fleet and service expansion, bus maintenance and administrative facilities, transfer facilities, bus malls, transportation centers, intermodal terminals, park-and-ride stations, acquisition of replacement vehicles, bus rebuilds, bus preventive maintenance, passenger amenities such as passenger shelters and bus stop signs, accessory and miscellaneous equipment such as mobile radio units, supervisory vehicles, fare boxes, computers and shop and garage equipment."  <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 142.  Funds are allocated on a discretionary basis. Congress earmarks these funds based on grant applications by the operators.  <u>See</u> Joint Glossary at 1.

180.  Section 5309 Discretionary Capital - New Starts funds are used for construction of new fixed guideway systems or extensions for light rail, rapid/ heavy rail, commuter rail, monorail, "people movers," motor bus on exclusive or controlled right of way/HOV lanes, and the like. New Starts programs typically receive funds through a full funding grant agreement (FFGA) that defines the scope and specifies the total multi-year Federal commitment to the project. Congress earmarks these funds based on grant applications by the operators.  <u>See</u> Joint Glossary at 2.

181.  MTC determines whether a project is statutorily eligible for Section 5307 funds and Section 5309 formula funds.  <u>See</u> RT 237:1-238:1; McMillan Dep. of 12-19-07 at 400:8-402:6.

182.  MTC is the designated recipient for Section 5307 funds for large urbanized areas in the Bay Area whose populations exceed 200,000.  <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 125.

183.  MTC uses the Transit Capital Priorities ("TCP") process to allocate Section 5307 funds and some Section 5309 funds.  This process is not required by statute.  <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 126.

184.  The goal of MTC's TCP process is to prioritize the highest-need capital replacement requirements.  <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 127.

185.    In its TCP process, MTC uses a scoring system to determine which statutorily eligible projects will be prioritized for Section 5307 and Section 5309 formula funds.  <u>See</u> RT 234:23-235:4.  The highest scoring projects generally receive a score of 16, while the lowest scoring projects receive a score of 8.  <u>See</u> RT 238:2-6.  Occasionally, projects receive a priority score of 17.  <u>See</u> RT 238:16-240:4; Tr. Ex. 112 at 54, n. 42.  Replacement of revenue vehicles, which are vehicles that carry passengers and generate revenue through fare collection, receives a score of 16.  <u>See</u> RT 238:7-15; Tr. Ex. 112.  Preventive maintenance receives a score of 9.  <u>See</u> RT 241:17-19, 242:1-4; Tr. Ex. 112.  Transit expansion receives a score of 8 and is the only category that receives a score lower than preventive maintenance.  <u>See</u> RT 241:20-22.

186.    Section 5307 funds are allocated based on a formula.  For the national amount available, one third of the amount is distributed to the rail operators, or fixed guideway related operators.  The other two thirds of the amount go to bus operators.  Because there are many more bus operators than rail operators, operators in urbanized areas that have a combination of rail and bus services receive more overall funding at the outset.  MTC is the designated recipient of these funds.  It does not allocate these funds to the operators in accordance with the national formula.  Rather, MTC blends the funds and ranks them according to need.  All the transit operators compete for the funds on a basic level based on their capital replacement needs cycle under the TCP scoring system.  <u>See</u> RT 1297:20-1299:9.

187.    Section 5307 funds are eligible for fund exchange or fund swap as long as the federal funds are used for a statutorily eligible purpose. <u>See</u> Second Supplemental Joint Proposed Findings of Fact (docket # 353) at ¶ 299.

188.    By statute, an eligible use of Section 5307 formula funds is preventive maintenance (also known as capitalized maintenance), an operating expense.  <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 131.

189.    In 1999, MTC made an exception to its TCP policy to allow AC Transit to use Section 5307 funds for preventive maintenance purposes pursuant to MTC Resolution No. 3225.  This was the first time within the San Francisco/Oakland urbanized area that a preventive maintenance

**United States District Court**
For the Northern District of California

project was funded over a higher-scoring capital project within the same urbanized area. <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 132.

190.   In 2002, MTC allowed preventive maintenance funds to be used by operators with an operating shortfall for fiscal year 2003-04. <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 133.

191.   In 2003, MTC allowed preventive maintenance funds to be used by AC Transit, GGT, and VTA to cover their operating shortfalls for fiscal year 2004-05 pursuant to MTC Resolution 3580. <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 134.

192.   MTC rescinded $7,222,088 in operating assistance from AC Transit in the fiscal year 1999-2000 pursuant to MTC Resolution No. 3186. <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 136.

193.   MTC used Section 5307 funds, which has been programmed for preventive maintenance, to replace the $7,222,088 in operating assistance it rescinded from AC Transit in the fiscal year 1999-2000. <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 137.

194.   MTC made an exception to its TCP policy when it used Section 5307 funds to backfill the $7,222,088 in operating assistance that it rescinded from AC Transit in the fiscal year 1999-2000. <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 139.

195.   A significant portion of the Section 5307 funds that MTC has programmed to AC Transit for preventive maintenance has been used to buy foreign buses that cannot be purchased with federal funds. RT 177:19-178:23.

196.   MTC retains the final decision as to modifications of the TCP scoring system and has frequently made modifications or exceptions. <u>See</u> RT 246:9-15.

197.   In Resolution No. 3515, MTC approved a temporary "flexible programming" of Section 5307 funds for the 2003-04 year that was established by agreement of all operators in the San Francisco/Oakland, Concord, and Antioch urbanized areas. According to Resolution No. 3515, operators had the discretion to use Section 5307 funds for preventive maintenance or

capital projects with scores of twelve or above under the current Transit Capital Priorities Policies and Procedures.  See Tr. Ex. 1041; RT 247:6-25; McMillan Dep. of 12-19-07 at 417:8-418:6.

198.  To be eligible for Section 5307 preventive maintenance funds, an operator must show that: (1) an operating shortfall exists; (2) the operator has implemented reasonable cost control and revenue generation strategies; and (3) the shortfall, if not addressed, would result in a significant service reduction.  See RT 255:12-256:15; Tr. Ex. 504 at PL023941; Tr. Ex. 112; McMillan Dep. of 12-19-07 at 423:19-25, 424:11-21, 425:9-17, 425:22-426:6, 427:7-10. Even if MTC determines that an operator has met the three requirements, an operator must meet four additional conditions before preventive maintenance will be programmed under Resolution 3688: (1) the operator must show a board-approved bridging strategy that will sustain financial recovery beyond the year for which preventive maintenance is requested; (2) the bridging strategy cannot depend on future preventive maintenance funding from MTC; (3) preventive maintenance cannot be considered as a mechanism to sustain or replenish operating reserves; and (4) an operator may only use Section 5307 funds for preventive maintenance in two of every twelve years.  See RT 258:8-260:9; Tr. Ex. 504 at PL023942.

199.  Section 5309 funds are eligible for fund exchange or fund swap as long as the federal funds are used for a statutorily eligible purpose.  See Second Supplemental Joint Proposed Findings of Fact (docket # 353) at ¶ 300.z

200.  Under MTC's TCP process, Fixed Guideway Modernization Program funds can be used only for rail improvement and ferry improvement.  See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 146.

201.  Section 5309 Fixed Guideway Modernization funds are limited to rail, ferry, and exclusive guideways associated with bus service.  The bus element associated with an HOV project could also qualify.  See RT 961:13-24.

202.  Under MTC's TCP process, AC Transit is not eligible for Fixed Guideway Modernization Program funds. See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291)

at ¶ 147.

203.    Muni and Caltrain each received one-third of all Section 5309 Bus Discretionary funds in

FY2003-2007.  See RT 544:5-11; Tr. Ex. 771.  BART received a little over one-seventh of

all Section 5309 Bus Discretionary funds in FY2003-2007.  See RT 544:5-11; Tr. Ex. 771.

AC Transit received a little under one-twelfth of total Section 5309 Bus Discretionary funds

in FY2003-2007.  See RT 544:12-13; Tr. Ex. 771.

204.    Section 5310 Elderly Individuals and Individuals with Disabilities Program funds may be

utilized for operating, capital expansion, and capital renewal and replacement purposes.

See Tr. Ex. 112, Ex. C at 10-11.

205.    Under current law, Section 5316 Job Access and Reverse Commute ("JARC")

Apportionments funds can be utilized for transit operations, capital expansion, and capital

renewal and replacement projects.  The JARC grant program was established in 1998 as part

of the Transportation Equity Act for the 21st Century ("TEA-21"), Pub. L. NO. 105-178, §

3037, 112 Stat. 107 (1998). "Grants may finance capital projects and operating costs of

equipment, facilities, and associated capital maintenance items related to providing access to

jobs; promoting use of transit by workers with nontraditional work schedules; promoting use

by appropriate agencies of transit vouchers for welfare recipients and eligible low income

individuals; and promoting use of employer-provided transportation including the transit

pass benefit program."  Tr. Ex. 112, Ex. C at 11-12.

206.    After JARC became a formulaized program, AC Transit received approximately $500,000

annually in JARC funds.  See RT 128:4-10; see also Martin Dep. of 9-11-07 at 45:17-22;

48:5-10.

207.    MTC allocates ten percent ADA Set-Aside funds based on the ADA needs of the transit

operator. See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶

128.

208.    MTC uses a different policy to allocate ten percent ADA Set-Aside funds than the policy

MTC uses to allocate and program Section 5307 funds. See Joint Proposed Findings of Fact

and Conclusions of Law (docket # 291) at ¶ 129.

209.    MTC does not use a scoring system in allocating and programming ten percent ADA

37

Set-Aside funds.  <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 130.

210.    Ten percent ADA set-aside funds are eligible for operating expenses.  <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 158.

211.    In FY 2006-2007 and 2007-2008, there was an unexpected excess of $210 million in Section 5307 formula funds from the Federal Transit Administration ("FTA") that were available for the region.  <u>See</u> RT 263:6-264:12.  FTA is the United States Department of Transportation agency that provides financial and planning assistance to help plan, build and operate rail, bus and paratransit systems. The agency also assists in the development of local and regional traffic reduction programs.  <u>See</u> Joint Glossary at 8.  MTC made the decision on how to program these funds for Fiscal Year 2006-2007 and Fiscal Year 2007-2008.  <u>See</u> RT 264:13-265:10; McMillan Dep. of 12-19-07 at 435:13-436:16.

212.    AC Transit is eligible for Transportation Enhancement Activities ("TEA") funds to the extent that AC Transit has an eligible project that falls within the statutory definition of "transit enhancement activities."  <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 157.  TEA funds are a federal transportation funding category consisting of ten percent of Surface Transportation Program  moneys that are set aside for projects that enhance the compatibility of transportation facilities with their surroundings. The primary purpose of STP is construction, reconstruction, rehabilitation, resurfacing, restoration and operational improvements for highways and bridges including construction or reconstruction necessary to accommodate other transportation modes.  Other eligible transit activities are capital costs of transit projects.  Examples of TEA projects include bicycle and pedestrian paths, restoration of rail depots or other historic transportation facilities, acquisition of scenic or open space lands next to travel corridors, and murals or other public art projects.  <u>See</u> Joint Glossary at 17.

### State Committed Funds

213.    State law requires that, by March 1 of every year, MTC publish an estimate of available transportation revenues ("Fund Estimate") that it allocates on a yearly basis and the expected distribution of those funds among eligible claimants.  This Fund Estimate includes an

United States District Court
For the Northern District of California

estimate of expected revenue generations for the coming year, and a reconciliation of carryover funds from the prior fiscal year as well as an adjustment to the remaining revenue levels for this year. Fund sources included in the estimate are Transportation Development Act ("TDA"), State Transit Assistance ("STA"), AB 1107 (Cal. Pub. Util. Code § 29142.2) and transit-related bridge toll funds. Transit operators and other claimants may request an allocation of these funds in the upcoming fiscal year up to the amount apportioned to them in the Fund Estimate; however, disbursement will be subject to actual cash availability. See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 116.

214.   Operators use the Fund Estimate to craft annual budgets.   See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 119.

215.   MTC provides the financial information in the Fund Estimate to all operators to assist them in developing budgets in a timely manner.  See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 120.

216.   MTC's Fund Estimate is a first step in the distribution of TDA, STA and AB 1107 funds that an operator is eligible to receive in the next fiscal year.  See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 121.

217.   Using financial projections of the aggregate funds expected to be available for the upcoming fiscal year, MTC's Fund Estimate apportions the funds to eligible claimants based on statutory eligibility.  MTC's policies and existing agreements apply to this funding.  See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 123.

### Transportation Development Act

218.   The Transportation Development Act ("TDA") is a state law enacted in 1971, which imposes a tax of one-quarter of one percent on all retail sales in each county, that is used for transit, special transit for disabled persons, and bicycle and pedestrian purposes.  TDA funds are collected by the state and allocated by MTC to fund transit operations and programs. In nonurban areas, TDA funds may be used for streets and roads under certain conditions. See Joint Glossary at 17.

219.   TDA funds are generally divided into three separate types:  (1) Articles 4 and 8; (2) Article 4.5; and (3) Article 3.  See Joint Proposed Findings of Fact and Conclusions of Law (docket

United States District Court
For the Northern District of California

# 291) at ¶ 159.

220. TDA Articles 4 and 8 funds may be utilized for transit operations and for transit capital replacement.  <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 160.

221. TDA Article 4.5 funds may be utilized for paratransit operations. <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 161.

222. TDA Article 3 funds may be used for bikes and pedestrian facilities.  <u>See</u> RT 298:11-12.

223. TDA funds, by statute, must go back to the county in which the sales taxes were generated. <u>See</u> Tr. Ex. 112, Ex. C at 15-16.  If there are multiple eligible transit operators in a county, MTC develops a fund estimate and apportions the TDA funds among the entities that are eligible to request the funds.  <u>See</u> RT 296:22-297:1; McMillan Dep. of 11-21-07 at 42:18-43:9.  MTC has discretion over how to allocate these funds to eligible claimants within a county.  <u>See</u> RT 297:7-9.

224. The Bay Area region receives approximately $260-270 million in TDA funds annually. <u>See</u> RT 297:10-13.  The annual MTC Fund Estimate is the cornerstone of MTC's allocation of TDA funds.  <u>See</u> RT 299:11-18.  MTC makes the ultimate decision as to how to allocate TDA funds and need not follow recommendations by transit operators.  <u>See</u> RT 302:7-17.

225. MTC made a policy decision that BART may not receive TDA funds for which it is eligible in San Francisco and Alameda counties.  Instead, those TDA funds are claimed by Muni in San Francisco, and AC Transit in Alameda.  <u>See</u>  RT 303:18-304:4, 1278:17-1281:14.  AC Transit receives approximately $56 million annually in TDA funds.  <u>See</u> RT 305:17-306:8; Tr. Ex. 654, Attachment A at 2, 14.

## State Transit Assistance

226. State Transit Assistance ("STA") provides funding for mass transit operations and capital costs.  <u>See</u> Joint Glossary at 15-16.

227. STA funds are composed of: (1) revenue-based funds; and (2) population-based funds. These two types of STA funds are allocated differently.  <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 162.

228. STA revenue-based funds may be utilized for transit operations. <u>See</u> Joint Proposed Findings

40

of Fact and Conclusions of Law (docket # 291) at ¶ 163.

229. STA population-based funds may be utilized for transit operations and capital. <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 164.

230. MTC distributes STA funds based on statutory eligibility and the allocation policies in MTC Resolution No. 2310. <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 165.

231. By statute, 50% of STA funds are distributed to transit operators based on the transit operators' revenue-generating capacity, while the other 50% is distributed to Regional Transportation Planning Agencies based on population. <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 166.

232. Pursuant to MTC policy, AC Transit is eligible for STA funds allocated to paratransit purposes. <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 167.

233. MTC allocated $11,597,580 in STA funds to AC Transit during the fiscal year 2001-02 for operating purposes pursuant to MTC Resolution No. 3371. <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 168.

234. In FY 2005-2006, MTC received additional funds from Proposition 42, which increased the base STA funds available in the region. <u>See</u> RT 318:4-7.

235. MTC Resolution 3837 is MTC's new policy for allocating STA population-based funds. <u>See</u> RT 321:2-4; Tr. Ex. 1744. Resolution 3837 was approved by MTC in January 2008 and superseded Resolution 2310. <u>See</u> RT 310:17-25. Resolution 3837 still allocates STA population-based funds to the same four categories found in Resolution 2310: northern counties, small operators, paratransit, and regional coordination programs. <u>See</u> RT 321:5-25; Tr. Ex. 1744 at Attachment A.

**Proposition 1B**

236. Proposition 1B (the Highway Safety, Traffic Reduction, Air Quality, and Port Security Bond Act of 2006) passed with 61 percent of the vote in November 2006. Proposition 1B, also known as the Infrastructure Bond, authorized the state to issue a $20 billion general obligation bond for a variety of transportation improvements. <u>See</u> Joint Proposed Findings

of Fact and Conclusions of Law (docket # 291) at ¶ 169; Joint Glossary at 12.

237. Proposition 1B included funding "to the Department of Transportation for intercity rail projects and to commuter or urban rail operators, bus operators, waterborne transit operators, and other transit operators in California for rehabilitation, safety or modernization improvements, capital service enhancements or expansion, new capital projects, bus rapid transit improvements, or for rolling stock procurement, rehabilitation, or replacement." See Cal. Gov't Code § 8879.23(f)(1); see also Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 170.

### AB 664

238. AB 664 is the Net Bridge Toll Revenues Program, originally passed by the California Legislature in 1975, is codified at Streets and Highways Code § 30880 et seq.  AB 664 imposed a toll increase on the SF-Oakland (Bay) Bridge, the San Mateo Bridge and the Dumbarton Bridge.  The Legislature intended "that toll bridge revenues be used to further the development of public transportation systems in the vicinity of toll bridges in order to alleviate automobile-related congestion and pollution and to diminish the need for state expenditures on new bridge facilities."  Cal. Sts. & Hwy. Code § 30880; see also Joint Glossary at 2.

239. MTC Resolution 3215 is MTC's policy with respect to bridge toll funds including AB 664. See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 171.

240. Approximately $12 million to $15 million in AB 664 funds come into MTC's Bay Area region on an annual basis.  See RT 325:4-6.

241. By statute, AB 664 funds must be used for transit purposes within bridge corridors.  See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 172.

242. By statute, MTC can allocate AB 664 funds for capital purposes.  See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 173.

243. MTC's policy is to make AB 664 funds available as matching funds for federal formula funds Section 5307, Section 5309, STP, CMAQ and STIP.  See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 175.

244. MTC has made exceptions to its general policy of using AB 664 funds as local match funds

for federal formula funds.  <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 176.

245.   MTC made an exception to its general policy of allocating AB 664 funds in 2003, 2004 and 2005 by allocating AB 664 funds to eligible transit operators to implement the BART feeder bus program.  <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 177.

246.   MTC has used AB 664 funds as a local match for preventive maintenance funds.  <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 179.

**Regional Measure 1**

247.   Regional Measure 1 ("RM 1"), passed by Bay Area voters in 1988 and codified at Streets and Highways Code § 30910 et seq., increased tolls on the region's seven state-owned bridges to a uniform $1 at the time.  Revenues generated by the toll increase were dedicated by RM 1 to fund certain highway and bridge improvements, public transit rail extensions, and other projects that reduce congestion in the bridge corridors.  <u>See</u> Joint Glossary at 13.

248.   RM 1 is divided into two primary pots of money:  5% Reserves, and 90% Rail Extension Reserves.  The 90% Rail Extension Reserves component is derived from the toll increase on the Bay Bridge.  Cal. Sts. & Hwys. Code § 30912(b).  Streets & Highways Code § 30919 requires RM 1 90% rail extension reserves to be used exclusively for rail transit capital extension and improvements.  <u>See</u> Joint Glossary at 13.

249.   By statute, the 60% share of funds over which MTC has discretion are to be used for reducing congestion and improving travel options on bridge corridors.  <u>See</u> Second Supplemental Joint Proposed Findings of Fact (docket # 353) at ¶ 273.

250.   MTC's allocation policy for Regional Measure 1 5% funds is set forth in Resolution 2004.  <u>See</u> Second Supplemental Joint Proposed Findings of Fact (docket # 353) at ¶ 180.

251.   It is MTC's policy to allocate a majority of 5% Reserves Regional Measure 1 Funds to the ferry program. <u>See</u> Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 180.

252.   The 5% RM1 funds go to ferries and to the Bay Trail under MTC policy because those entities do not receive most of the funds available to other operators.  <u>See</u> RT 930:8-25.

253. Forty percent of the 5% funds are required by statute to be used for ferry capital and operating expenses.  See Second Supplemental Joint Proposed Findings of Fact (docket # 353) at ¶ 272.

254. AC Transit applied for 5% Reserves Regional Measure 1 Funds for fiscal year 1998-99. See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 182.

255. AC Transit is statutorily eligible to receive a portion of Regional Measure 1 5% funds.  See Second Supplemental Joint Proposed Findings of Fact (docket # 353) at ¶ 274.

256. MTC has never allocated any of the 5% Reserves Regional Measure 1 funds to AC Transit. See RT 358:3-21.

257. MTC allocates 90% Rail Extension Reserves Regional Measure 1 Funds pursuant to MTC Resolution 2004. See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 181.

258. AC Transit is not statutorily eligible for Regional Measure 1 90% rail extension reserves. See Second Supplemental Joint Proposed Findings of Fact (docket # 353) at ¶ 270.

### Regional Measure 2

259. Regional Measure 2 ("RM 2") was a ballot measure instituting a $1 bridge toll increase passed by Bay Area voters in March 2004.  The expenditure plan for the measure funds thirty-seven capital projects, with an emphasis on transit improvements in the bridge corridors, as well as a dozen transit operating projects to enhance service along the bridge corridors. See Joint Glossary at 13.

260. Specific projects are earmarked for funding in the legislation implementing RM 2. See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 184.

261. RM 2 provided for a specific line item expenditure plan of projects eligible for this fund source.  MTC can only change the projects in the legislation through two limited means. First, if a project is deemed undeliverable after a public hearing, the funds may be shifted to another project in the same bridge corridor.  Second, if a project could be fully funded from a different source, then the RM 2 funds may be moved to another project in the same corridor, after a public hearing. See RT 931:15-932:9.

262. MTC allocated RM 2 Funds to operating and planning for fiscal year 2005-06 pursuant to

United States District Court
For the Northern District of California

1  MTC Resolution No. 3719.  <u>See</u> Tr. Ex. 500.

2                                  **RTIP/STIP**

3  263.  The Regional Transportation Improvement Program ("RTIP"), California Government Code

   § 14527(a), is a listing of highway and transit projects that the region hopes to fund,

   compiled by MTC every two years from priority lists submitted by local jurisdictions.  The

   California Transportation Commission ("CTC") must either approve or reject the RTIP list in

   its entirety.  Once the CTC approves an RTIP, it is combined with those from other regions

   to comprise seventy-five percent of the funds in the State Transportation Improvement

   Program ("STIP").  The RTIP must include all projects to be funded with regional

   improvement funds under Streets and Highways Code § 164(a).  <u>See</u> Joint Glossary at 14.

264.  The State Transportation Improvement Program is the output after CTC combines the

   various RTIPs in California as well as a list of specific projects proposed by Caltrans.

   Covering a five-year span and updated every two years, the STIP determines when and if

   transportation projects will be funded by the state.  The STIP is the "Transportation Capital

   Program" referenced in Section 164 of the Streets and Highways Code.  The RTIP is MTC's

   submission into the STIP.  <u>See</u> Joint Glossary at 16.

265.  The RTIP was established by statute in 1997 to restructure the STIP into two parts.  Twenty-

   five percent of the funds made available for transportation capital improvement projects to be

   programmed in the STIP is assigned to various state level programs focusing on

   inter-regional connections among the highways and rail.  The remaining seventy-five percent

   is assigned by formula to regional agencies.  The funds go to the region based on calculated

   county shares.  <u>See</u> RT 957:2-24; Cal. Streets & Highways Code §§ 163, 164.

266.  RTIP funds come from the state and have many limitations because they are allocated by

   county.  <u>See</u> RT 486:19-487:2.

267.  Both transit and highway improvements are eligible for RTIP funds.  The RTIP funds come

   out of the State Highway Account, which has huge demands for rehabilitating the state

   highway system.  <u>See</u> RT 958:5-15.

268.  MTC's role in adopting the RTIP is largely ministerial.  Projects in the RTIP must be

   consistent with the RTP.  <u>See</u> RT 960:9-21.

45

**United States District Court**
For the Northern District of California

269. RTIP funds that are programmed for transit average less than $50 million a year. See RT 960:22-25.

### AB 1107

270. AB 1107 funds (Cal. Pub. Util. Code § 29142.2) are derived from 1977 legislation to make permanent a temporary one-half cent general sales tax originally imposed to build BART in Alameda, Contra Costa and San Francisco counties. See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 189.

271. Under state law, 75% of AB 1107 funds are allocated to BART. See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 190.

272. Under state law, MTC may allocate the remaining 25% among AC Transit, BART and Muni. See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 191.

273. During the last five years, MTC has allocated half of the 25% share to AC Transit and the other half to Muni, with none to BART. See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 192.

274. MTC does not allocate any AB 1107 funds to Caltrain as Caltrain is not eligible for these funds. See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 193.

275. MTC changed its allocation basis for allocating AB 1107 funds from a dollar amount to a percentage basis in 2004 pursuant to MTC Resolution 3590. See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 194.

### Uncommitted Funds

276. Federal "Flexible" Highway Programs uncommitted funds are generally divided into three separate types:  1)  Surface Transportation Program ("STP"); 2) Congestion Mitigation and Air Quality ("CMAQ"); and 3) Transportation Enhancement Activity ("TEA") Program. See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 150.

277. MTC established a "Fix-it-First" policy under which MTC dedicates a significant amount of money in the RTP to capital rehabilitation of the existing transit system. See RT 372:9-15. MTC intends the policy to strike a balance between sustaining the existing system and expanding it, with an emphasis on the former in terms of the proportion of funding that is allocated to capital rehabilitation versus capital expansion. See RT 406:1-5; 900:21-901:6.

46

United States District Court
For the Northern District of California

278.   MTC's practice under its "Fix-It-First" policy is that a portion of RTP "Uncommitted" or "Track 1" funds go to maintaining and sustaining the system in terms of meeting capital shortfalls in addition to the approximately eighty percent of the "Committed" funds already going to that purpose.  See RT 405:6-14; McMillan Dep. of 11-15-07 at 766:23-769:7.

279.   MTC passed Resolution 3331 in January 2001.  See Tr. Ex. 509.  Resolution 3331 is MTC's regional policy for fund exchanges for projects programmed with regional discretionary funds.  See RT 459:9-12; Tr. Ex. 509 at PL19710.  Pursuant to Resolution 3331, sponsors who were receiving federal dollars for certain projects identified as regional priorities could use federal funds allocated to that project on another project that was already approved for the use of federal funds and, in exchange, redirect local dollars to the regional priority project.  See RT 458:15-459:12; Tr. Ex. 509 at PL19710, 712.  "Local dollars" are funds that the project lead or sponsor has direct responsibility and control over, such as sales tax funds or general funds.  See Bockelman Dep. of 11-27-07 at 32:9-19.  The "clean" local funds would be directed to the local project that had not yet met the requirements of federal funds.  See RT 458:21-460:10; Bockelman Dep. of 11-27-07 at 28:4-18.  Resolution 3331 is currently in effect.  See RT 462:21-23; Bockelman Dep. of 11-27-07 at 50:11-14.

280.   It is MTC policy under MTC Resolution 3331 that the project funded with "clean" local funds must be consistent with MTC's programming policy in programming the regional discretionary fund.  See Second Supplemental Joint Proposed Findings of Fact (docket # 353) at ¶ 278.

281.   It is MTC policy under MTC Resolution 3331 that the projects for which the "clean" local funds are used should be completed in the same time frame as they would have been had federal funds had been used.  See Second Supplemental Joint Proposed Findings of Fact (docket # 353) at ¶ 279.

**STP/CMAQ**

282.   Congestion Mitigation and Air Quality ("CMAQ") Improvement Program funds consist of a sum of federal money for projects and activities that reduce congestion and improve air quality, both in regions not yet attaining federal air quality standards and those engaged in

47

United States District Court
For the Northern District of California

1    efforts to preserve their attainment status.  <u>See</u> Joint Glossary at 6.

2    283.   The purpose of the CMAQ program is to "fund transportation projects or programs that will

3           contribute to the attainment or maintenance of the national ambient air quality standards

4           (NAAQS) for ozone, carbon monoxide (CO), and particulate matter (PM)."  <u>See</u> Joint

5           Glossary at 6.

6    284.   CMAQ funds are generally limited to capital expenses, but may also be used to help fund

7           operating costs for the first three years of new operations.  <u>See</u> Joint Glossary at 6.

8    285.   Surface Transportation Program ("STP"), 23 U.S.C. §133, funds are one of the key federal

9           funding programs. STP moneys are "flexible" in the sense that they can be spent on mass

10          transit and pedestrian and bicycle facilities as well as on roads and highways.  <u>See</u> Joint

11          Glossary at 16.

12   286.   The primary purpose of STP is construction, reconstruction, rehabilitation, resurfacing,

13          restoration and operational improvements for highways and bridges including construction or

14          reconstruction necessary to accommodate other transportation modes.  Other eligible transit

15          activities are capital costs of transit projects.  <u>See</u> Joint Glossary at 16.

16   287.   The California Department of Transportation ("Caltrans") apportions the regional STP to the

17          MPOs.  Caltrans must apportion funds in accordance with the formula set forth in 23 U.S.C.

18          § 133(d)(3).   Funds apportioned under this subdivision remain available for three federal

19          fiscal years.  Caltrans must notify each metropolitan planning organization receiving an

20          apportionment under this section each year of the amount of obligation authority estimated to

21          be available for program purposes.  <u>See</u> Joint Glossary at 16.

22   288.   STP and CMAQ are multi-modal funds that come to the region by formula. They are mostly

23          limited to capital except for CMAQ in very limited circumstances.  MTC works with the Bay

24          Area Partnership Board to develop a programming process that balances needs of transit,

25          bicycles, transportation land use coordination, local streets and road rehabilitation, and

26          strategic expansion.  All of these programs are eligible for these funds.  <u>See</u> RT

27          952:11-953:19.

28   289.   STP and CMAQ funds are about the same in amount, although CMAQ is a little lower.

            CMAQ funds are allocated to the region based on its non-attainment status in meeting

federal air quality thresholds.  Because the Bay Area is relatively clean, it is not eligible for as many funds as other regions.  See RT 953:25-954:18.

290.    The type of project determines whether it is eligible for STP funds or CMAQ funds. Eligibility is determined by legislation.  See Martin DT 38:6-23; 39:7-13.

291.    STP and CMAQ funds are considered by MTC to be "regional discretionary funds" because MTC makes the programming decision about where and how to spend those funds.  See RT 277:25-278:6; RT 460:17-22.  By federal statute, highway funds under both STP and CMAQ are eligible to be "transferred" to transit projects.  See 23 U.S.C. § 104(k); RT 276:19-277:5. MTC regularly converts a portion of STP funds from highway to transit.  See RT 669:7-12.

292.    MTC programs STP and CMAQ funds together.  See RT 278:20-22.  MTC programs approximately $65 million in STP funds to transit annually.  See RT 277:6-10.  MTC programs approximately $60 million in CMAQ funds to transit annually.  See RT 277:11-13. In programming STP and CMAQ funds, MTC considers whether those capital projects are funded through the TCP process.  See McMillan Dep. of 12-19-07 at 397:14-24.

293.    MTC programmed over $50 million in STP and CMAQ funds to regional projects for which MTC was the sponsor in the Transportation Equity Act for the 21st Century ("TEA-21") authorization period.  See RT 281:16-282:11.  TEA-21, successor to SAFETEA and passed by Congress in 1998, retained and expanded many of the programs created in 1991 under ISTEA.  TEA-21 reauthorized federal surface transportation programs for six years (1998-2003), and significantly increased overall funding for transportation.  See Joint Glossary at 17-18.  MTC programmed over $44 million to projects for which MTC was the program sponsor in FY  2007-2008 and FY 2008-2009.  See RT 282:12-283:22; Tr. Ex. 1694 at MTCP260327.  MTC programmed approximately $12 million to AC Transit during that same two-year time period (during FY 2007-2008 and FY 2008-09).  See RT 284:10-12; Tr. Ex. 1694 at MTCP260329.

294.    In FY2004-2005, MTC had an unexpected windfall of STP and CMAQ funds of $107 million. See RT 284:13-16.  MTC programmed that windfall in MTC Resolution 3695.  See RT 285:4-5; Tr. Ex. 1038.  The windfall funds were required to be used within one year.  See RT 285:14-22.  MTC programmed these funds under its TCP process.  See RT 288:14-22.

295.   In FY 2008-2009, MTC anticipated an additional $72 million in CMAQ funds.  See RT 288:23-25; Tr. Ex. 1742 at MTCP270203.  MTC used this money to fund regional initiatives addressing such issues as smart growth, congestion pricing, and transit expansion. See RT 289:14-22; Tr. Ex. 1742 at MTCP270203.

296.   STP may be used for almost any capital need, including rehabilitation or expansion, for any mode of surface transportation.  See RT 276:11-18; Tr. Ex. 112 Ex. C at 13-14.  STP funds may be utilized for "[c]apital costs of transit projects that are eligible under Chapter 53 of 49 U.S.C., including vehicles and facilities, publicly or privately owned, that are used to provide intercity bus service; carpool projects and fringe & corridor parking facilities; transit safety infrastructure improvements and programs; transit research, development and technology transfer; surface transportation planning programs; public transportation management systems under 23 U.S.C. § 303."  Tr. Ex. 112 Ex. C at 13-14 (quoting FTA, "FHWA and FTA Funds That May Be Used for Either Highway or Transit Purposes" http://::www.fhwa.dot.gov/hep/flexfdtble.htm).

297.   STP funds that come to the region total about $60 million per year.  MTC allocates approximately 50% to non-transit and the other 50% to transit.  See RT 563:20-565:10; Tr. Ex. 1694, 1094-1097. 1887.

298.   MTC does not dedicate all of the region's STP funds to transit because there are a lot more needs to be met with these funds than just transit, including local streets and road rehabilitation, Transportation for Livable Communities Program and bicycle needs. See RT 954:20-955:13.

299.   Resolution 3618 sets forth MTC's Transportation for Livable Communities Program guidelines. The TLC Program is to support community-based transportation projects that bring new vibrancy to downtown areas, commercial cores, neighborhoods, and transit corridors, enhancing their amenities and ambience and making them places where people want to live, work and visit.  See Tr. Ex. 1653.

300.   STP funds are also eligible to be used for preventive maintenance.  See RT 279:17-280:2.  It is not MTC's general policy or practice to program STP funds for preventive maintenance. See RT 279:17-25.

United States District Court
For the Northern District of California

301.   Resolution 3738 sets out the agreement between BART and MTC to allocate STP funds to BART in exchange for "clean" (i.e. unrestricted) local funds to be used for BART's future car replacement needs.  See Tr. Ex. 521.  The 2005 RTP projected a $1.3 billion transit capital shortfall for BART's capital replacement needs.  The BART car replacement accounted for a significant portion of this projected shortfall.  MTC therefore approved a resolution to direct STP funds to the BART car replacement project.  See RT 280:3-22.  Resolution 3738 provides that BART will be programmed STP funds for preventive maintenance for at least a four-year period, while at the same time, BART will provide an equal amount of local funds in an account to fund the BART car replacement project.  See Tr. Ex. 521; Bockelman Dep. of Dec. 5, 2007, at 113:7-114:5, 114:9-116:11, 120:16-121:3; Second Supplemental Joint Proposed Findings of Fact (docket # 353) at ¶ 285.

302.   Resolution 3738 is a departure from MTC's general policies and practices with respect to STP funds.  See Second Supplemental Joint Proposed Findings of Fact (docket # 353) at ¶ 294.

303.   In 1994, pursuant to the STP Reimbursement Exchange Program (Resolution 3018), Santa Clara County Traffic Authority was provided $19.32 million in STP funds in exchange for SSCTA repaying the same amount of "clean" local dollars to MTC.  See RT 464:1-6; Tr. Ex. 515.  MTC restricted the use of the "clean" local funds to projects that could have received STP funds, but would have had difficulty completing the administrative steps required to receive federal funds.  See Bockelman Dep. of 11-27-07 at 71:24-74:1; see also RT 464:20-465:5.

304.   MTC had full discretion to determine how the "clean" local funds would be used.  Second Supplemental Joint Proposed Findings of Fact (docket # 353) at ¶ 283.

305.   Clean local funds can be used for any transit purpose within statutory requirements.  Second Supplemental Joint Proposed Findings of Fact (docket # 353) at ¶ 284.

306.   MTC made exceptions to its own policy and did not require all projects funded with STP Reimbursement Exchange Program funds to be eligible for STP funds.  See RT 464:20-465:5.  On at least one occasion, MTC used "clean" local funds provided to it pursuant to the STP Reimbursement Exchange Program for the Golden Gate Bridge Physical Suicide

51

Deterrence System, which was not eligible for STP funds. Id.; Bockelman Dep. of 11/27/07 at 79:17-80:10.

307.    MTC also programmed to itself $1.2 million in "clean" local funds pursuant to the STP Reimbursement Exchange Program for a TransLink project. See RT 465:6-20; Bockelman Dep. of 11-27-07 at 82:3-83:2.

308.    Congestion Mitigation and Air Quality funds may be utilized for "[a]ny transit capital projects and operating expenses for new services. Funds may only be used in non-attainment and maintenance areas and projects must demonstrate an air quality benefit. States without non-attainment or maintenance areas may use their minimum apportionment of CMAQ for any project in the State eligible under either CMAQ or STP. Operating assistance is limited to new or expanded transportation services. Operating assistance is limited to three (3) years." Thus, CMAQ funds are generally limited to capital expenses, but may also be used to help fund operating costs for the first three years of new operations. See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 154.

309.    CMAQ funds transferred from highway to transit may be used for, among other purposes, new transit vehicles "to expand the fleet or replace existing vehicles," for "operating assistance to introduce new transit service or expand existing transit service for a maximum of three years," and for transit fare subsidies under specified conditions. See Tr. Ex. 501, Sections b., d. and e. at PL024143-44; Tr. Ex. 112 Ex. C at 13-14.

310.    According to the guidance on eligibility of CMAQ funds, capital rehabilitation is not an eligible use. See RT 955:16-956:15, Tr. Ex. 1924 at 11. However, CMAQ funds are eligible for several projects that constitute capital rehabilitation, such as replacement of older vehicles with vehicles that utilize new clean air technologies, and diesel engine retrofits. See RT 1269:15-1271:5; Tr. Ex. 1924 at 17; Tr. Ex. 112 Ex. C at 13-14.

311.    Resolution 3731 establishes an agreement between MTC and Sonoma County Transportation Authority to exchange $2.5 million in CMAQ funds with the same amount of Sonoma County "clean" local measure funds. See Tr. Ex. 523; Bockelman Dep. of 11-27-07 at 96:5-97:22. The "clean" local funds provided by Sonoma County would be used by MTC to continue the STP exchange program embodied in Resolution 3018. See Bockelman Dep. 12-

52

5-07 at 134:17-135:5.

312. MTC has the ability to structure exchanges similar to the STP Reimbursement Exchange Program with other operators. See Tr. Ex. 112.

**TEA**

313. The Transportation Enhancement Activity ("TEA") Program is a federal transportation funding category, as described in more detail above in paragraph 214.

314. The Intermodal Surface Transportation Efficiency Act ("ISTEA") is federal legislation enacted in 1991 that initiated broad changes in the way transportation decisions are made. ISTEA emphasized diversity and balance of modes, as well as the preservation of existing systems before construction of new facilities. ISTEA expired in 1997, but much of its program structure was carried forward in successor federal legislation such as the Transportation Equity Act for the 21st Century ("TEA-21") and the Safe, Accountable, Flexible, Efficient Transportation Equity Act ("SAFETEA"). See Joint Glossary at 9.

315. As set forth above in paragraph 295, TEA-21 succeeded ISTEA in 1998.

316. SAFETEA is a multi-year federal transportation bill, signed into law by President George Wilderness Act. Bush on August 10, 2005. The bill authorizes $255.5 billion in funding for federal surface transportation programs over five years. SAFETEA maintains the program structure of its predecessor, TEA 21, but provides a much higher number of earmarks for special projects chosen by Congress. SAFETEA is distinguished by its emphasis on safety, including a federal Safe Routes to School Program, and new flexibility for states to develop high occupancy/toll ("HOT") lanes. See Joint Glossary at 14.

## CONCLUSIONS OF LAW

**Standing**

The "irreducible minimum" of standing consists of three elements:

First, the plaintiff must have suffered an "injury in fact" -- an invasion of a legally protected interest which is (a) concrete and particularized, [citations omitted] and (b) 'actual or imminent,' not 'conjectural' or 'hypothetical,' [citations omitted]. Second, there must be a causal connection between the injury and the conduct complained of -- the injury has to be 'fairly . . . traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court.' [citations omitted]. Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'

United States District Court
For the Northern District of California

53

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  A plaintiff must have suffered or be threatened with an injury that is "concrete and particularized" and "actual or imminent" in order to have standing, coupled with a sufficient likelihood that he will again be wronged in a similar way. Bates, F.3d at 985-86  (quoting Lujan, 504 U.S. at 560; City of Los Angeles v. Lyons, 461 U.S. 95, 111 (1983).   See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 1 (Conclusion of Law).

Plaintiffs may satisfy the first element with only one type of injury.  See Lujan, 504 U.S. at 560.  See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 2 (Conclusion of Law).  Actual quality of life injuries satisfy the injury in fact prong requirement.  See Duke Power Co. v. Carolina Env. Study Group, 438 U.S. 59, 73-74, n.18 (1978); Lujan, 504 U.S. at 560; see also Aug. 21, 2008 Order on Summ. Adjudication/Judgment at 8; Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 3 (Conclusion of Law).  Concrete economic injury is also sufficient to establish injury in fact for standing purposes.  See Sierra Club v. Morton, 405 U.S. 727, 737 (1972); Lujan, 504 U.S. at 560; see also Sept. 19, 2005 Order on Motion to Dismiss at 6; Jan. 20, 2006 Order on Motion to Dismiss at 8; Aug. 21, 2008 Order on Summ. Adjudication/Judgment at 9; Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 4 (Conclusion of Law).

With respect to quality of life or economic harm, Plaintiffs must show "that a favorable decision is likely to redress [their] injur[ies], not that a favorable decision will inevitably redress [their] injur[ies]," in order to demonstrate redressability for the purposes of standing.  Graham v. Fed. Emerg. Mgmt. Agency, 149 F.3d 997, 1003 (9th Cir. 1998); see also Aug. 21, 2008 Order on Summ. Adjudication/Judgment at 12; Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 6 (Conclusion of Law).  The Court previously held that "Plaintiffs' own experiences sufficiently demonstrate their quality of life injury."  See Aug. 21, 2008 Order on Summ. Adjudication/Judgment at 9:23-24.  The Court also previously held that "Plaintiffs have met their burden of demonstrating economic injury for purposes of summary judgment."  See Aug. 21, 2008 Order on Summ. Adjudication/Judgment at 10:14-15.

The causation element of the standing analysis is satisfied if the alleged injury is fairly traceable to the purportedly illegal conduct.  See Lujan, 504 U.S. at 560-61 (quoting Simon, 426

U.S. at 41-42).  The <u>Lujan</u> Court stated:

> When, however, as in this case, a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed.  In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction -- and perhaps on the response of others as well.  The existence of one or more of the essential elements of standing 'depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict,' [citation omitted]; and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such a manner as to produce causation and permit redressability of injury. [citation omitted].  Thus, *when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish.* [citation omitted]

<u>Lujan</u>, 504 U.S. at 562 (emphasis added).

A defendant's actions must have a determinative or coercive effect on the third party's decisions to the third party's disadvantage.  <u>See</u> <u>Bennett v. Spear</u>, 520 U.S. 154, 168 (2000); Aug. 21, 2008 Order at 11; Def.'s Proposed Separate Findings of Fact and Conclusions of Law ¶ 3.  At a minimum, a defendant's actions must constitute a "substantial factor motivating" the conduct of the third party.  <u>See</u> First Order on Motion to Dismiss at 8 (citing <u>Bennett v. Spear</u>, 520 U.S. 154, 168 (2000); <u>Tozzi v. U.S. Dep't of Health & Human Servs.</u>, 271 F.3d 301 (D.C. Cir. 2002)) (internal citations and quotations omitted); <u>see also</u> Aug. 21, 2008 Order on Summ. Adjudication/Judgment at 11 (quoting <u>Tozzi</u>, 271 F.3d at 308); Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 5 (Conclusion of Law).  The record must present "substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress."  <u>National Wrestling Coaches v. Dep't of Education</u>, 366 F.3d 930, 941 (D.C. Cir. 2004); <u>see also</u> <u>Graham</u>, 149 F.3d at 1003 (a plaintiff also lacks standing when redressability "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or predict.") (quoting <u>ASARCO, Inc. v. Kadish</u>, 490 U.S. 605, 615, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989) (plurality opinion)); <u>Tozzi</u>, 271 F.3d 301; Def.'s Proposed Separate Findings of Fact and Conclusions of Law ¶ 3.

Here, the question of causation and redressability for the purpose of standing is a close one

United States District Court
For the Northern District of California

because of the stricter test applied to government actions that are one step removed from the Plaintiffs due to the intervening actions of a third party not before the Court.  On the one hand, AC Transit is an independent third party entity with an elected board of directors that controls its budget and determines all questions of policy, including what services to provide.  RT 157:16-19; 158:7-15. For example, without any coercion or directive by MTC, AC Transit chooses to run Transbay service, which represents 13% of AC Transit's Vehicle Revenue Hours ("VRH") and 20% of Vehicle Revenue Miles ("VRM").  RT 1079:4-1080:1; 1327:9-19.  This service aimed at commuters between the East Bay and San Francisco, often from the more affluent and whiter areas served by AC Transit, does not primarily benefit the Plaintiff Class of minority riders.  Transbay service costs more than $20 million per year, with the farebox recovery rate of just over 20%, so if AC Transit reduced or eliminated that service, it would save money.  See RT 721:22-722:14; 1328:22-1329:11; Spencer DT 20:4-11.  Moreover, AC Transit recently agreed to make a capital contribution of a total of $57 million to the Transbay terminal project, which facilitates transbay transit but not transit within the urbanized areas of higher minority concentration on which Plaintiffs focus.  RT 209:23-210:1; 212:25-213:18.

Further, the state of the economy at times more directly affects service levels and fares than any funding decisions by MTC.  Whereas projected shortfalls are predictions or best estimates that do not always materialize in reality, unanticipated economic downturns adversely affect revenues such as sales receipts.  Like the observation by the economist John Kenneth Galbraith that "[t]he only function of economic forecasting is to make astrology look respectable," forecasting transit funding levels is an imperfect science.[2]  These fundamental economic forces are beyond the control of either MTC or AC Transit.  However, the state of the economy is not an independent third party decision-maker of the kind that led to the more stringent test for standing in Lujan and its progeny.

On the other hand, AC Transit must set its service levels within the parameters of its available funding (RT 158:10-15), and when it faces an imminent shortfall, must make cuts and

---

[2]  See Vikas Bajaj, Has the Economy Hit Bottom Yet?, New York Times, Mar. 14, 2009, available at http://www.nytimes.com/2009/03/15/weekinreview/15vikas.html?_r=1&scp=2 &sq=john%20kenneth%20galbraith&st=cse.  Also, while recessions tend to reduce transit funding, at least from state and local sources, steep increases in the price of gasoline may at times raise the level of transit use and thus farebox recoveries, even in hard economic times.  See RT 606:6-18.

**United States District Court**
For the Northern District of California

perhaps also raise fares.  AC Transit has been forced to cut urban bus service to the detriment of the Plaintiff Class in the past due to funding shortfalls, and would likely spend some, if not all, of any additional funds on avoiding further cuts and/or expanding those services.  While an economic downturn will tend to reduce funding and may lead to reductions in service, a shift of funds from other transportation uses to AC Transit would alleviate the extent of those reductions.  The Board of AC Transit is elected and is therefore designed to be responsive to the needs of its constituents, including the Plaintiff Class.  While Plaintiffs' witness, Mr. Peeples, did not testify on behalf of the Board, as a long time Board member and current President, he exemplified a commitment to improving service to the Plaintiff Class.  Further, AC Transit's Board adopted a "Strategic Vision" in 2001 which included many projects which would benefit the Plaintiff Class, and has requested more funding from MTC for such projects than it has received.  The "Strategic Vision" remains the current policy of the AC Transit Board.  RT 99:3-5.  Therefore, on balance, AC Transit is likely to use a significant portion of any additional funds to benefit the Plaintiff Class.

An association has standing when: (1) its members would otherwise have standing to sue in their own right; (2) the interest that it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the suit.  Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977); see also Aug. 21, 2008 Order on Summ. Adjudication/Judgment at 15; Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 7 (Conclusion of Law).  The first prong of Hunt is satisfied so long as an organization has at least one member who would have standing to bring the suit.  Nat'l Lime Assoc. v. Env. Prot. Agency, 233 F.3d 625, 636 (D.C. Cir. 2000).  See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 8 (Conclusion of Law).  The second prong of the Hunt test  is "undemanding," and requires "only that an organization's litigation goals be pertinent to its special expertise and the grounds that bring its membership together."  Humane Society of the U.S. v. Hodel, 840 F.2d 45, 26, 58 (D.C. Cir 1988); see also Aug. 21, 2008 Order on Summ. Adjudication/Judgment at 16; Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 9 (Conclusion of Law).   The third Hunt prong does not require participation of individual members when the suit does not seek individualized damages.  See Presidio Golf Club, 155 F.3d at 1159; Aug. 21, 2008 Order on Summ. Adjudication/Judgment at 15; Joint Proposed Findings of Fact

and Conclusions of Law (docket # 291) at ¶ 10 (Conclusion of Law).

This case does not require the participation of individual members from either ATU or CBE because Plaintiffs seek prospective and equitable relief, not individualized damages. See Aug. 21, 2008 Order on Summ. Adjudication/Judgment at 15; Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 11 (Conclusion of Law).  ATU and CBE have established germaneness for purposes of trial based on the record submitted for summary judgment. See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 264.  To the extent that the individual members of the organizational Plaintiffs have standing, the organizational Plaintiffs also have standing.  Here, class members Yvonne Williams and Margo Robinson are members of ATU, and class members Concepcion Chavez, Octavio Hernandez and Virginia Martinez are members of CBE.[3]

The Court concludes that Plaintiffs have met their burden of showing standing.

**Statute of Limitations**

The statute of limitations for Plaintiffs' claims under California Government Code Section 11135 is two years.  See Cal. Civ. Proc. Code § 335.1; Taylor v. Regents of Univ. of Cal., 993 F.2d 710, 712 (9th Cir. 1993); Gatto v. County of Sonoma, 98 Cal.App.4th 744, 759-60 (2002).  MTC argues that because Plaintiffs' complaint was filed on April 19, 2005, Plaintiffs' claims are limited to actions taken by MTC on or after April 19, 2003.  Therefore, MTC argues that Plaintiffs' challenges to MTC's funding policies with respect to Resolution 3434 and committed funds are time-barred because the fund allocation policies were adopted well before April 2003.

The question of whether some of Plaintiffs' claims are time-barred was raised prior to trial in MTC's Motion in Limine to exclude time-barred evidence.  Without ruling on the merits of the statute of limitations issue, the Court denied MTC's motion, stating: "Defendant's Motion in Limine to exclude time-barred evidence is denied with respect to pre-2003 evidence on the basis that while

---

[3]   At the summary judgment stage, MTC raised the question of CBE's standing to participate in this lawsuit in light of the releases contained in the March 2004 settlement agreement between CBE and MTC.  In the August 21, 2008 Order on Summary Judgment, the Court instructed the parties to try to reach an agreement on the effect of the settlement on CBE's ability to proceed in this case.  The parties did not do so, but in light of the Court's ruling on Plaintiffs' disparate impact claim, as described below, the Court need not reach this issue.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   Plaintiffs' continuing violation theory may not be viable, historical information may be relevant as

2   background." Sept. 19, 2008 Order Following Pretrial Conference at 2:7-9. This issue was raised

3   again by MTC in counsel's opening statement at trial. RT 40:7-10. Yet Plaintiffs failed to address

4   this issue in their post-trial brief, nor did they seek leave to file any additional briefing on this issue,

5   which was raised in MTC's post-trial brief. Thus, it appears that Plaintiffs have abandoned their

6   opposition to MTC's statute of limitations argument. Nonetheless, the Court will address the issue.

7        To determine the timeliness of Plaintiffs' claims, the Court must examine the specific

8   practices that are at issue. See National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 110-11

9   (2002). Prior to the Supreme Court's decision in Morgan, the continuing violation doctrine

10  preserved a plaintiff's claims for actions taken prior to the statute of limitations period pursuant to

11  an ongoing discriminatory policy or practice, as long as at least one of the actions occurred during

12  the limitations period. See Morgan v. National R.R. Passenger Corp., 232 F.3d 1008, 1015-16 (9th

13  Cir. 2000), aff'd in part and rev'd in part, National R.R. Passenger Corp. v. Morgan, 536 U.S. 101

14  (2002). The Supreme Court in Morgan substantially limited the continuing violation doctrine,

15  precluding its application to discrete acts of employment discrimination, such as termination, failure

16  to promote, denial of transfer or refusal to hire, even if done pursuant to an ongoing policy. At the

17  same time, the Court allowed the application of the doctrine to a claim for hostile work environment,

18  which by its nature consists of multiple related actions that by themselves may not constitute

19  discrimination, but in the aggregate create an ongoing discriminatory workplace environment.

20  Morgan, 536 U.S. at 122. Morgan did not consider whether the continuing violation doctrine

21  applied to the pattern or practice claims, which were not raised in that case. 536 U.S. at 115, n. 9.

22  By the same token, it did not endorse the continued application of that doctrine to such claims. See

23  Lyons v. England, 307 F3d 1092, 1106 (9th Cir. 2002).

24        Although Plaintiffs' claims are based on disparate impact, Plaintiffs appeared to argue pre-

25  trial that their claims involve a pattern or practice and so are timely under the continuing violation

26  theory. Plaintiffs did not bring this case based on pattern and practice, but on disparate impact. The

27  question of the applicability of the continuing violation doctrine to explicit pattern or practice claims

28

United States District Court
For the Northern District of California

is unsettled, so its extension to disparate impact claims is questionable.[4]  A disparate treatment case, Morgan and its progeny did not address disparate impact claims.  On the one hand, Plaintiffs' claims are similar to the individual decisions at issue in a disparate treatment case such as Morgan in the sense that Plaintiffs challenge discrete policies and practices that arose at a particular time.  Indeed, a successful disparate impact claim must identify a discrete practice.  See Stout v. Potter, 276 F.3d 1118, 1124 (9th Cir. 2002) ("Plaintiffs generally cannot attack an overall decisionmaking process in the disparate impact context, but must instead identify the particular element or practice within the process that causes an adverse impact.") (citing Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 656-57 (1989)).  On the other hand, Plaintiffs' claims are arguably somewhat like pattern or practice or hostile work environment claims, which involve an empirical showing of wide-ranging and routine discrimination.  See Cherosky v. Henderson, 330 F.3d 1243, 1247 (9th Cir. 2003) (concluding that the plaintiffs had not shown a wide-ranging discriminatory policy, and instead had shown only discrete acts:  "As the district court aptly noted, the 'heart of plaintiffs' complaint does not stem from the policy regarding the use of respirators, but rather from the individualized decisions that resulted from implementation of a policy originating from OSHA.'  These individualized decisions are best characterized as discrete acts, rather than as a pattern or practice of discrimination.").

Plaintiffs here, however, challenge MTC's specific funding policies as they affect the class of minority AC Transit riders.  An allegation by Plaintiffs that harmful discrete acts were taken in furtherance of a discriminatory policy does not extend the limitations period.  See Cherosky, 330

---

[4]  In Lyons, the Ninth Circuit held that when a plaintiff "alleges a systematic violation, each individual act of discrimination occurring within the limitations period may form the basis of an actionable claim, even if the discriminatory policy was initiated outside the limitations period."  See Lyons, 307 F.3d at 1107, n. 7 (citing Bazemore v. Friday, 478 U.S. 385, 395 (1986) (holding, in a pattern or practice case that plaintiffs may challenge a discriminatory pay structure that was initiated before Title VII became applicable to public employees because "each week's paycheck that delivers less to a black man than to a similarly situated white is a wrong actionable under Title VII.")).  In Ledbetter v. Goodyear Tire & Rubber Co.,127 S. Ct. 2162 (2007), however, the Supreme Court limited Bazemore and held that a "new Title VII violation does not occur and a new charging period is not triggered when an employer issues paychecks pursuant to a system that is 'facially nondiscriminatory and neutrally applied.'"  Ledbetter, 127 S. Ct. at 2174.  Congress, however, enacted legislation in January 2009 that overturned Ledbetter as undermining long-established principles of American law and "at odds with robust application of the civil rights law that Congress intended."  See Lilly Ledbetter Fair Pay Act of 2009, Pub.L. No. 111-2, 123 Stat. 5 (2009), amending 42 U.S.C. § 2000e-5[e] at Sec. 2, Findings (1) and (2).

United States District Court
For the Northern District of California

F.3d at 1247; Lyons, 307 F.3d at 1107 (the "assertion that this series of discrete acts flows from a company-wide, or systematic, discriminatory practice will not succeed in establishing the employer's liability for acts occurring outside the limitations period because the Supreme Court has determined that each incident of discrimination constitutes a separate actionable unlawful employment practice."). Thus, it appears that Plaintiffs' challenges to ongoing effects of policies adopted prior to April 19, 2003 are likely time-barred under Morgan. Discrete decisions made up to two years before this lawsuit was filed are actionable. For example, AC Transit applied to have three projects, including a Bus Rapid Transit project in two phases and an enhanced bus projects on eight miscellaneous corridors, included in the 2001 call for projects pursuant to Resolution 3434. RT 116:18-117:4; 425:23-427:6. Prior to the statute of limitations period, MTC included only Phase 1 of the Bus Rapid Transit project and enhanced bus on three of the eight corridors on the 2001 project list. RT 430:12-16. After this suit was filed, AC Transit's Resolution 3434 projects were further reduced by elimination of two of the three enhanced bus corridors. RT 431:21-432:2; 1350:19-21. The actions causing the reduction in the scope of AC Transit's projects under Resolution 3434 did not flow automatically from the policy itself and are therefore actionable. Similarly, since as early as 2001, well before the statute of limitations began to run, MTC has made exceptions to its longstanding TCP scoring system to allocate funds to preventive maintenance. RT 179:8-181:5; 182:3-7; 183:3-6; 183:25-185:12. Thus, the policies did not dictate use of the funds. In any case, as the Court ruled prior to trial, evidence of prior practices is admissible in disparate impact cases (Paige v. California, 291 F.3d 1141, 1149 (9th Cir. 2002)), so the Court may consider time-barred events as evidence in connection with Plaintiffs' timely claims.

**Disparate Impact**

California Government Code Section 11135 prohibits discrimination in state-funded programs, just as Title VI, 42 U.S.C. § 2000d, et seq., prohibits discrimination in federally-funded programs. Section 11135(a) provides in relevant part:

> (a) No person in the State of California shall, on the basis of race, national origin, ethnic group identification, religion, age, sex, sexual orientation, color, or disability, be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state.

United States District Court
For the Northern District of California

See also 22 Cal. Code Regs. § 98101(i)(1) (prohibition against "in carrying out any program or activity directly, or through contractual, licensing or other arrangements, on the basis of ethnic group identification, religion, age, sex, color, or a physical or mental disability: . . . (i) to utilize criteria or methods of administration that: (1) have the purpose or effect of subjecting a person to discrimination on the basis of ethnic group identification, religion, age, sex, color, or a physical or mental disability. . . ."). Unlike Title VI, however, the analogous California statute and its implementing regulations provide a private right of action. See Cal. Gov't Code § 11139 ("This article and regulations adopted pursuant to this article may be enforced by a civil action for equitable relief."); see also Blumhorst v. Jewish Family Servs. of Los Angeles, 126 Cal.App.4th 993, 1002 (2005) (stating that: "the Legislature did create a private cause of action for civil rights discrimination by the amendments to section 11139. . . ."); Aug. 21, 2008 Order on Summ. Adjudication/Judgment at 19-20.

As under Title VI, a prima facie case of disparate impact discrimination under section 11135 requires a plaintiff to show: (1) the occurrence of certain outwardly neutral practices; and (2) a significantly adverse or disproportionate impact on minorities produced by the defendant's facially neutral acts or practices. See Gamble v. City of Escondido, 104 F.3d 300, 306 (9th Cir. 1997) (quoting Pfaff v. U.S. Dep't of Housing and Urban Development, 88 F.3d 739, 745 (9th. Cir 1996) (construing the Fair Housing Act)); see also Aug. 21, 2008 Order on Summ. Adjudication/Judgment at 21; Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 16 (Conclusion of Law). Demonstration of discriminatory intent is not required under disparate impact theory. See Griggs v. Duke Power Co., 401 U.S. 424, 432 (1971); Gamble, 104 F.3d at 306; see also Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 17 (Conclusion of Law). Causation is established by offering "statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of . . . [plaintiffs] because of their membership in a protected group." Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 994-95 (1988) ("Our formulations, which have never been framed in terms of any rigid mathematical formula, have consistently stressed that statistical disparities must be sufficiently substantial that they raise such an inference of causation.").

**United States District Court**
For the Northern District of California

1    Once a prima facie case is established, a defendant must demonstrate a substantial legitimate

2    justification for its actions.  See New York Urban League v. State of New York, 71 F.3d 1031 (2d

3    Cir. 1995); Coalition of Concerned Citizens Against I-670 v. Damian, 608 F. Supp. 110 (E.D. Ohio

4    1984); Committee for a Better No. Philadelphia v. Southeastern Pennsylvania Transportation

5    Authority, 1990 U.S. Dist. LEXIS 10895 (E.D. Pa. Aug. 9, 1990).  If a defendant carries this burden,

6    a plaintiff must then show an equally effective alternate practice that results in less racial

7    disproportionality.  See Georgia State Conference of Branches of NAACP v. Georgia, 775 F.2d

8    1403, 1417 (11th Cir. 1985).

9    Plaintiffs argue that MTC's funding policies cause a disparate impact on the largely minority

10    riders of AC Transit's bus system in favor of the lower minority ridership of other Bay Area transit

11    operators, including rail transit operators such as BART and Caltrain.  Specifically, Plaintiffs argue

12    that the emphasis on rail expansion that Plaintiffs contend is embodied in MTC's Regional Transit

13    Expansion Program (Resolution 3434) comes at the expense of improving the bus service used by

14    the more heavily minority bus riders of AC Transit.  Plaintiffs also argue that MTC's policies for

15    allocating both "committed" and "uncommitted" funds among transit operators has resulted in

16    operating shortfall projections for AC Transit leading to cuts in service quality and quantity that

17    disproportionately affect AC Transit's minority ridership.  As discussed below, Plaintiffs have

18    established a prima facie case of disparate impact only with respect to MTC's practice under

19    Resolution 3434.

20    **Prima Facie Case**

21    **Resolution 3434**

22    Resolution 3434 is a strategic long-range plan for transit expansion projects.  In 2001, MTC

23    invited proposals for Resolution 3434 projects to be evaluated under Resolution 3357, which

24    provides financial and performance criteria for Resolution 3434 projects.  The financial criteria

25    include how much funding the project sponsor has already identified through local, state and/or

26    federal sources.  Performance criteria include congestion relief, air quality, connectivity, land use

27    issues, smart growth goals and urban core support.  Project sponsors are responsible for all funding

28    and project delivery.

United States District Court
For the Northern District of California

1    Plaintiffs argue that MTC's practice of choosing projects for inclusion under Resolution

2  3357 causes a discriminatory adverse impact.  Plaintiffs contend that MTC promoted a large

3  expansion of costly rail projects while sacrificing more cost-effective expansion of bus service used

4  by riders who are more heavily minority on a percentage basis.  In particular, in 2001, MTC only

5  funded about one-fifth of AC Transit's requested approximately $1.25 billion, rejecting one of its

6  three proposed projects altogether and part of a second, and further reduced the scope of the second

7  in 2006.  RT 119:13-21; 430:12-16; 431:18-432:2; see Findings of Fact, supra, at ¶¶ 148, 150.

8    The evidence showed that MTC applied different criteria to bus projects than to rail projects.

9  RT 1255:8-11.  AC Transit was required to show that its proposed bus projects would lure travelers

10 out of their single occupancy vehicles, whereas rail projects did not have to make such a showing

11 expressly.  Instead, MTC's Deputy Executive Director for Policy, Therese McMillan, testified that

12 rail projects were simply assumed to do so.  RT 1256:20-1258:3.  The evidence also showed that

13 MTC did not apply any rigorous cost effectiveness criteria across the board, which would probably

14 have resulted in some additional bus expansion, which is less capital intensive because it generally

15 shares existing roadways, compared to rail expansion, which requires laying down dedicated train

16 tracks.

17    In 2001, AC Transit submitted three projects, Bus Rapid Transit Phase 1, Bus Rapid Transit

18 Phase 2, and enhanced bus service on eight miscellaneous corridors, for a total capital cost of over

19 $1 billion.  RT 119:5-8; 426:2-427:6; Tr Ex. 103 at MTCP000982-990.  MTC included the Bus

20 Rapid Transit Phase 1 in full, did not include Phase 2, and included enhanced bus service on only

21 three of the proposed eight miscellaneous corridors, representing in total about one-fifth of the

22 capital money sought by AC Transit.  RT 430:12-16; 431:18-20.  In 2006, AC Transit's projects

23 were further limited by elimination of two of the three enhanced bus projects.  RT 431:21-432:2.

24    Plaintiffs' expert in the areas of transit finance, transit funding and long-range transportation

25 planning, Mr. Thomas Rubin, testified regarding the impact of MTC's selection process.  He

26 concluded that approximately 94% of the Resolution 3434 project costs were for rail projects, and

27 less than 5% were for bus projects.  RT 517:8-12.  He also opined that 84.4% of Resolution 3434

28 funds were dedicated to lower minority operators, and that higher minority operators received only

**United States District Court**
For the Northern District of California

8%.  RT 519:21-520:2.  On the other hand, he conceded that it would be valid to attribute the BART to San Jose project to its sponsor, VTA, which like AC Transit is a higher minority operator, rather than to BART as he did in making those calculations.  RT 613:2-20.  Doing so would considerably reduce the disparity between Resolution 3434 funds allocated to higher minority operators and funds allocated to lower minority operators.  Similarly, Mr. Rubin also testified that he attributed a large portion of the cost of the Transbay Terminal to Caltrain (RT 516:1-517:1), even though the project sponsor was the Transbay Joint Powers Authority, of which AC Transit is a member, and Phase I of the Transbay Terminal project was limited to bus only.  RT 566:16-18; 1295:14-15.  Nonetheless, even if the BART project was attributed to VTA and the Transbay Terminal project was attributed at least in part to AC Transit, MTC's selection process still causes a disparity in funding for rail projects that on the whole are used by a lower percentage of minority riders, as opposed to bus projects.  Further, as capital-intensive rail operators such as BART increase their fleets of rail cars, there will be even more demand on Resolution 3434 funds for rail expansion (RT 412:10-413:1), likely at the expense of bus services.  In addition, Mr. Rubin testified that AC Transit's proposed expansion projects would not only have enabled AC Transit to provide better service at a lower cost, but might have also restored service that had been cut previously.  RT 602:7-22; 1386:14-25.

On balance, Plaintiffs have shown that MTC's practice with respect to Resolution 3434 caused disparate impact.  As described above, MTC allocates more funding to rail projects than to bus projects, resulting in bus projects proposed by AC Transit being excluded from projects listed in Resolution 3434.  Although Plaintiffs' challenge to MTC's initial decisions on which projects to include under Resolution 3434 appear to be barred by the statute of limitations, those decisions constitute relevant context for MTC's further reductions in 2006 of the scope of the few AC Transit bus projects that had initially been included.

### Committed Funds

Plaintiffs challenge MTC's ostensibly neutral practices of: (a) committing to capital use federal formula funds under Section 5307 (urbanized area) and Section 5309 (fixed guideway modernization) that are eligible for transit operations; and (b) committing to expansion STIP/RTIP funds that are eligible for capital rehabilitation.  Plaintiffs argue that the overall effect is to shift

65

funds away from operating the existing transit system into costly expansion projects, including those in Resolution 3434, in effect starving the existing bus system to feed the growth of capital-hungry rail.

The allocation of federal formula funds is governed by MTC's TCP process, which is set forth in Resolution 3688. The scoring system in Resolution 3688 was determined by a consensus of the region's transit operators, including AC Transit. RT 993:24-995:15. The highest score, generally sixteen, goes to the equipment necessary to provide actual service: vehicles, rolling stock, BART cars, buses, ferry boats and fixed guideway. RT 965:7-10. In the San Francisco/Oakland urbanized area, it is rare that any project with a score of less than sixteen is funded because there are not enough federal funds to do so. RT 240:5-22. Although preventive maintenance, an operating expense, is eligible for Section 5307 funds (RT 233:25-234:5), it only receives a score of nine (RT 241:17-19). Other needs that receive a lower score include maintenance facilities, service vehicles and tools. RT 965:17-23. To prevent any one operator from monopolizing the funds, MTC placed a cap on the total amount of Section 5307 funds that any one operator can receive in any one year. RT 240:23-241:1.

Despite preventive maintenance's low score, MTC has allowed some committed funds to be used for preventive maintenance in limited circumstances. RT 965:23-966:4. Although there is evidence that MTC has made ad hoc exceptions to provide AC Transit with preventive maintenance funds when it specifically requested them in every year since at least 2001 (RT 179:8-181:1; 181:2-5; 182:3-7; 183:3-6; 183:25-184:17; 184:18-185:12; Exhs. 504, 505, 1040, 1041), many of these exceptions were actually funding swaps to enable AC Transit to purchase buses with funds that would not otherwise be eligible for that purpose. RT 179:11-15. Therefore, the preventive maintenance allocations did not necessarily result in any net gain in operating revenue. RT 249:16-250:7. More importantly, in 2005, MTC revised its TCP process to allow a ten percent flexible set-aside by which operators could use their share of funds for whatever scored project they chose, including preventive maintenance, but specifically limited this use to twice in a twelve-year period. RT 996:11-997:16; Exhs. 504, 505. Thus, the current policy still limits the use of these funds for operating costs.

United States District Court
For the Northern District of California

1    The second practice challenged by Plaintiffs that relates to committed funds is MTC's policy

2  of committing funds to expansion that could be used instead for capital rehabilitation.  For example,

3  Plaintiffs point to State/Regional Transportation Improvement Program (STIP/RTIP) funds, which

4  can generally be used for capital rehabilitation.  RT 294:14-20.  These funds, however, must go to

5  projects that are chosen initially by county congestion management agencies, and only then brought

6  to MTC for inclusion in the RTP.  RT 959:13-18.  MTC's sole role is to evaluate these projects to

7  determine consistency with the RTP.  RT 960:9-16.  In light of MTC's limited role in this process,

8  Plaintiffs have not shown that MTC's decisions on STIP/RTIP funds have a significant adverse

9  impact on the Plaintiff Class.

10    Plaintiffs' expert, Mr. Rubin, expressed his opinion that MTC's practices with regard to the

11  allocation of committed funds (together with its practices regarding uncommitted funds) produced a

12  disparate impact on high-percentage minority operators.  He testified that AC Transit's operating

13  shortfall as a percentage of its operating budget was higher than that of any of the lower minority

14  operators, and that the average for all high-minority operators was almost three times that of the

15  lower-minority operators.  Tr. Ex. 113, ¶¶ 99-102, Ex. F.  The Court was impressed by Mr. Rubin's

16  deep expertise in transportation planning and his forceful advocacy on behalf of Plaintiffs in this

17  case.  However, by virtue of his position as an expert for Plaintiffs, he was not hired to provide a

18  neutral viewpoint.  In particular, the Court does not credit his analysis on this point because he

19  unilaterally added approximately $500 million to AC Transit's projected 2005 RTP operating

20  shortfall without making similar adjustments for other operators.  RT 528:13-529:11.  While Mr.

21  Rubin explained that he did so to account for a reduction of service prior to the 2005 RTP (RT

22  528:13-25), AC Transit had already included those service cuts in the information given to MTC

23  prior to the issuance of the 2005 RTP.  On cross-examination, Mr. Rubin admitted that he did not

24  adjust GGT's operating shortfall similarly, even though it had also made large cuts, citing GGT's

25  falling demand as the basis for the cuts and his rationale for treating it differently in his analysis.  RT

26  593:4-594:2.  Yet AC Transit's ridership had also declined steadily, if modestly, from a peak in FY

27  2000-2001.  See Tr. Ex. 1195 at 1-16 (May 2004 STRP); Stipulation re: Ridership, Revenue Vehicle

28  Miles and Revenue Vehicle Hours (docket # 371) at Ex. C.  Moreover, Mr. Rubin conceded that he

67

1    did not analyze GGT's service in detail so he could not say whether the decline in ridership was the

2    cause or rather the result, in whole or in part, of cuts in service, insofar as its customers in affluent

3    Marin County could react to cuts in service that made bus travel less convenient by switching to

4    cars, perhaps to a greater extent than AC Transit's customers.  RT 513:18-514:9.

5          Mr. Rubin also acknowledged that he did not make a similar adjustment for VTA either,

6    despite its service cuts, citing a different reason: VTA's projected increase in future service due to

7    anticipated population and employment growth and its greater access to local (sales tax) funding set

8    forth in the 2005 RTP.  RT 594:20-595:1; Tr. Ex 213 at 2.1-23.  Yet the same RTP goes on to

9    project a deficit for VTA, despite its access to local funds and planned fare increases, that "will have

10   to be eliminated either through additional funding or service cutbacks."  Tr. Ex. 213 at 2-1-24.

11   Finally, Mr. Rubin had to acknowledge that all of the operators were cutting service as of the early

12   part of the fiscal year 2003-2004.  Thus, the operators had either already made cuts or their budget

13   data showed imminent planned cuts at the time they supplied data to MTC for use in the 2005 RTP

14   in response to its call for data during the period of June through December 2003.  RT 595:23-598:6.

15   This evidence seriously undermines the proffered rationale for only adjusting AC Transit's data.  On

16   the other side of the ledger, the evidence cited by Plaintiffs in support of this unilateral adjustment

17   (see Pls.' Post Trial Brief at 16:10-26) is ambiguous at best and does not persuade the Court.

18         Mr. Boedeker testified more persuasively on this point that a sounder statistical comparison

19   would adjust all the operators similarly for any cuts, or use unadjusted data for all of them.  Indeed,

20   without the one-sided adjustment of AC Transit's operating shortfall, the projected operating

21   shortfall for AC Transit is only one percent, the lowest operating shortfall per rider for the five

22   operators with operating shortfalls.  RT 743:24-744:10.  Mr. Boedeker testified that MTC funded

23   about 95% of AC Transit's operating shortfall, a higher percentage than any other operator with a

24   shortfall, although less than the 100% funding of operating shortfalls of SamTrans (a higher

25   minority bus operator) and BART (a lower minority rail operator).  RT 749:15-750:5; Tr. Ex. 1908.

26   AC Transit would have had a much higher operating shortfall than any of the other five operators

27   with shortfalls if not for MTC's funding.  Indeed, AC Transit starts at a disadvantage compared to

28   other operators in terms of its ability to raise its own local funds, quite apart from any decisions by

68

MTC.  For example, 80% of VTA's operating budget is supplied by local or state sales tax measures.  RT 910:10-20.  Similarly, between 50% and 60% of the revenues for GGT's budget comes from Golden Gate Bridge tolls.  RT 973:1-4.  Further, Muni's local and state dedicated funds constitute approximately 70% of its annual operating expenses.  RT 1010:22-1011:5; Tr. Ex. 1908.  MTC has no influence over these funds and cannot control operators' access to them.  RT 638:17-639:14.  By contrast, AC Transit receives less support from dedicated local and state funds for reasons that have nothing to do with MTC.  RT 641:2-643:6.  Specifically, the only tax that AC Transit can put on the ballot is a parcel tax, which requires a two-thirds majority vote.  Parcel taxes impose a uniform fee per property owner regardless of the size of the property.   RT 136:7-137:3; 150:17-151:24; 536:14-19.  Although three parcel tax measures proposed by AC Transit have passed in recent years, they do not generate as much revenue as sales taxes.  RT 136:20-22; 632:20-23; 680:19-23.  Therefore, even if MTC funded the same percentage of each operator's projected operating shortfall, the operators would remain in different positions.  Thus, to some extent, the argument is whether AC Transit's glass is half full due to MTC's funding some of its shortfall or half empty due to MTC's failure to allocate additional funding to AC Transit over and above other operators who do not need as large subsidies from non-dedicated sources.

Other significant differences between the seven largest operators in the Bay Area compound the difficulty of making valid comparisons between them (the proverbial "apples and oranges" issue).  First, some operators are bus only (AC Transit and SamTrans), one is heavy rail only (Caltrain), one is both light and heavy rail (BART), one is bus and ferry (GGT), one is electric and diesel buses, light rail, historic trolleys, and cable cars (Muni), and one is bus and light rail (VTA).  See Joint Glossary at 3-5, 8, 11, 15, 18-19.  Second, the operators are functionally distinct in that rail systems constitute the "backbone" of a regional transportation system in that they serve the "long haul distance" and focus on commuter travel, while buses and light rail provide more "short haul" service on streets and freeways, complementing to the rail systems.  RT 1108:14-1109:1;1096:7-1097:25.  Third, the operators are also differently situated as to certain funding eligibility by geography, with AC Transit, BART, Muni, GGT and SamTrans all operating within the San Francisco/Oakland urbanized area, while VTA operates within the San Jose urbanized area and

United States District Court
For the Northern District of California

Caltrain operates in both. RT 688:4-9; Tr. Ex. 213. Fourth, as discussed below, the operators are also distinct in their ability to generate their own revenue. Specifically, while some operators may propose sales tax ballot measures, AC Transit does not have authority to do so. Finally, the cost structures are very different; bus systems have lower capital costs than rail systems. RT 618:7-10; Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at 82.

Defining the appropriate comparison groups to assess disparate impact is further complicated by the Bay Area's "majority minority" population of transit users, as 61% of all riders are minorities. Plaintiffs' bifurcation of operators into "high minority" as those with 70% or above minority ridership, and "low minority" as those with 60% or below minority ridership, draws support from MTC's use of a 70% benchmark to analyze disparate impact for Title VI monitoring purposes. Yet, the margin of error of three percent makes it uncertain whether some of the operators are correctly classified by this approach. For example, SamTrans is estimated to have a 70% minority ridership, but given the margin of error, may fall below (or above) 70%. RT 630:3-6. Similarly, Muni has a 58% minority ridership, but with the margin of error, could have as much as 61% (or as low as 55%). Further, analyzing the seven operators on a continuum, as MTC's statistical expert did (among other analyses), rather than bifurcating them in a somewhat arbitrary way, also makes sense, and generally did not show a statistical correlation between MTC funding and level of minority ridership. See, e.g., Tr. Ex. 1908 (graph entitled MTC Operating Shortfall as a Percentage of Operating Budget).

While Plaintiffs also argue that rail operators as a whole have 51.6% minority ridership as compared to bus operators as a whole with 66.3% minority ridership, bus operators collectively still fall below Plaintiffs' chosen high minority threshold of 70%. RT 522:10-17; 766:15-17. Further, although Plaintiffs characterize SamTrans as high minority/bus and Caltrain as low minority/rail, the complex interrelationships between the operators undercuts any rigid classification into stand-alone high and low minority operators engaging in a single mode of transit. For example, Caltrain operates under a joint powers agreement between the San Francisco Municipal Transportation Agency, the Santa Clara Valley Transportation Authority and the San Mateo County Transit District (SamTrans), each of which have a role in the operation of Caltrain, and each of which also operate

**United States District Court**
For the Northern District of California

bus service.  RT 859:7-12; 871:1-16.  Class members, including a named representative, have used both AC Transit and BART.  See, e.g., Declaration of Vivian Hain in Supp. of Pls.' Reply regarding Mot. for Summ. Adjudication at ¶ 26; Declaration of Rebecca Jones-White in Supp. of Pls.' Reply regarding Mot. for Summ. Adjudication at ¶ 8.

Finally, looking at the data from the viewpoint of absolute numbers of minority riders advantaged or disadvantaged by MTC's funding policies, as MTC urges, the picture becomes more complicated than Plaintiffs portray it.  Although absolute numbers are not the focus of disparate impact analysis, they do provide some useful context.  At bottom, Plaintiffs' main complaint is that MTC facilitates expansion of costly capital-intensive rail and light rail, especially by BART, instead of channeling more funds to bus service, especially by AC Transit.  Yet in FY 2005-06, BART carried a significantly higher total number of passengers, over 101 million, so with a minority percentage of 53%, its total minority passengers were over 53 million.  See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶¶ 55-56.  By contrast, in FY 2005-06, AC Transit carried only 65 million passengers (approximately one-third less), and at 78% minority, the total number of AC Transit's minority passengers was approximately 51 million, or 2 million fewer.  See id.  Yet it is also true that during that time period any funding practice that favored BART over AC Transit benefitted BART's approximately 47 million white riders, who make up 47% of BART's total ridership of approximately 101 million, compared to AC Transit, which has less than a third of the absolute number of white riders (14.3 million) that BART has, and less than half of the percentage of white riders of BART (22%).

Plaintiffs' reliance on Vehicle Revenue Miles ("VRM") to make comparisons between operators using different transit modes is not entirely persuasive.  VRM is the total number of miles that each transit vehicle is in revenue service (i.e., excluding miles traveled to and from storage facilities, and other deadhead travel), and is only one of several measures commonly used to evaluate transit service.  See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 74.  VRM is affected by a number of factors, including service choices by operators, topography, geographic coverage and changes to service areas.  RT 1422:19-1423:5.  As Mr. Rubin acknowledged, comparing transit service is more "an art than a science."  RT 711:6-15.  He testified

1   that AC Transit, SamTrans and VTA had decreases in their VRM over the period from 1993 through

2   2007, whereas BART and Caltrain had significant increases in VRM over the same period, and

3   Muni had a slight increase in VRM.  RT 507:5-511:17.  Yet Mr. Rubin's analysis also showed that

4   GGT, which has the lowest minority ridership, suffered greater decreases in VRM over the same

5   period than did AC Transit.  See Tr. Ex. 765.  While Plaintiffs are correct that one "outlier" does not

6   invalidate a statistical analysis, GGT, as the "whitest" of the seven Bay Area operators with only

7   38% minority riders, provides a strong counter example to Plaintiffs' analysis that merits further

8   investigation.  Yet Mr. Rubin acknowledged that he did not analyze it in much detail.  RT 514:1-9.

9       Another measure is "Vehicle Revenue Hours" ("VRH"), which represents the total number

10  of hours that each transit vehicle is in revenue service, including layover time.  The measure also

11  excludes hours consumed while traveling to and from storage facilities, and during other deadhead

12  travel.  See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 76.  Mr.

13  Rubin criticized the VRH metric as not accounting for the fact that riders use transit services to

14  travel distances, not hours, and as influenced by traffic congestion.  RT 506:17-507:3.  Yet he

15  conceded that VRH is a "useful" measure.  RT 506:15.

16      Mr. Boedeker analyzed the seven largest operators using a VRH metric, similar to the

17  analysis done by Mr. Rubin with respect to VRM.  Analyzing VRH for the period of 1995 through

18  2007, Mr. Boedeker opined that AC Transit generally followed the same trends in terms of increases

19  and decreases over time as the other six large transit operators.  RT 759:8-25; Tr. Ex. 1908.

20  However, he relied on two graphs plotting VRM and VRH that provided a distorted impression of

21  the data.  For example, with respect to his analysis of VRM, Mr. Boedeker plotted AC Transit on the

22  left axis with VRM ranging from 15,000 to 25,000, a difference of approximately 67% between the

23  low and high points.  The remaining six operators are plotted on the right axis with VRM ranging

24  from 100,000 to 130,000, a difference of only approximately 30%, or less than one-half the

25  magnitude of AC Transit's VRM range.  Even if, as suggested by Mr. Boedeker, the Court were to

26  ignore the part of the graph with no data, the percentage differences in the VRM ranges are

27  significant (30% versus 20%).  RT 796:6-798:2.

28      Under either analysis, however, the evidence reflects that AC Transit has experienced a

United States District Court
For the Northern District of California

somewhat steeper downward trend in service since a peak in FY 2002-2003, than all other large

operators combined, who also trended down but less steeply from a peak in FY 2001-2002.  See

Stipulation re: Ridership, Revenue Vehicle Miles and Revenue Vehicle Hours (docket # 371) at Ex.

A, B; Tr. Ex. 1908;[5] Tr. Ex. 113, Ex. I.[6]  Specifically, AC Transit had a decrease of approximately

7.5% in VRM and a decrease of approximately 11.8% in VRH for the period from 2002-2003 to

2006-2007.  See Stipulation re: Ridership, Revenue Vehicle Miles and Revenue Vehicle Hours

(docket # 371) at Ex. A.  This evidence lends some support to Plaintiffs' argument that funding

practices disproportionately impact AC Transit's service level during the statute of limitations

period.  However, the snapshot of AC Transit's service level trend varies depending on the starting

point for the calculation.  For example, AC Transit ended the period from 1995-1996 through 2006-

2007 at almost the same level of service as it began, with a very slight decrease (0.6%) when

measured in VRM, and a slight increase (1.9%) when measured in VRH.  See id.  Over an even

longer period, however, from 1992-1993 through 2006-2007, AC Transit's VRM fell a little more

(7.5%).  Of course, the farther back the analysis goes, the more the data reflects decisions that are

outside the statute of limitations.

　　　　While Mr. Boedeker's two flawed graphs described above were not persuasive, his other

analyses and graphs effectively countered Plaintiffs' claims that MTC's process for allocating

committed federal formula funds has a substantial disproportionate adverse impact on high-minority

operators like AC Transit.  Mr. Boedeker analyzed operating shortfalls as a percentage of operating

budgets for the seven largest operators against the percentage of minority ridership.  See Tr. Ex.

1908 (graph entitled MTC Operating Shortfall as a Percentage of Operating Budget).  He found that

there was no correlation between operating shortfalls as a percentage of operating budgets and

minority ridership.  For example, SamTrans, at 70% minority, classified by Plaintiffs as a high

minority operator, had no operating shortfall as a percentage of its operating budget, yet GGT, at

---

[5]  See graphs entitled Total AC Transit Revenue Vehicle Miles vs. Total Aggregate Revenue Vehicle Miles of Other Large Operators and Total AC Transit Revenue Vehicle Hours vs. Total Aggregate Revenue Vehicle Hours of Other Large Operators.

[6]  See graphs entitled Total AC Transit Revenue Vehicle Miles vs. Total Aggregate Revenue Vehicle Miles of all Operators Less AC Transit, and Total AC Transit Revenue Vehicle Hours vs. Total Aggregate Revenue Vehicle Hours of all Operators Less AC Transit.

38% minority being the lowest minority operator, had an operating shortfall of 4.5% of its operating budget.

As addressed above with respect to standing, the question of causation with regard to MTC's practices in connection with committed funds is complicated. The RTP is a planning document, whose projections do not necessarily come to pass. For example, even though five of the top seven operators had projected operating shortfalls in the 2005 RTP (Ex. 213 at 2.1-2), none of those operators had cut service as of the time of the trial. Caltrain and AC Transit have added service. RT 552:1-5; Bruzzone DT 12:19-23. And although Plaintiffs' expert forecast a $14 million shortfall for FY 2007-08, in fact AC Transit ran a $3.8 million surplus that year (although it was projected to have a $3.8 million deficit for the following year). RT 1449:14-24, Tr. Ex. 1895 at 9.

Economic fluctuations also have a significant impact on actual shortfalls. RT 882:25-883:5 (poor economy causes ridership declines, which affects fare revenue); 908:1-18 (state sales taxes also affected by economy); 972:12-22 (poor economy also affects Golden Gate bridge toll revenue). For example, even though the 2001 RTP did not project operating shortfalls for any operator other than AC Transit, all transit operators saw major revenue sources begin to fall in 2001 as a result of the dot com crash, prompting all of the top seven operators to cut service during that period. RT 549:16-20; 907:5-25. On the other hand, unexpected windfalls do on occasion occur, although less often than they are desired. In one instance, after this lawsuit was filed, MTC programmed a portion of larger than expected CMAQ funds to AC Transit's Bus Rapid Transit project that was included in Resolution 3434. RT 290:11-18. However, AC Transit did not get any funds from a separate windfall of STP and CMAQ funds in 2004-2005. RT 284:13-285:9.

Nonetheless, Plaintiffs have shown that MTC's projections, particularly those in the near future, constitute a substantial factor contributing to service reductions by AC Transit. It is true that other factors, such as unanticipated economic recessions that reduce state sales tax revenue or unexpected federal funding windfalls, may confound expectations. Yet the planning process is not intended to be a meaningless paper exercise, but instead is designed to guide decision-making. Indeed, while MTC's Ms. McMillan was not as direct in her initial testimony at trial on the subject of the impact of projected shortfalls, she had to acknowledge that in her deposition she testified that

she had warned the transit operators at a Partnership Board meeting that they must address "now" the "dangerous lines down the road" shown by projected operating shortfalls. RT 396:4-9. Mr. Rubin testified that projected operating shortfalls are a substantial factor. RT 533:7-9. MTC's expert Dr. Cervero also acknowledged, when questioned about AC Transit's service cuts, that: "[t]hat's what deficits, shortfalls prompt you to do." RT 1202:24-25. Further, transit operators take operating shortfalls seriously and plan well in advance to make responsive service cuts if they cannot secure additional funds through raising fares or other means. See, e.g., RT 134:15-17 ("So probably a year or two out we would go from there merely being red flags to actually trying to plan what we were going to do in terms of service cuts or additional income."): 893:21-894:10 (policy of SamTrans and Caltrain is to plan ahead to address projected shortfalls).

In conclusion, Plaintiffs have shown that MTC could take at least some additional steps to allocate committed funds in a way that would somewhat alleviate AC Transit's shortfalls. However, on balance, Plaintiffs have not met their burden of showing that MTC's funding practices regarding committed funds have a significantly disproportionate adverse impact on the Plaintiff Class.

### Uncommitted funds

The Court determined at the summary judgment stage that MTC has a facially neutral practice of failing to cover operating shortfalls in the RTPs based on MTC's four step funding process that culminates in the assignment of uncommitted funds. Aug. 21, 2008 Order on Summ. Adjudication/Judgment at 22:9-10. Uncommitted or flexible funds, which include STP, CMAQ and STIP/RTIP funds, can be used for transit, highway, streets and roads. See Joint Proposed Findings of Fact and Conclusions of Law (docket # 291) at ¶ 102. Due to the restriction on the use of CMAQ funds for operations to only the first three years after a new service is launched, Mr. Rubin does not recommend their use for operating expenses. RT 495:5-21. STIP/RTIP funds, as discussed above, must be used for capital rehabilitation. See Cal. Gov't Code § 14527 (a); Cal. Streets & Highways Code § 164. Thus, the only category of uncommitted funds that can be used for operating purposes (other than funding for the first three years of a new service by CMAQ) are STP funds. STP capital funds can be transferred to the transit side and used for preventive maintenance for AC Transit and many other operators in the state. RT 275:21-276:18; 277:18-278:22. MTC programs only

approximately $65 million in STP funds per year (RT 277:6-10), and decides, in conjunction with the Partnership Board, how to allocate those funds (RT 279:1-6).  MTC's general practice is not to apply STP funding to preventive maintenance, although it could if it so chose.

Plaintiffs' argument in their post-trial brief that the allocation of uncommitted funds disproportionately impacts riders of high minority operators rests on Mr. Rubin's calculations that include the addition of $500 million to AC Transit's operating shortfall in the 2005 RTP, without making similar adjustments for the other largest operators.  Therefore, Plaintiffs have not met their burden of showing a prima facie case of showing a significant disparate impact with respect to uncommitted funds.

**MTC's burden**

Plaintiffs having established a prima facie case as to Resolution 3434, and assuming arguendo that Plaintiffs had done so as to committed and uncommitted funds, the burden shifts to MTC to show a sufficient justification for the challenged practices.  The parties have a fundamental disagreement about the nature of MTC's burden.  Plaintiffs argue that MTC must demonstrate a strict transportation necessity through empirical validation studies, citing landmark cases that arose in the employment context.  See Griggs v. Duke Power Co., 401 U.S. 424 (1971); Albemarle Paper Co. v. Moody, 422 U.S. 405 (1975).  MTC responds that it need only show a substantial legitimate justification for its actions in order to carry its burden, relying on more recent lower court cases that arose in the transportation context.  See New York Urban League v. State of New York, 71 F.3d 1031 (2d Cir. 1995); Committee for a Better No. Philadelphia v. Southeastern Pennsylvania Transportation Authority, 1990 U.S. Dist. LEXIS 10895 (E.D. Pa. Aug. 9, 1990); Coalition of Concerned Citizens Against I-670 v. Damian, 608 F. Supp. 110 (E.D. Ohio 1984).  For the reasons set forth below, the Court concludes that MTC needs to show a substantial legitimate justification for its conduct, and is not confined to reliance on the particular type of proof that Plaintiffs advocate, as long as MTC relies on persuasive evidence.

In Griggs, the plaintiffs alleged that the defendant's practice of requiring a high school education or passage of a standardized general intelligence test as a selection criterion for hiring employees violated Title VII.  The Supreme Court held that the touchstone for determining whether

United States District Court
For the Northern District of California

a screening device that causes a disparate racial impact is justified is a showing of business necessity, and that the company had failed to make that showing.  See Griggs, 401 U.S. at 431.  In Albemarle Paper Co. v. Moody, 422 U.S. 405 (1975), the Supreme Court stated that the burden on the company was to show that a given requirement has "a manifest relationship to the employment in question."  Id. at 425.  The Court focused on whether the company had shown that the intelligence tests were job related, and determined that there had been no showing of job relatedness where there were no studies or statistics from which to determine whether the tests actually correlated to job preparedness or promotability.  In Larry P. v. Riles, 793 F.2d 969 (9th Cir. 1984), the Ninth Circuit extended that test to the use of IQ tests as a screening device for placing students into special education classes.  See Larry P., 793 F.2d at 982, n. 9 ("In the Title VI disproportionate impact claim in the educational situation, the defendants must therefore show that any given requirement has a manifest relationship to the education in question, i.e., that the IQ tests are required by educational necessity.") (citing Board of Education of New York v. Harris, 444 U.S. 130, 151 (1979)).  In those cases, however, unlike the case before the Court, the employment and educational practices at issue were very discrete, involving a single screening or selection device (high school diploma or intelligence test) applied to one population (e.g., job applicants or students), and fit readily into the parameters of the Title VII analysis.  In this case, by contrast, Plaintiffs challenge the application of several complex budgetary practices to a host of transit operators, which are differently situated as to funding and modes of service, and serve multiple, overlapping populations of riders.  Further, MTC's practices in this case are subject to a complex array of statutory, regulatory and administrative constraints, not to mention numerous, and sometimes competing policy goals, which require making difficult trade-offs.

Following Griggs, the Supreme Court relaxed the necessity standard somewhat in Wards Cove Packing Co. v. Atonio, 490 U.S. 642 (1989), although the import of that decision on this case in the wake of Congress's subsequent amendment to Title VII is unclear.  In Wards Cove, the Supreme Court stated that the business practice need not be essential to constitute a legal employment practice:

> The touchstone of this inquiry is a reasoned review of the employer's justification for his use of the challenged practice.  A mere insubstantial justification in this regard

will not suffice, because such a low standard of review would permit discrimination to be practiced through the use of spurious, seemingly neutral employment practices. At the same time, though, there is no requirement that the challenged practice be "essential" or "indispensable" to the employer's business for it to pass muster: this degree of scrutiny would be almost impossible for most employers to meet, and would result in a host of evils we have identified above.

Id. at 659 (internal citation omitted).  After Wards Cove, Congress amended Title VII to restore the prior standard of business necessity to employment cases by expressly requiring the defendant to show that "the challenged practice is job related for the position in question and consistent with business necessity."  42 U.S.C. § 2000e-2(k)(1)(A)(i).  Regardless of its general applicability to other statutes beyond Title VII, this amendment concerns a discrete practice tied to a specific position with a particular employer.  Thus, the amendment does not readily translate to scrutiny of MTC's complex and multi-faceted decisions regarding differently situated operators.[7]

Courts addressing disparate impact in the transportation context have not held defendants to a strict necessity standard.  For example, in New York Urban League v. State of New York, 71 F.3d 1031 (2d Cir. 1995), the question was whether the defendant, which like MTC allocated transportation funds in the region, violated Title VI by causing an unjustified disparate impact where the largely minority riders of the urban subway and bus system paid a disproportionate share of the cost of operating the overall transit system as compared to the largely white riders of the commuter rail lines.  The appellate court applied the standard of "substantial legitimate justification."  It held that the district court erred in finding a disparate impact based on the farebox recovery ratio because the district court failed to also find that such a ratio was a reliable indicator.  See New York Urban League, 71 F.3d at 1038.

Lower courts have applied a more relaxed burden than the appellate court in New York Urban League.  In Coalition of Concerned Citizens Against I-670 v. Damian, 608 F. Supp. 110 (E.D.

---

[7]     Some commentators have questioned the applicability of Wards Cove to cases outside of the Title VII context.  See, e.g., Johnson, Disparity Rules, 107 Colum. L. Rev. 374, 396 (2007).  Others recognized that the legal question of the application of the business necessity amendment to disparate impact cases based on other statutes remains unsettled, with legitimate arguments both for and against.  See, e.g., Vartanian, et al., Disparate Impact Discrimination: Fair Lending at a Crossroads, 49 Consumer Finance Law Quarterly 76, 80 (1995).  This Court does not attempt to decide this question as a general matter regardless of context, but instead seeks to find the proper standard for the specific issues presented here, taking its guidance from the case law on disparate impact in the mass transit context.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Ohio 1984), the question was whether the construction of a highway through low income, high minority areas in the city of Columbus had a disparate impact in violation of Title VI. The court described the defendants' burden after the plaintiffs met their prima facie case as requiring them to "present a justification for their actions." Id. at 127. The court determined that the defendants met their burden of justifying the location of the highway by "articulating legitimate nondiscriminatory reasons for the location." Similarly, in Committee for a Better No. Philadelphia v. Southeastern Pennsylvania Transportation Authority, 1990 U.S. Dist. LEXIS 10895 (E.D. Pa. Aug. 9, 1990), the question was whether the transportation authority's allocation of subsidies had a disparate impact on minorities who used the city's transit, as opposed to others who used the regional rail system. The court articulated the defendant's burden as requiring a showing that the conduct was based on legitimate, nondiscriminatory reasons. Id. at *9. The court found that the defendant met its burden by justifying the use of cross-subsidization as necessary to stabilize regional rail fares, maintain service to the area, lure back regional rail riders and maintain a balanced budget, as it determined to be but for the transit needs of the entire region in its business judgment. None of these cases required the defendant to conduct a rigorous statistical validation study to meet its burden.

This Court concludes that the standard of proving a substantial legitimate justification set forth in New York Urban League most appropriately describes the burden on MTC here to rebut Plaintiffs' non-robust prima facie showing. This showing may be made by a preponderance of competent, relevant evidence, which need not consist of rigorous statistical studies as long as it is persuasive. The lesser burden as articulated by the two district courts noted above may too closely resemble the reduced burden on defendants for rebutting prima facie showings in disparate treatment cases under Title VII (merely articulating a legitimate, nondiscriminatory reason), as opposed to disparate impact cases. At the same time, an overly strict requirement of establishing transportation necessity in the sense of indispensability is not appropriate for judging the complex policy decisions and tradeoffs that MTC must make in allocating funds that are always too scarce among competing legitimate needs to achieve the myriad goals for the region mandated by the planning statute. Moreover, MTC must do so while planning for growth in the region, where approximately nine million people are expected to live by the year 2035. RT 899:13-19. For example, while

preservation of the existing transportation system is one important priority, MTC must also further the goals of increasing the safety and security of the transportation network, improving interconnectivity, protecting and enhancing the environment and promoting energy conservation and smart growth.  23 U.S.C. § 134(h)(1)(A)-(H).  To the extent that MTC exercises discretion in doing so, any particular decision or policy would virtually always be vulnerable to the claim that it was not strictly necessary, which would set too high a bar.  Nor are such complex policy decisions and tradeoffs in the region's multifaceted and interconnected transportation systems readily subject to the kind of statistical validation studies that Plaintiffs point to from cases assessing discrete binary decisions such as whether or not an IQ test is a valid selection device for a particular job or educational track.  It is one thing to require statistical proof of a correlation between job performance and IQ, but would be quite another to require regional planning agencies engaged in the kind of complicated, long-term planning and funding processes at issue here to provide such studies for their multi-faceted decisions involving a host of variables.  At the same time, a requirement of showing a *substantial* legitimate justification, not merely articulating any legitimate reason, provides a safeguard against illegal discrimination masquerading as a neutral policy.

MTC presented evidence that in formulating the challenged policies, it relies in large part on the advice of the Partnership Board, which consists of representatives of all the regions's transit operators, including AC Transit, its Congestion Management Agencies ("CMAs"), its Air Quality Districts, its cities and counties and the Federal Transit Administration ("FTA").  RT 168:24-169:10; 860:5-15; 862:7-11; 864:11-18; 865:17-866:10.  Plaintiffs argued that MTC's reliance on the supposed consensus of the Partnership Board to make its decisions does not constitute a substantial legitimate justification because the consensus is not unanimous and operators like AC Transit feel forced to acquiesce or risk offending a key source of funding.  Although the Partnership Board is advisory only and does not require unanimity in its decisions (RT 235:8-16; 862:22-864:8), and the Court recognizes that operators do not always feel at complete liberty to risk giving offense to MTC, on balance the evidence showed that MTC's reliance on the Board to help set policy is substantially justified.  While Mr. Peeples testified that in his view, consensus is "often heavily coerced" (RT 167:21), the evidence showed a more nuanced situation.  Mr. Peeples based his belief

1    on his view that the former general manager of AC Transit had difficulty getting items on the

2    Partnership Board's agenda and finally gave up.  RT 167:23-168:5.  Mr. Peeples acknowledged,

3    however, that the current general manager of AC Transit has been more successful in dealing with

4    the Partnership Board and successfully persuaded MTC to make an exception to their preventive

5    maintenance policy to permit use of preventive maintenance funds for operating expenses, to AC

6    Transit's benefit.  RT 169:18-170:14.  The Court was impressed by Mr. Peeples's dedication to

7    public service and to meeting the needs of poor minority riders of AC Transit, and has no doubts

8    about the sincerity of his beliefs.  Nonetheless, as an elected Board member who is an advocate for

9    maximizing funds for the constituents whom he represents, his viewpoint is necessarily focused on

10   what he perceives as best for AC Transit, rather than for the transportation system as a whole.  By

11   contrast, MTC must balance competing interests and satisfy diverse and to some extent conflicting

12   mandates.  Having all the stakeholders work together to achieve a general policy consensus, even if

13   less than unanimous, is an important legitimate justification.

14          Resolution 3434 must strike a balance in long range transportation planning that preserves

15   and upgrades the existing physical plant and its operations, while anticipating and accommodating

16   growth, and meeting other legitimate statutorily required objectives.  RT 1090:9-14; 1091:1-8;

17   1095:13-19; 1108:4-7.  Plaintiffs' argument that Resolution 3434 runs afoul of MTC's mandate to

18   preserve the existing system above all else is not persuasive.  Plaintiffs' expert opined that

19   preservation of the system should be the first priority, trumping all other goals, but his opinion is not

20   adequately supported by the statute upon which he primarily relies.  See 23 U.S.C. § 134(h)(1); RT

21   487:14-19; 1385:23-1386:2.  Further, Mr. Rubin acknowledged that preservation of the existing

22   system should yield when, for example, travel patterns change or an operator creates a more efficient

23   service.  RT 500:4-501:11.

24          At the same time, the Court also disagrees with the other extreme advocated by MTC's

25   expert, Dr. Cervero, that preservation of the existing system under Section 134 means only

26   preservation of the capital plant, to the exclusion of maintaining a level of service such as existing

27   bus routes.  RT 1126:5-7 ("I think 'preservation' tells us focusing on capital investment,

28   rehabilitation maintaining an asset which is in place.").  Ms. McMillan testified more persuasively

United States District Court
For the Northern District of California

1  that maintaining and sustaining the existing system requires consideration of both the physical plant

2  and the operation of services.  RT 1248:18-23.  If preserving the system meant new buses sitting idle

3  in the garage because the drivers could not be paid, the statutory mandate would be hollow.

4       While the experts and Ms. McMillan testified as to their interpretation of the governing

5  planning statute in support of their opinions on planning priorities, statutory construction is a

6  question for the Court, which ultimately did not find the expert testimony particularly helpful on this

7  issue.  The express language of the statute provides for consideration of projects and strategies that

8  promote nine different goals, many of which are multi-faceted:

9       (h) Scope of planning process.--

10      (1) In general.--The metropolitan planning process for a metropolitan planning area
        under this section shall provide for consideration of projects and strategies that will--
11      (A) support the economic vitality of the metropolitan area, especially by enabling
        global competitiveness, productivity, and efficiency;
12      (B) increase the safety of the transportation system for motorized and nonmotorized
        users;
13      (C) increase the security of the transportation system for motorized and nonmotorized
        users;
14      (D) increase the accessibility and mobility of people and for freight;
        (E) protect and enhance the environment, promote energy conservation, improve the
15      quality of life, and promote consistency between transportation improvements and
        State and local planned growth and economic development patterns;
16      (F) enhance the integration and connectivity of the transportation system, across and
        between modes, for people and freight;
17      (G) promote efficient system management and operation; and
        (H) emphasize the preservation of the existing transportation system.

18

19  23 U.S.C. § 134(h)(1).  While preservation of the existing system is clearly a priority to be

20  considered in the planning process under Section 134, it is listed last and is not the only

21  consideration to the exclusion of all the others set forth.  Rather, preservation of the existing system

22  must be harmonized with numerous other goals in light of the limited funding available to the region

23  and the fact that the majority of that funding has restrictions on its use for bus operations.  For

24  example, while Plaintiffs criticize the use of funding for BART expansion to the airports, rather than

25  for existing AC Transit bus operations, that expansion furthers several of the goals enumerated in

26  Section 134, such as enhancing the connectivity of transportation systems across and between

27  modes, improving mobility by reducing congestion on highways, and increasing safety and security

28  of the transportation system by providing an alternative to road travel in the event of a disaster such

United States District Court
For the Northern District of California

as an earthquake.

In addition, the evidence shows that high minority operators, as classified by Plaintiffs, endorsed and supported financially some of the major Resolution 3434 projects that Plaintiffs fault as diverting funds from bus service to the detriment of minority riders. For example, a high minority operator, VTA, voluntarily contributed more than $3 billion in revenues to finance the BART to San Jose project's construction, underscoring the perceived benefit to its large minority ridership of 70% (the threshold advocated by Plaintiffs). RT 613:3-9; 15-23. Similarly, Caltrain's "baby bullet" train project is supported financially by Muni, SamTrans and VTA. Like VTA, SamTrans is classified by Plaintiffs as a high minority operator. And AC Transit itself is part of the Transbay Joint Powers Board, which is the project sponsor of the Transbay Terminal project, as is another high minority operator, SamTrans. Thus, high minority operators view the expansion of BART and Caltrain, and the improvement of inter-operator and intermodal connectivity afforded by the Transbay Terminal, as so beneficial to their riders that they have chosen voluntarily to spend their own scarce dollars on these projects. These actions provide powerful evidence of a substantial legitimate justification.

Further, MTC has assisted AC Transit in finding funding sources for its Bus Rapid Transit and enhanced bus projects that MTC did include under Resolution 3434, even though AC Transit had not met MTC's criterion of securing such funding itself as the project sponsor. MTC did not fund all of AC Transit's projects because of the lack of secured funding and the large scope of the projects. RT 1051:7-1053:3. Because AC Transit's third project of miscellaneous enhancements was estimated to cost over $900 million with no committed funds, MTC essentially directed AC Transit to downsize its overall request, resulting in AC Transit's foregoing its third request. In 2006, MTC told AC Transit that its funding was still insufficient. The scope of AC Transit's project was reduced to the Grand/MacArthur corridor (RT 1051:7-1053:3; 1305:8-1306:6), eliminating two other enhanced bus corridors. RT 431:21-432:2. Although Plaintiffs point out that the 2006 update to Resolution 3434 contained an estimated $518 million in RTIP funds over the next twenty five to thirty years, the county shares of those funds are not available to AC Transit projects unless those projects are included in a congestion management plan adopted by a congestion management

United States District Court
For the Northern District of California

1    agency, not MTC.  RT 611:17-612:9; 959:15-18.  The congestion management agency decided that

2    significant RTIP funds would go to BART Oakland Airport connector.  RT 1030:4-1031:15.

3        Finally, Resolution 3434 rail projects complement bus service by providing connectivity, and

4    help further the goal of harmonizing transportation and planned development.  RT 1096:6-1097:25.

5    Resolution 3434 emphasizes building core capacity through projects like the BART extension to

6    Warm Springs and the bus rapid transit projects in Oakland, which inhibit sprawl and encourage

7    investment in urban centers.  RT 1139:2-16.  Resolution 3434 serves not only the suburban riders,

8    but also minority riders, with such light rail projects as the Third Street light rail in San Francisco.

9    RT 1143:4-1144:8.  Plaintiffs are correct that MTC could do somewhat more to benefit AC Transit's

10   minority riders through bus expansion projects, which can be more cost effective than rail projects,

11   and that might well be desirable.  But as a matter of legal liability, the Court cannot say that MTC

12   has failed to show a substantial legitimate justification for Resolution 3434, especially with respect

13   to the actions taken within the limitations period.

14       MTC has also shown a substantial legitimate justification for the manner in which it allocates

15   committed funds.  First, MTC legitimately chooses to allocate a portion of STA population-based

16   funds to small operators that receive only minimal revenue-based STA funds.  RT 940:20-941:1.

17   MTC also legitimately allocates a portion of STA funds to every operator in the region to support

18   services required under the Americans with Disabilities Act.  RT 941:2-4.  Another portion of the

19   funds go to MTC for regional coordination programs, such as Translink, a universal fare card that

20   can be used on any of the transit systems.  RT 941:5-14.  Similarly, MTC has developed the 511

21   information system, which provides transit users with connectivity information for all operators.  RT

22   941:15-19.  These programs directly further the legitimate goals of interconnectivity and improved

23   convenience for transit users.  MTC is substantially justified in funding and taking the lead on these

24   regional projects.  MTC is statutorily required to encourage coordination in transit operations.  RT

25   942:4-8.  It would be difficult for any single operator to develop these regional projects which

26   benefit other operators' riders as well; individual operators are understandably more focused on their

27   own transit operations.  RT 941:20-942:3.  Indeed, AC Transit has supported such projects,

28   becoming one of the first operators to participate in the Translink program.  RT 942:9-943:3.

1   Plaintiffs' transportation planning expert did not testify to the contrary.

2         MTC has also dedicated over $700 million to the Lifeline Program, which defined a network

3   of transit routes identified by MTC as critical to meeting the transportation needs of low-income

4   people in the Bay Area in part from STA population-based funds and also from STA Proposition 42

5   funds.  RT 1075:15-1076:7.  This allocation is also substantially justified.  A high percentage of AC

6   Transit's riders will benefit from these STA expenditures because AC Transit's percentage of transit

7   dependent riders is approximately 22%.  RT 1459:2-17.  Again, Plaintiffs' transportation planning

8   expert did not testify to the contrary.

9         Further, the evidence reflects that MTC's allocation of AB 1107 funds is substantially

10  justified.  While 75% of the AB 1107 funds are statutorily allocated to BART, MTC divides the

11  remaining 25% equally between AC Transit and Muni, even though BART is eligible for the funds

12  and even though Muni has three times the ridership of AC Transit.  See Joint Proposed Findings of

13  Fact and Conclusions of Law (docket # 291) at ¶¶ 55, 191, 192.  This allocation proportionately

14  favors AC Transit riders.

15        MTC maximizes the use of Section 5307 funds, which are a relatively stable source of

16  funding, for "Fix It First" capital rehabilitation, rather than capital expansion.  RT 967:5-968:5;

17  987:18-21.  The "Fix It First" policy refers to "maintaining and sustaining the existing transit

18  system."  RT 372:9-18.  The Partnership Board, which includes AC Transit, has not recommended

19  altering the scoring system for ranking projects for receipt of Section 5307 funds, even though it has

20  recommended changes to the TCP policy that MTC has adopted regarding preventive maintenance

21  funds.  RT 253:7-14;1083:5-7.  Moreover, the TCP policy is more favorable to bus operators like

22  AC Transit than the allocation method primarily used in the rest of the country, where funds are

23  returned to an operator based on the amount of revenue that operator generated, to the benefit of rail

24  operators.  RT 1297:23-1299:22.

25        Plaintiffs criticize MTC's "Fix it First" policy as improperly prioritizing capital

26  rehabilitation, such as replacing older buses and train cars, over funding operators' expenses so as to

27  maintain the same level of bus service.  However, if MTC were to abandon its "Fix it First" policy in

28  favor of a "Fund Operations First" policy, there would soon be too few working buses to maintain

United States District Court
For the Northern District of California

1    service overall and more delays due to increased breakdowns of aging buses.  Diverting a large

2    amount of funds from capital rehabilitation to operations is at best a temporary, stopgap measure and

3    would quickly become self-defeating.

4         The Court acknowledges that there is some force to the Plaintiffs' argument that in the past

5    MTC could have struck a somewhat better balance between funding operations and capital

6    rehabilitation.  During the course of this lawsuit, MTC somewhat increased funding available for

7    operations through Resolution 3688, which permits MTC to program preventive maintenance funds

8    to any operator under the TCP process in two out of twelve years, regardless of need.  Tr. Ex. 504,

9    505; RT 253:7-14; 259:24-260:3; 996:9-997:16.  While Plaintiffs object to the limitation of two

10   years out of twelve, this Resolution strikes a substantially justified, legitimate balance between

11   funding operations more and depleting capital rehabilitation funding excessively.  Although Mr.

12   Rubin testified that MTC could control the depletion of funds for other uses by implementing

13   funding caps as it has done in the past (RT 492:15-17), MTC's limit on funding to two years out of

14   twelve is a valid use of such caps.

15        In 2001, at the request of transit operators, MTC analyzed the potential impact on the capital

16   plant if MTC were to routinely accommodate operators' requests for preventive maintenance.  RT

17   998:8-18.  MTC concluded that "if preventive maintenance were fully tapped, . . . this single

18   urbanized area [San Francisco/Oakland] would wipe out the federal [funding] program."  RT

19   1001:8-10.  MTC also examined the impact on the capital plant of funding just ten percent of the

20   preventive maintenance need of all the operators, and found that: "at the end of the ten-year period,

21   we will have exacerbated the estimated shortfall [of capital rehab] by 415 million bucks, moving

22   toward half a billion, just by accommodating ten percent of one urbanized area through the

23   program."  RT 620:9-621:7; 898:23-899:12; 1001:16-1002:5.  Yet a ten percent transfer to

24   preventive maintenance would only provide AC Transit with approximately $4.3 million in

25   additional operating funds per year (ten percent of its $43 million eligibility for operations through

26   preventive maintenance).  RT 558:24-560:1.  AC Transit's operating shortfalls in the last four RTPs,

27   however, range from $36.7 million to $360.5 million (see Second Supplemental Joint Proposed

28   Findings of Fact (docket # 353) at ¶ 306-309), so this allocation would not do much to alleviate its

United States District Court
For the Northern District of California

1  shortfalls.  A larger shift to preventive maintenance would, of course, further exacerbate the capital

2  shortfall.

3      While Plaintiffs argued with some justification that MTC's analysis of the effect of a ten

4  percent conversion to operating funds is overstated because not all operators have operating

5  shortfalls or would need an additional ten percent, MTC persuasively countered that even shifting

6  only half that amount to preventive maintenance would result in a substantial capital rehabilitation

7  shortfall ($207.5 million rather than $415 million).  Also, as Plaintiffs' expert acknowledged, an

8  operator that is not currently showing a shortfall could reconfigure its financial picture to show a

9  projected deficit in order to take advantage of an extra ten percent in operating funds.  RT 559:12-

10  19; 1442:20-1443:22.  Mr. Rubin opined that MTC could satisfy the entire region's preventive

11  maintenance needs with Section 5307 funds (RT 491:13-18; 494:22-495:4), which account for $180

12  million per year.  RT 962:23-963:2.  But his suggestion that MTC could backfill this amount from

13  other funding sources, such as STP and RTIP, is not persuasive because these other funding sources

14  would be severely depleted, at the expense of important current programs that rely on those funds

15  such as road projects funded by STP.  RT 557:1-558:16.  Furthermore, AC Transit has not used all

16  the preventive maintenance funds that MTC has provided for operations, but instead, has decided to

17  use some of the funds for capital projects.  RT 183:25-184:25; Tr. Ex. 1082.  In short, the Court is

18  persuaded that MTC has shown by a preponderance of the evidence that its policy on preventive

19  maintenance funding is legitimate and substantially justified.

20      Finally, MTC has shown a substantial legitimate justification for its practice for allocating

21  uncommitted funds.  As described above, RTIP and CMAQ funds are not eligible or suitable for use

22  for operations.  RT  495:5-21; 952:11-953:4; 957:2-24; 958:22-959:10; 959:13-960:12.  STP funds

23  constitute multi-modal capital funds of approximately $65 million per year.  Of that amount, MTC

24  reasonably allocates 50 percent to transit and 50 percent to non-transit uses.  RT 564:25-565:2; Tr.

25  Exs. 1694, 1887, 1094-1097.  Plaintiffs' expert did not opine that additional STP funds should

26  necessarily be shifted from roads to transit, and stated that STP funds would not be the first place he

27  would look.  RT 669:13-23.  Through Partnership Board consensus, priorities are set for all

28  uncommitted funds converted to transit, including the Transportation for Livable Communities

**United States District Court**
For the Northern District of California

1  Program and bicycle needs.  RT 954:20-955:13.  In addition to these programs, STP funds were

2  assigned to congestion management agencies, as well as to regional programs including Translink,

3  the 511 program, the Clean Air program, Lifeline, and regional bicycle and pedestrian programs.

4  RT 954:20-955:13; 669:13-23; Ex. 389, Att. B at 2.  Transit dependent riders from AC Transit

5  benefit from the Lifeline program and the Transportation for Livable Communities program, and the

6  Translink and 511 programs as well as cleaner air benefit all transit riders.

7       The Court sympathizes with the predicament of the members of the Plaintiff Class, who have

8  experienced declines in bus services on which they depend to meet their basic needs, such as getting

9  to school and work safely and on time.  Nonetheless, MTC has met its burden of showing a

10  substantial legitimate justification for the challenged funding practices.  Therefore, the burden shifts

11  back to Plaintiffs to show an equally effective alternative with less racially disproportionate impact.

12  As described below, Plaintiffs have not met this burden.

13       **Equally effective alternative**

14       In their post-trial brief, Plaintiffs offer several alternatives that they believe constitute less

15  discriminatory alternatives.  Although plausible, Plaintiffs did not show by a preponderance of the

16  evidence at trial that these alternatives would be equally effective while causing less racial disparity.

17  First, Plaintiffs argue that MTC could score and rank bus and rail projects together under Resolution

18  3434 based on how well they perform against criteria that have a relationship to improved air

19  quality, cost effectiveness and other regional and statutory objectives.  However, Plaintiffs presented

20  no evidence as to whether this alternative would be equally effective in using Resolution 3434 funds

21  while lessening any racial disparity.

22       Second, Plaintiffs argue that MTC should modify its policy with respect to committed funds

23  to meet some or all of AC Transit's preventive maintenance needs while backfilling the additional

24  capital shortfall out of other funding sources such as STIP/RTIP and CMAQ.  However, there is a

25  limited amount of funds from all sources.  If MTC uses funds from one source to cover AC Transit's

26  operating expenses, there could well be less funding to cover another high-minority operator's

27  needs.  For example, Plaintiffs' expert testified that MTC could use Section 5307 funds to increase

28  the amount of operating money AC Transit receives by shifting funds from other sources.  RT

  
United States District Court
For the Northern District of California

1  485:5-18. He also testified that shifting funds in this way would cause increased capital shortfalls

2  that he believed could be backfilled with other funds, such as STP and RTIP, which he believed

3  should be used for operations rather than capital rehabilitation in order to preserve the existing

4  system. RT 485:19-490:7. Mr. Rubin also suggests that MTC use federal funds first for operations

5  because MTC cannot collect interest on those funds, and then use the remaining funds, which can

6  earn interest, to pay for longer term projects. RT 493:25-494:21.

7          While all the suggestions have potential merit, on balance they did not meet Plaintiffs'

8  burden. For example, whether the amount of interest that could be earned by such an approach

9  would be large enough (depending, as it does on variables outside MTC's control, such as the rate of

10 interest, which currently appears to be at an historic low) to translate into an equally effective

11 alternative was not established. Also, Mr. Rubin did not calculate how much STP funding would

12 need to be used to backfill his proposed Section 5307 funding for operating expenses. RT 558:8-12.

13 In addition, although he acknowledged that STP funds are currently used mostly for road projects,

14 he did not analyze what would happen to projects currently funded by STP. RT 557:11-18. Further,

15 as noted above, he later backed away from advocating shifting STP funds to transit from roads.

16 Also, even though Mr. Rubin suggested that any operator should be able to use Section 5307 flexible

17 funds for all of that operator's operating expenses, he did not study what would happen to the

18 availability of funding sources, such as Section 5307, for other uses if MTC filled even 50% of

19 every operator's preventive maintenance needs with Section 5307 funds. RT 559:2-6. Mr. Rubin

20 acknowledged that the STP funds could not cover the backfilling requirements if every operator

21 sought Section 5307 funds for half of its preventive maintenance eligibility, but he did not think that

22 all operators would seek those funds. RT 559:7-19. This opinion, however, is somewhat

23 speculative, and depends on operators not reconfiguring their budgets to show operating shortfalls, a

24 possibility he acknowledged. Plaintiffs have not made a sufficient showing that this alternative is

25 feasible or equally effective.

26         Third, Plaintiffs argue that MTC can shift the use of uncommitted funds to fund operating

27 shortfalls on an equal footing with capital shortfalls. While it is true that, for example, STP funds

28 can be converted to transit funds and then used for preventive maintenance (RT 277:18-24), MTC

1   has made a legitimate policy decision, in conjunction with the Partnership Board, not to prioritize

2   using STP funds for preventive maintenance and there is no evidence that any other policy would be

3   equally effective and less racially disproportionate.  STP is a multi-modal program whose primary

4   purpose is funding capital rehabilitation and construction of highways, roads and bridges as well as

5   transit, but which may also be used for pedestrian and bicycle facilities.  <u>See</u> Joint Glossary at 16;

6   RT 279:19-22.  Therefore, Plaintiffs' proposal to use most or all of the STP funds for transit

7   operating expenses would not be equally effective in meeting the broader goals of the STP program,

8   much less the overall transportation planning responsibilities of MTC.

9   **Conclusion**

10          Upon consideration of all of the evidence and the parties' arguments at trial and in their post-

11   trial briefs, the Court holds that Plaintiffs have failed to prove disparate impact.  Accordingly,

12   Plaintiffs are not entitled to any relief against MTC.

13   **IT IS SO ORDERED.**

14   Dated: March  27, 2009

15                                                    ELIZABETH D. LAPORTE
                                                     United States Magistrate Judge

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                   90